1

2

3

4

5

6

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

7   FIFTY-SIX HOPE ROAD MUSIC, LTD.;   )
    ZION ROOTSWEAR, LLC; and ROBERT   )
8   MARLEY FOUNDATION, LTD.,          )
                                      )
9          Plaintiffs,                )
                                      )          2:08-CV-00105-PMP-GWF
10   v.                               )
                                      )          ORDER
11   A.V.E.L.A., INC.; LEO VALENCIA; X )
    ONE X MOVIE ARCHIVE, INC.; JEM    )
12  SPORTSWEAR; and CENTRAL MILLS     )
    (FREEZE),                         )
13                                    )
           Defendants.                )
14                                    )
                                      )
15  A.V.E.L.A., INC. and LEO VALENCIA, )
                                      )
16         Counterclaimants,          )
                                      )
17  v.                                )
                                      )
18  FIFTY-SIX HOPE ROAD MUSIC, LTD.   )
    and ZION ROOTSWEAR, LLC,          )
19                                    )
                                      )
20         Counterdefendants.         )
                                      )
21                                    )
                                      )
22

23         Presently before the Court is Defendants' Motion for Summary Judgment (Doc.

24  #113), filed on November 30, 2009.  Plaintiffs filed an Opposition (Doc. #127) on

25  December 18, 2009.  Defendants filed a Reply (Doc. #133) on January 11, 2010.

26  ///

1    Also before the Court is Plaintiffs' Motion for Summary Adjudication on

2  Plaintiffs' False Association Claim Under 15 U.S.C. § 1125(a) (Doc. #114), filed on

3  November 30, 2009.  Defendants filed an Opposition (Doc. #126) on December 18, 2009.

4  Plaintiffs filed a Reply (Doc. #134) and Response to Objections (Doc. #135) on January 11,

5  2010.

6  **I. BACKGROUND**

7    Bob Marley was a world-famous singer, songwriter, performer, and guitarist.

8  (Pls.' Mot. Summ. J. (Doc. #114) ["Pls.' MSJ"], Decl. of Doreen Crujeiras ("Crujeiras

9  Decl.") at 3.)  He has sold millions of albums and has several well-known songs, including

10  "I Shot the Sheriff," "No Woman, No Cry," and "One Love."  (Id.)  Bob Marley died

11  intestate in 1981.  (Id. at 2.)

12    Plaintiff Fifty-Six Hope Road Music, Ltd. ("Hope Road") is named after the

13  location of Bob Marley's residence in Jamaica.  (Id. at 4.)  Hope Road is composed of and

14  owned by Bob Marley's children.  (Id. at 5.)  Hope Road owns U.S. Trademark Registration

15  No. 2,349,361 for "BOB MARLEY" in eleven classes of goods, including t-shirts.  (Pls.'

16  MSJ, Decl. of Jill Pietrini ("Pietrini Decl.") at 2 & Ex. A.)  Hope Road has applied for the

17  trademark "MARLEY" for clothing.  (Pietrini Decl. at 2 & Ex. C.)  Plaintiffs have

18  registered for Marley's publicity rights in several states, including Nevada.  (Pls.' Opp'n to

19  Defs.' Mot. Summ. J. (Doc. #127) ["Pls.' Opp'n"], Ex. K at 117.)

20    In 1999, Hope Road granted Plaintiff Zion Rootswear, LLC ("Zion") an

21  exclusive world-wide license to design, manufacture, and sell t-shirts bearing Marley's

22  image, likeness, and other manifestations of his identity.  (Crujeiras Decl. at 7.)  Hope Road

23  licenses the manufacture of many products bearing the Marley intellectual property,

24  including hats, posters, calendars, key chains, and beach towels.  (Crujeiras Decl. at 7 &

25  Exs. I, J.)  Plaintiffs market these items through websites, an eBay online store, catalogs,

26  and at trade shows.  (Crujeiras Decl. at 4 & Ex. D; Defs.' Opp'n to Pls.' Mot. Summ. J.

1   (Doc. #126) ["Defs.' Opp'n"], Conley Decl. at 2-3.)

2          Hope Road authorizes Zion to use from three to five hundred different

3   photographs of Marley for use on t-shirts.  (Defs.' Mot. Summ. J. (Doc. #113) ["Defs.'

4   MSJ"], Ex. H.)  Zion's 2009 catalog included t-shirts displaying Marley's image and name,

5   but not all t-shirts displayed the words "Marley" or "Bob Marley," or an image of Bob

6   Marley.  (Defs.' MSJ, Ex. I.)  The decision whether to include the words "Bob Marley" or

7   Marley's image on the t-shirts was an artistic decision.  (Defs.' MSJ, Ex. J.)

8          Over the years, Plaintiffs have enforced their rights in the Bob Marley intellectual

9   property, sending out approximately four hundred cease and desist letters and filing over

10  twenty trademark, copyright, and right of publicity suits.  (Crujeiras Decl. at 8-9 & Ex. M;

11  Pls.' MSJ, Ervin Decl. at 3 & Ex. E.)  For example, in March 2004, Plaintiffs learned The

12  Tunes Company, a Florida corporation, was displaying Marley-related goods on its website,

13  and Plaintiffs sent a cease and desist letter.  (Pls.' Opp'n, Ervin Decl. at 3.)

14         Plaintiffs first encountered Defendant A.V.E.L.A., Inc. ("Avela") at the February

15  2005 MAGIC apparel trade show in Las Vegas.  Avela is in the business of publishing and

16  licensing artwork for distribution in the retail marketplace.  (Defs.' MSJ, Valencia Decl. at

17  1.)  Avela collects and restores artwork and images related to classic movies, television

18  programs, and other entertainment.  (Id.)  Defendant Leo Valencia ("Valencia") is the

19  president and owner of Defendants Avela and X One X Movie Archive, Inc. ("X One X").

20  (Id.)  Defendant X One X previously was involved in restoring movie posters and reselling

21  them at auction.  (Pls.' MSJ, Pietrini Decl., Ex. F at 35.)  Avela acts as a licensing agent for

22  X One X.  (Id. at 41.)

23         The parties dispute the circumstances surrounding their first interaction.  The

24  parties agree that Michael Conley ("Conley") of Zion met Valencia at the 2005 MAGIC

25  show, Valencia showed Conley some images, and the two agreed to discuss further a

26  possible licensing arrangement.  However, the parties dispute what was contained in those

images.  According to Conley, none of the images he viewed in Valencia's portfolio depicted Bob Marley.  (Pls.' Opp'n, Bost Decl., Ex. G at 58.)  Likewise, Val Formica ("Formica") of Gateway Licensing, an entity working with Zion, also avers that Valencia did not show him any photographs of Bob Marley.  (Pls.' Opp'n, Formica Decl. at 2.)  Rather, Formica and Conley contend that their discussions with Valencia concerned Zion's potential licensing of Avela's movie-based properties.  (Pls.' Opp'n, Bost Decl., Ex. G at 54-56.)

According to Valencia, Avela's portfolio at the 2005 MAGIC show included certain images of Marley which Avela had obtained from a photographer named Roberto Rabanne ("Rabanne").  (Defs.' MSJ, Valencia Decl. at 1-2; Pls.' MSJ, Ex. H at 79-80.)  Valencia avers that Conley viewed the portfolio including the Marley images.  (Defs.' MSJ, Valencia Decl. at 3.)  However, Kimberly Mileski of Defendant Central Mills, Inc. d/b/a Freeze ("Freeze") testified that she viewed Avela's binder at the 2005 MAGIC show, but it did not contain any Marley images at that time, and the first time Valencia showed her photographs of Marley was in 2007.  (Pls.' Opp'n, Bost Decl., Ex. H at 33-34, 43-44.)  Liza Acuna, Avela's licensing agent, also testified she did not believe Valencia showed or sent to Conley any Marley images at the 2005 MAGIC show or in follow-up emails.  (Pls.' Opp'n, Bost Decl., Ex. I at 286-87.)  After the MAGIC show, the parties continued to discuss a potential licensing arrangement, but no licensing agreement was reached.  (Defs.' MSJ, Valencia Decl. at 2; Pls.' Opp'n, Formica Decl. at 1-2.)

At the same 2005 MAGIC trade show, Zion and Hope Road discovered another company, Legends4Life.com ("Legends"), was displaying a Bob Marley t-shirt.  (Pls.' Opp'n, Ervin Decl. at 2.)  Zion and Hope Road subsequently commenced suit against Legends and several other parties that were offering Marley goods at the 2005 show.  (Id. at 2-3.)  Plaintiffs thereafter filed an application to register the rights of publicity for Bob Marley with the Nevada Secretary of State's Office on January 24, 2006.  (Id. at 4.)

1    In addition to disputing when Avela first displayed to others any Marley

2 photographs, the parties dispute when Avela first obtained the photographs from Rabanne.

3 According to Valencia, he was introduced to Rabanne in 2004. (Defs.' MSJ, Valencia

4 Decl. at 1.)  Rabanne showed Valencia photographs of Bob Marley, which Rabanne stated

5 he took with Bob Marley's permission.  (Id.)  Rabanne agreed to allow the Marley images

6 to be used in Avela's portfolio to see if any potential licensees were interested in using the

7 photos.  (Id.)  According to Valencia, Rabanne repeatedly told him both orally and in

8 writing that Bob Marley had given Rabanne express permission to sell the photographs and

9 to use them in merchandising products such as t-shirts and posters.  (Id. & Ex. D; Pls.' MSJ,

10 Pietrini Decl., Ex. G at 105, Ex. S at 335-36, 361.)

11    However, Rabanne testified that he first met Valencia in June 2006, about a

12 month before he signed a July 2006 contract with Valencia.  (Pls.' Opp'n, Bost Decl., Ex. A

13 at 54-55.)  Rabanne denies he met Valencia in 2004.  (Id. at 55.)  According to Rabanne,

14 after litigation commenced in another lawsuit involving the Marley photographs, Valencia

15 sent him contracts dated 2003 and 2004.  (Id. at 123-24.)  Rabanne testified that Valencia

16 sent him these contracts because Valencia "needed to backdate the actual contract" that

17 Valencia and Rabanne originally had signed in an effort to show Valencia and Rabanne's

18 relationship dated back to 2003 or 2004.  (Id. at 124; see also Pls.' Opp'n, Bost Decl., Ex.

19 B.)  Rabanne declined to sign the documents.  (Pls.' Opp'n, Bost Decl., Ex. A at 125-26.)

20    Rabanne also denied that he told Valencia that Bob Marley had approved

21 Rabanne's use of the photos for merchandising other products.  According to Rabanne,

22 Valencia "coached" him to say that Marley was aware that Rabanne sold photos of Marley.

23 (Pls.' Opp'n, Bost Decl., Ex. C at 82-83.)  According to Rabanne, Marley never actually

24 saw Rabanne selling pictures, but it was Rabanne's impression that Marley knew he was

25 selling pictures.  (Id.)  Further, Rabanne testified that he did not sell t-shirts or posters when

26 Marley was alive, and hence Marley did not approve of that use for any of Rabanne's

1    photographs.  (<u>Id.</u> at 87-88.)  Rather, Rabanne sold only fine art prints during that time.

2    (<u>Id.</u>)

3         According to Avela's former counsel, Gregg Paradise ("Paradise"), Valencia first

4    requested he do work related to the Marley rights in August 2006.  (Pls.' Opp'n, Bost Decl.,

5    Ex. E at 38-39; Pls.' MSJ, Pietrini Decl., Ex. T.)  Paradise understood that Valencia was

6    looking into marketing t-shirts depicting Marley photographs, and that the t-shirts were not

7    in the marketplace at that time.  (Pls.' Opp'n, Bost Decl., Ex. E at 39-40.)

8         In the fall of 2006, Valencia discussed a possible licensing agreement with Rohan

9    Marley ("Rohan"), one of the Marley children.  (Pls.' MSJ, Pietrini Decl., Ex. V.)

10   According to Valencia, he discussed with Rohan only a possible license to use the words

11   "Bob Marley," but he was not seeking a licence to use Marley images on apparel.  (Defs.'

12   Opp'n, Valencia Decl. at 4.)  According to Rohan, Valencia mentioned that he wanted to

13   produce t-shirts to mass market retailers, but Rohan indicated the Marleys were not

14   interested in mass market sales.  (Pls.' Opp'n, Bost Decl., Ex. F at 102-03.)  According to

15   Rohan, Valencia responded that he came to the family out of respect, but that if the family

16   did not want to participate, Valencia could market the t-shirts without them.  (<u>Id.</u>)  Rohan

17   asked Valencia how he could do that, to which Valencia replied that he could do it in

18   certain territories, including Las Vegas, without the family's permission.  (<u>Id.</u>)  No licensing

19   agreement was reached between Rohan and Valencia.

20        On February 7, 2007, Plaintiffs filed a complaint and sought a temporary

21   restraining order against Fame Jeans, Inc. ("Fame"), Avela, and Valencia for trademark and

22   rights of publicity infringement.  (Crujeiras Decl. at 9; Pls.' MSJ, Ervin Decl, Ex. A.)  The

23   suit alleged Fame, Avela, and Valencia were marketing Marley products without a license

24   at the 2007 MAGIC trade show in Las Vegas.  (Pls.' MSJ, Ervin Decl., Ex. A.)  This Court

25   granted an ex parte motion for temporary restraining order.  (Pls.' MSJ, Ervin Decl., Ex. B.)

26   During the parties' settlement negotiations, Fame stated it never made any Bob Marley

1   related products, and it displayed only one Marley photograph at the 2007 MAGIC trade

2   show, which Fame had licensed from Avela.  (Crujeiras Decl. at 9.)  Fame did not take any

3   orders for a Marley product, and agreed it would not make any such products in the future.

4   (Id.)  Plaintiffs contend they believed the Fame incident was the extent of Avela's and

5   Valencia's use of Marley-related images.  (Id.)  Plaintiffs thereafter dismissed the 2007

6   lawsuit without prejudice.  (Pls.' MSJ, Ervin Decl., Ex. D.)

7         Fame was not Avela's only customer for Marley-related products, however.

8   Avela licensed Marley images to Defendants Jem Sportswear ("Jem") and Freeze, as well

9   as others not named as defendants in this suit.  (Defs.' MSJ, Valencia Decl. at 2.)  In mid-

10   January 2008, Plaintiffs learned Avela and Valencia were licensing the Rabanne

11   photographs of Marley to different manufacturers who were selling Marley products

12   through retailers such as Target and Wet Seal.  (Crujeiras Decl. at 10.)

13         Target listed for sale on its website a t-shirt identified as "Marley Vintage Tee,"

14   and another as "Licensed Black Marley Raibow [sic] Monster Tee."  (Defs.' MSJ, Ex. G.)

15   At stores, Target listed the product on shelf labels identifying the item as "Bob Marley

16   black."  (Pls.' MSJ, Pietrini Decl., Ex. N at 97-98.)  According to Target buyer Elizabeth

17   Kinneberg, Target used these designations as "the item description, which is just that

18   general description," and as "just a descriptor of who's on the t-shirt."  (Id. at 54, 57-58.)

19   Both shirts contain an image of Marley, but do not contain any graphic text.  (Defs.' MSJ,

20   Ex. G.)  The t-shirts' neck tags have Avela logos.  (Pls.' MSJ, Pietrini Decl., Ex. N at 100-

21   01.)  Target obtained the shirts from Jem, and sold the shirts from October 2008 to the

22   summer of 2009.  (Id. at 57, 59-61, 95, 99 & Dep. Ex. 185.)

23         Wal-Mart advertised on its website several Marley "hoodies" and t-shirts.  (Defs.'

24   MSJ, Ex. G.)  The hoodies and t-shirts displayed images of Marley.  (Id.)  Two t-shirts also

25   displayed words, but the shirts do not display the name Bob Marley.  (Id.)  Wal-Mart

26   advertised these products as "Bob Marley - Men's Zip Hoodie," "Jimi Hendrix Bob Marley

- Big Men's Mock-Layer Tee," "Bob Marley - Men's Short-Sleeve Graphic Tee," and "Bob Marley - Men's Mock-Layer Tee."  (Id.)

Wet Seal advertised on its website a "Bob Marley Rasta Tee," a "Marley Concert Tank," and a "Bob Marley Peace Tee."  (Pls.' MSJ, Ex. O.)  One of these shirts contained only Marley's image.  (Id.)  Another displayed his image along with the words "Stand Up" and "Stand Up for Your Rights," which are words from a Marley song.  (Id.; Pls.' Reply (Doc. #134), Supplemental Bost Decl., Ex. E at 54.)  The third shirt contained a Marley image and the words "Peace" and "Love."  (Pls.' MSJ, Ex. O.)

Another retailer, Balzout, sold t-shirts containing Bob Marley's image as well as the words "One Love," a Marley song title, and "Catch a Fire," a Marley album title.  (Pls.' Reply, Supplemental Bost Decl., Ex. A at 64-66, 108-09.)  The House, Inc. sold boxer shorts with the song title "Soul Revolution" and a Marley image.  (Id., Ex. C at 43-45.)

According to Valencia, Avela "takes careful steps to make sure that in licensing or otherwise using images and artwork it does not infringe others' intellectual property rights."  (Defs.' MSJ, Valencia Decl. at 1.)  Valencia researched the United States Patent and Trademark Office registrations prior to any manufacture of products using the Marley images, and found Plaintiffs' registration for the trademark "BOB MARLEY."  (Id. at 2-3.)  Valencia avers that due to this registration, Avela made it clear to its licensees that no items ever could be sold with the words MARLEY or BOB MARLEY on the product.  (Id. at 3.)  Avela had an approval process for any licensed items using the Marley images, and Avela disapproved an item proposed by Freeze because it contained the words "Bob Marley."  (Id. & Ex. E.)  According to Valencia, Avela never has received a complaint or correspondence indicating there has been consumer confusion in the marketplace as to the source, origin, affiliation, or sponsorship of any of Defendants' licensed products bearing the Marley images.  (Valencia Decl. at 3.)

///

However, Plaintiffs retained an expert in this case, E. Deborah Jay ("Jay") of Field Research Corporation, who conducted a survey in August 2009 of potential purchasers of graphic t-shirts. (Pls.' MSJ, Pietrini Decl., Ex. DD.) The survey's purpose was "to determine whether potential purchasers of graphic or screened T-shirts are likely to mistakenly believe that the heirs, estate or agents of Robert Nesta Marley ('Bob Marley') are the source or the sponsor of, or are affiliated with, A.V.E.L.A. T-shirts bearing Bob Marley's image." (Id. at 402.) Jay conducted 509 face-to-face interviews with potential graphic t-shirt purchasers. (Id.) Jay split the group into a control group, which was shown a fictitious Avela t-shirt bearing the image of an unknown African-American male with dreadlocks, and a test group, which was shown an actual Avela t-shirt bearing Marley's image. (Id. at 402-03.) Both t-shirts contained the Avela neck label, stated that the designs were the property of X One X, and indicated a 1976 copyright for Rabanne. (Id. at 403.)

Jay had the respondents look at either the test or control t-shirt, and then interviewers posed a series of questions about the shirt. Interviewers asked who the respondents thought made the t-shirt, whether the respondents thought the t-shirt makers received permission from anyone else to make the t-shirt, and whether the respondents thought the t-shirt maker produces something other than t-shirts. (Id. at 403-04.) Neither the interviewers nor the respondents were told the name of Jay's client or that the survey was being used in connection with litigation. (Id. at 404.)

When asked who made or put out the t-shirt, seventeen percent of the test group answered Avela or X One X and nine percent stated Bob Marley or the person on the t-shirt.[1] (Id. at 418.) In the control group, twenty-two percent answered Avela, and two percent answered Marley or the person on the shirt. (Id.) When asked whether the t-shirt

---

[1] Other answers included Hot Topic, Spencer's, or other retailers such as Wal-Mart or Target. Twenty-nine percent of the test group answered they did not know. Thirty-four percent of the control group answered they did not know.

maker received permission from someone to put out the t-shirt, of those who said yes, thirty-seven percent of the test group answered Bob Marley or the person on the shirt, whereas twenty percent of the control group answered Marley or the person on the shirt. (Id. at 419.)  Forty-one percent of the respondents in the test group and fifty-nine percent of the respondents in the control group answered that the t-shirt maker did not have to receive approval from anyone or the respondents had no opinion on the question.  (Id.)  Overall, forty-two percent of the test group said Marley or the person on the shirt was the source or sponsor of the shirt, while twenty-two percent of the control group thought so.  (Id. at 420.) These results led Jay to conclude that forty-two percent of respondents in the test group mistakenly believed Marley, his heirs, or the person on the shirt were the source or sponsor of the t-shirt.  (Id. at 422.)  The comparable percentage for the control group was twenty-two percent.  (Id.)  Jay thus concluded that twenty percent of the test group was confused as to source of the actual Avela t-shirt because it bears Marley's image.  (Id.)  Jay opined there is a likelihood of confusion as to the source or sponsor of the Avela t-shirts due to the use of Marley's image thereon.  (Id.)

Upon discovering the shirts on sale at Target, Plaintiffs initiated this action in this Court on January 23, 2008, against Avela and Valencia.  (Compl. (Doc. #1).)  Plaintiffs also moved ex parte for a temporary restraining order.  The Court ordered the motion served, held a hearing, and denied the motion for temporary restraining order and the motion for preliminary injunction.  Avela and Valencia answered and asserted counterclaims for interference with contractual relations, interference with prospective economic advantage, declaratory judgment of non-infringement, and cancellation of trademarks.[2]  (Ans. & Countercl. (Doc. #23).)  On December 29, 2008, Plaintiffs amended their Complaint, adding X One X, Jem, and Freeze as defendants.  (Am. Compl. (Doc. #61).)  Plaintiffs

---

[2]  Avela and Valencia also asserted counterclaims for Nevada unfair trade practices and Sherman Act violations, but later agreed to dismiss these claims.  (Doc. #41, #42.)

assert in their Amended Complaint claims for trademark infringement under the Lanham
Act (count one); unfair competition under the Lanham Act (count two); common law
trademark infringement (count three); unauthorized commercial use of right of publicity
under Nevada law (count four); and intentional interference with prospective economic
advantage (count five).

Defendants now move for summary judgment on all of Plaintiffs' claims.
Defendants argue they are entitled to summary judgment on Plaintiffs' trademark and unfair
competition claims because Plaintiffs own the trademark in the words "Bob Marley" and
Defendants do not use those words on any of their products.  Defendants contend Plaintiffs
do not own a trademark in Marley's image or any particular photograph of Marley, and
Plaintiffs do not make consistent use of any single Marley image as a trademark.
Defendants also argue they do not use Marley's image as a source indicator, and thus their
use does not constitute trademark use.

As to Plaintiffs' right of publicity claim under Nevada law, Defendants argue
Plaintiffs waived any right of publicity by failing to timely register their rights in Nevada.
Defendants also argue their use pre-dated Plaintiffs' registration, and hence statutorily
Plaintiffs cannot assert their publicity rights against Defendants.  Defendants contend the
Nevada statute does not grant rights to persons who died before the act was passed.  Finally,
Defendants assert the intentional interference claim fails because it is based on the
trademark and right of publicity claims.

Plaintiffs respond that they have a trademark right in Marley's identity and
persona.  Plaintiffs also argue that even if the respective mark is only Bob Marley's name, a
genuine issue of material fact remains that Defendants have used Marley's name to
advertise the t-shirts and that such use does not constitute fair use.  Plaintiffs also argue
Marley's image is the same as his name under the doctrine of equivalents.  As to the right of
publicity claim, Plaintiffs argue they need not register with Nevada within six months of

any unauthorized use.  Rather, they must do so only within six months of a particular defendant's unauthorized use.  Plaintiffs further argue they registered their claim within six months of their knowledge of unauthorized use in Nevada by Legends at the August 2005 MAGIC show, and thus their registration was timely even under Defendants' interpretation of the statute.  Plaintiffs also contend the Nevada statute applies to celebrities who died prior to the statute's enactment.

Plaintiffs also move for summary judgment, but only as to count two, unfair competition under the Lanham Act for designation of false origin or association.  Plaintiffs argue they own the rights in Marley's identity, Plaintiffs consistently have used his image and likeness to market apparel and other merchandise for many years, and Plaintiffs have policed others' attempts at using Marley's image or likeness.  Plaintiffs further argue Defendants have sold Marley images, including images with Marley song and album titles and lyrics, to others to place on t-shirts and beach towels.  Plaintiffs argue that Defendants' conduct of using Marley's image and likeness on the same products for which Plaintiffs use the images and likeness falsely associate Defendants' products with Plaintiffs.  Plaintiffs contend the survey results show a likelihood of confusion as to the source or affiliation of Defendants' t-shirts with Plaintiffs.

Defendants respond that Plaintiffs did not plead in their Amended Complaint a false association claim, and Plaintiffs should not be able to amend their Amended Complaint at summary judgment.  Defendants further argue that even if the Amended Complaint could be construed to have a false association claim, a Lanham Act claim still requires Plaintiffs to make a trademark use of Marley's image, which Plaintiffs have not done because Plaintiffs do not consistently use any particular image of Marley on their products.  Defendants also argue that this is not a right of publicity case under the Lanham Act, because those cases all concern the situation where the defendant used the celebrity's image to falsely portray the image that the celebrity endorsed the product.  Defendants

contend they did not use Marley's image in commercial advertising to promote the product. Defendants also argue there is no evidence in this case of actual customer confusion, and the survey does not sufficiently raise issues of fact on confusion.

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002). Initially, the moving party bears the burden of proving there is no genuine issue of material fact. Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002). After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial. Id. The Court views all evidence in the light most favorable to the non-moving party. Id.

## III.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. #113)

### A.  Count One - Trademark Infringement - 15 U.S.C. § 1114 & Count Three - Common Law Trademark Infringement

In count one of Plaintiffs' Amended Complaint, Plaintiffs allege Defendants have used in commerce merchandise bearing the "Marley Intellectual Property," and thus have infringed on the federally registered trade mark "BOB MARLEY." The Amended Complaint defines "Marley Intellectual Property" as "including but not limited to" (1) common law rights in the name Bob Marley in association with music and entertaining and merchandise promoting the same; (2) the federally registered BOB MARLEY mark; and (3) the Nevada registered rights of publicity. The parties dispute whether Plaintiffs can claim a

1    mark in all depictions of Marley, whether Marley's picture is the equivalent of the mark on

2    his name, whether Defendants used the BOB MARLEY mark, and if so, whether

3    Defendants' use of Marley's name is fair use.

4              1.  The Mark

5         Title 15 U.S.C. § 1114 provides for a private right of action in favor of a

6    trademark registrant against "[a]ny person who shall, without the consent of the registrant"–

7              (a) use in commerce any reproduction, counterfeit, copy, or
     colorable imitation of a registered mark in connection with the sale,
8    offering for sale, distribution, or advertising of any goods or services
     on or in connection with which such use is likely to cause confusion, or
9    to cause mistake, or to deceive; or
              (b) reproduce, counterfeit, copy, or colorably imitate a
10   registered mark and apply such reproduction, counterfeit, copy, or
     colorable imitation to labels, signs, prints, packages, wrappers,
11   receptacles or advertisements intended to be used in commerce upon or
     in connection with the sale, offering for sale, distribution, or
12   advertising of goods or services on or in connection with which such
     use is likely to cause confusion, or to cause mistake, or to deceive.

13

14   A "trademark" means "any word, name, symbol, or device, or any combination thereof"

15   which a person uses "to identify and distinguish his or her goods . . . from those

16   manufactured or sold by others and to indicate the source of the goods."  15 U.S.C. § 1127.

17   A trademark thus is "a limited property right in [a] particular word, phrase, or symbol . . .

18   that is used to identify a manufacturer or sponsor of a good or the provider of a service."

19   Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792, 806 n.12 (9th Cir. 2003) (quotation

20   and internal citation omitted).  The limited purpose of the Lanham Act's trademark

21   protection is "to avoid confusion in the marketplace by allowing a trademark owner to

22   prevent others from duping consumers into buying a product they mistakenly believe is

23   sponsored by the trademark owner."  Id. at 806 (quotation and alteration omitted).

24         To prevail on a trademark claim, a plaintiff must show that the alleged mark at

25   issue is a cognizable trademark, i.e., that the public recognizes the symbol as identifying the

26   plaintiff's goods or services and distinguishes those goods or services from those of others.

Comedy III Prods., Inc. v. New Line Cinema, 200 F.3d 593, 594-95 (9th Cir. 2000).  A plaintiff may meet this burden by showing either that its symbol is inherently distinctive, or that even if not inherently distinctive, the symbol has become distinctive through the acquisition of secondary meaning.  Id.  If the plaintiff establishes it has a cognizable mark, it then must show the defendant's use of the plaintiff's trademark is "likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of the two products."  Mattel, Inc., 353 F.3d at 807 (quotation omitted).

Plaintiffs' registered mark consists of the words BOB MARLEY.  Plaintiffs also contend, however, that their mark consists of any visual depiction of Marley.  Every court to consider the issue has held there is no cognizable trademark in every single photograph ever taken of a famous person.  For example, in ETW Corp. v. Jireh Publishing, Inc., the plaintiff owned the exclusive licensing rights to exploit Tiger Woods' name, image, likeness, and signature.  332 F.3d 915, 918 (6th Cir. 2003).  The plaintiff owned a registered trademark for the mark "TIGER WOODS."  Id.  The defendant published a painting entitled "The Masters of Augusta," which commemorated Woods' victory at the Masters Tournament.  Id.  The painting depicted Woods in three different poses, and included the likenesses of famous golfers of the past looking down on Woods.  Id.  The limited edition prints of the painting were enclosed in a white envelope, which contained the words "Tiger Woods" under the flap on the back of the envelope.  Id. at 918-19.  Woods' name also appeared in a narrative description of the painting.  Id. at 918.

In reviewing the plaintiff's Lanham Act trademark claim, the United States Court of Appeals for the Sixth Circuit rejected as "untenable" the plaintiff's claim of trademark protection "for any and all images of Tiger Woods."  Id. at 922.  As the Sixth Circuit put it, the plaintiff--

> asks us, in effect, to constitute Woods himself as a walking, talking trademark.  Images and likenesses of Woods are not protectable as a trademark because they do not perform the trademark function of

15

> designation.  They do not distinguish and identify the source of goods.
> They cannot function as a trademark because there are undoubtedly
> thousands of images and likenesses of Woods taken by countless
> photographers, and drawn, sketched, or painted by numerous artists,
> which have been published in many forms of media, and sold and
> distributed throughout the world.  No reasonable person could believe
> that merely because these photographs or paintings contain Woods's
> likeness or image, they all originated with Woods.

Id.  The Sixth Circuit thus held that "as a general rule, a person's image or likeness cannot function as a trademark," except perhaps in the limited circumstance where one specific photograph consistently is used as a mark.  Id. at  922-23.

The Second Circuit reached a similar conclusion in Pirone v. MacMillan, Inc., 894 F.2d 579 (2d Cir. 1990).  In that case, Babe Ruth's daughter brought suit against the publisher of a baseball calendar which included three photographs of Babe Ruth.  Id. at 581. Ruth's daughter did not claim any ownership in the particular photographs, but instead objected to the use of Ruth's likeness, arguing she owned a trademark in Ruth's likeness, even though the registered mark was only for the words "BABE RUTH."  Id.  The Second Circuit rejected this claim:

> Although its registration is limited to the words "Babe Ruth," Pirone
> would have us read her rights in that word mark to include every
> photograph of Ruth ever taken.  We decline to do so.
>            . . . Pirone's position finds support in neither precedent nor
> common sense.  Every case in which the owner of a word mark
> received protection against infringing use of a picture mark, or vice
> versa, involved a true picture mark, a single pictorial representation
> used repeatedly as an indication of origin. . . .
>            Unlike a stylized flying horse or similar picture marks, an
> individual's likeness is not a consistently represented fixed image–
> different photographs of the same person may be markedly dissimilar.
> Thus a photograph of a human being, unlike a portrait of a fanciful
> cartoon character, is not inherently "distinctive" in the trademark sense
> of tending to indicate origin.

Id. at 583.  The Second Circuit noted that a person's photograph may be a valid trademark "if, for example, a particular photograph was consistently used on specific goods."  Id.  But "[w]hatever rights Pirone may have in the mark 'Babe Ruth,' [the defendant's] use of

Ruth's name and photographs can infringe those rights only if that use was a 'trademark use,' that is, one indicating source or origin.  As the district court correctly determined, there was no 'trademark use' here."  Id.; see also Estate of Presley v. Russen, 513 F. Supp. 1339, 1363-64 (D.N.J. 1981) (rejecting a claim by Elvis Presley's estate that his image and likeness was a valid mark, except for one particular image of Presley that consistently had been used in the advertising and sale of Elvis Presley entertainment services to identify those services).

Consistent with the above case law, Plaintiffs' registered mark BOB MARLEY does not grant Plaintiffs a trademark in any and all photographs of Marley.  The evidence in the record shows Plaintiffs use hundreds of different photographs of Marley on t-shirts and other merchandise.  Thus, no single picture represents a Marley mark for Plaintiffs which would act as a source identifier that is the equivalent to the word mark BOB MARLEY.  Plaintiffs' trademark claims in this case thus are limited to the registered word mark BOB MARLEY.

### 2.  Picture Equivalent

Plaintiffs argue that a picture can be the equivalent of a word mark and thereby be entitled to trademark protection.  Defendants respond that the name of a celebrity as a trademark does not equate with every single photo ever taken of that celebrity.

Some courts have held that a picture can be the equivalent of a registered word mark.  For example, in Mobil Oil Corp. v. Pegasus Petroleum Corp., the Second Circuit considered whether Mobil's use of a flying horse symbol was infringed by another company calling itself Pegasus Petroleum.  818 F.2d 254, 255-56 (2d Cir. 1987).  The Second Circuit concluded that while "words and their pictorial representations should not be equated as a matter of law, a district court may make such a determination as a factual matter."  Id. at 257; see also Beer Nuts, Inc. v. King Nut Co., 477 F.2d 326, 329 (6th Cir. 1973) (holding that picture of overflowing stein of beer on nuts package infringed on "BEER NUTS" word

mark).

While in some cases a word and its pictorial depiction may be equivalent, there is no genuine issue of material fact that the Marley pictures are not the equivalent of the registered word mark BOB MARLEY. The pictorial equivalent cases are limited to a true picture mark consisting of a single pictorial representation used repeatedly as an indication of origin. In the case of a human being, a picture of the person and the word mark are equivalent only if the same picture consistently is used as a source indicator. Because, as discussed above, Plaintiffs did not use a single picture of Marley as a source indicator, any and all pictures of Marley are not the pictorial equivalent of the word mark BOB MARLEY as a matter of law.

### 3. Use of the BOB MARLEY Mark

As a result of the above discussion, Defendants' use of Marley's image is not actionable under trademark law. However, Plaintiffs contend Defendants used the BOB MARLEY word mark in connection with advertising the products, such as on websites and on store signage. Defendants respond that they did not use the mark, the retailers did, and any such use is fair use of the mark to describe Defendants' product, and not as a source indicator.

No genuine issue of material fact remains that Defendants did not use the registered word mark BOB MARLEY. The evidence in the record indicates that retailers such as Target or Wet Seal used the words "Bob Marley" to describe the product. However, Plaintiffs have presented no evidence that Defendants used the word mark on any product or advertisement. The only evidence Plaintiffs present of Defendants' use of Marley's name consists of an unauthenticated, unidentified document, which appears to be an internal Jem sales analysis report. (Pls.' Opp'n, Ex. N.) This document, even if admissible, would not raise a genuine issue of fact as to trademark infringement because Jem's use of the Marley name on an internal sales report does not show Jem used the mark

as a source indicator.  Additionally, the internal sales report would not cause any customer confusion as there is no evidence it ever was shown to a customer.  Because Plaintiffs present no evidence raising a genuine issue of material fact that Defendants used the BOB MARLEY mark, and the word mark is the only viable trademark at issue in this case, the Court will grant Defendants' motion for summary judgment on counts one and three of Plaintiffs' Amended Complaint.

**B.  Count Two - Unfair Competition Under 15 U.S.C. § 1125(a)**

As discussed more fully below with respect to Plaintiffs' motion for summary judgment, the Court will deny Defendants' motion for summary judgment on this claim.

**C.  Count Four - Nevada Rights of Publicity**

Defendants argue Plaintiffs have waived any rights to publicity they may have in the State of Nevada because they did not timely register their claim as required under the Nevada statute.  According to Defendants, Plaintiffs learned of unauthorized activity in Nevada as early as 2001, but did not register until January 2006.  Defendants contend that because the statute requires registration within six months of an unauthorized use, Plaintiffs failed to timely register.  Defendants also argue that even if Plaintiffs are correct that registration is required within six months of a particular defendant's use, Plaintiffs knew of Defendants' use as early as February 2005, and thus their January 2006 registration is untimely.  Defendants further contend that their use pre-dates Plaintiffs' registration, and thus Plaintiffs cannot preclude their use under the Nevada statute.  Finally, Defendants argue that the statute does not apply to individuals who died before the statute was enacted.

Plaintiffs respond that Defendants are misreading the statute, and that it does not require registration within six months of the first unauthorized use or rights are forever waived.  Rather, Plaintiffs argue, they need register only within six months of a particular unauthorized use.  Plaintiffs contend an issue of fact remains as to when they first learned of Defendants' use, as they dispute that Avela and Valencia even possessed Marley photos

1   in February 2005, much less showed them at the MAGIC show.  Plaintiffs also dispute they

2   knew of infringing activity in Nevada as early as 2001 because the evidence in the prior

3   case showed only that Plaintiffs were aware of infringing activity outside the state, and such

4   activity would not trigger the registration requirement in Nevada.

5          Nevada has enacted a statutory cause of action for the unauthorized use of a

6   person's rights of publicity in his or her name, voice, signature, photograph, or likeness.

7   Nev. Rev. Stat. § 597.770 et seq.  The right of publicity "endures for a term consisting of

8   the life of the person and 50 years after his death, regardless of whether the person

9   commercially exploits the right during his lifetime."  Nev. Rev. Stat. § 597.790(1).  Others

10  cannot make commercial use of a person's rights of publicity without written consent of the

11  person or his successor in interest absent a few exceptions not relevant here.  Id.

12  § 597.790(2).  "Commercial use" means using the person's name, voice, signature,

13  photograph or likeness "on or in any product, merchandise or goods or for the purposes of

14  advertising, selling or soliciting the purchase of any product, merchandise, goods or

15  service."  Id. § 597.770(1).  The statutory provisions "apply to any commercial use within

16  this state of a living or deceased person's name, voice, signature, photograph or likeness

17  regardless of the person's domicile."  Id. § 597.780.

18          A successor in interest or a licensee of a deceased person may register their claim

19  to the deceased person's publicity rights by filing an application with Nevada's Secretary of

20  State.  Id. § 597.800(3).  The registration serves a notice function, as the statute requires

21  others wishing to make commercial use of a deceased person's publicity rights first to make

22  a reasonable, good faith effort to discover the identity of anyone who qualifies as a

23  successor in interest to the deceased person.  Id. § 597.800(5).  The statute places

24  consequences on the failure to register.  A successor in interest of a deceased person may

25  not assert any right against any unauthorized commercial use of the deceased person's

26  publicity rights that begins before the successor has filed an application to register his

20

claim.  Id. § 597.800(4).  Moreover,

> [a] person claiming to be a successor in interest to a deceased person
> must, within 6 months after the date he becomes aware or should
> reasonably have become aware of an unauthorized commercial use of
> the deceased person's name, voice, signature, photograph or likeness,
> register a claim with the Secretary of State pursuant to subsection 3.
> Failure to register shall be deemed a waiver of any right of publicity.

Id. § 597.800(5).

### 1.  Timely Registration

The parties dispute the statute's meaning, specifically the provision which requires the timely registration within six months of an unauthorized use.  Defendants contend that the statute requires registration within six months of any unauthorized use by any person, or all rights to publicity in Nevada are waived forever.  Plaintiffs argue the statute requires registration within six months of any particular use, or the rights are waived only with respect to that particular use.

Nevada has not addressed this issue.  "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it."  Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007) (quotation omitted).  "In answering that question, this court looks for 'guidance' to decisions by intermediate appellate courts of the state and by courts in other jurisdictions."  Id. (quotation omitted).

Under Nevada law, statutory construction is a question of law for the Court.  Richardson Constr., Inc. v. Clark County Sch. Dist., 156 P.3d 21, 23 (Nev. 2007).  The Court should construe the statute to give effect to the Legislature's intent.  Id.  The Court begins with the statute's plain statutory language, giving effect to any unambiguous language.  Id.  If the statutory language is ambiguous, the Court must "examine the statute in the context of the entire statutory scheme, reason, and public policy to effect a construction that reflects the Legislature's intent."  Id.

By the statute's plain language, a successor in interest to a deceased person "must" register their claim within six months of the date he became aware or reasonably should have become aware of an unauthorized commercial use.  Failure to do so waives "any" right of publicity.  Thus, upon discovering an unauthorized use by anyone, a successor must register within six months or forever waive his claim to publicity rights in the deceased person.  Registration is permissive until the successor learns of an unauthorized use, at which point it becomes mandatory or the successor waives the claim to publicity rights in Nevada.  The statutory scheme fosters certainty in the claims surrounding publicity rights of a deceased person.  It encourages early registration by prohibiting a successor from asserting rights against a use that began before registration.  And it encourages registration upon learning of an unauthorized use by tying forfeiture of the right to a failure to register.  The statute thus encourages registration both to protect successors' rights, and to give potential users notice of prohibited uses.

However, the registration requirement is not triggered by a use outside of the State.  Although § 597.800(5) references "an" unauthorized use, which does not clearly limit it to Nevada, § 597.780 provides that the right of publicity statutory provisions "apply to any commercial use within this state . . . ."  Consequently, the unauthorized use triggering the registration requirement must be in Nevada.

Plaintiffs filed their registration on January 24, 2006.  To avoid forfeiture of their publicity rights in Nevada, Plaintiffs must not have been aware, nor reasonably should have been aware, of an unauthorized use of Marley's rights in Nevada prior to July 26, 2005. Genuine issues of material fact remain as to when Plaintiffs first became aware of an unauthorized use in Nevada.  Defendants have presented evidence that Plaintiffs were aware of internet advertisements by Florida-based companies as early as 2001 and 2004. Whether such internet activity constitutes a use "within" Nevada of which Plaintiffs were aware or reasonably should have been aware is a question of fact for the jury.  Defendants

also have presented evidence that Valencia showed Plaintiffs' representatives the Marley

photos in February 2005.  However, Plaintiffs present evidence that the images they viewed

in February 2005 did not include any Marley images.  Plaintiffs also present evidence those

images could not have included Marley images because Rabanne testified he did not even

meet Valencia until July 2006.  Genuine issues of material fact therefore remain as to when

Plaintiffs first discovered or reasonably should have discovered an unauthorized use in

Nevada.

For these same reasons, genuine issues of material fact also remain as to whether

Defendants' use of the Marley images began before Plaintiffs' registration.  Plaintiffs

present evidence Defendants did not even meet Rabanne until six months after Plaintiffs'

registration, and thus could not have been using the Marley photos on merchandise prior to

Plaintiffs' registration.

2.  Application to Persons Who Died Before the Statute was Enacted

Defendants argue that even if Plaintiffs timely registered their rights of publicity,

the statute does not apply to a person who died before Nevada enacted the statute.

Defendants argue retroactive application of the statute would be inappropriate.  Plaintiffs

respond that by the statute's plain language, and by the Legislature's intent, it applies to

persons who pre-deceased enactment.  Plaintiffs also argue the retroactivity argument is a

red herring, as the statute was enacted long before Defendants' alleged unauthorized use,

and hence is not an attempt to retroactively apply the law to Defendants' conduct.

Nevada's statute states that it applies to "any commercial use within this state of

a living or deceased person's name, voice, signature, photograph or likeness regardless of

the person's domicile."  Nev. Rev. Stat. § 597.780.  Because the statute applied to a

deceased person upon enactment, it would apply to persons who were deceased prior to

enactment.  This understanding is supported by the legislative history, which discussed

Orson Welles' estate's difficulty policing the use of his image following his death, and that

this bill would stop such activity.  (Mins. of the S. Comm. on Commerce & Labor, 65th Sess. June 2, 1989.)  Liberace and Elvis Presley also were referenced, including the potential impact of the bill on impersonators of already-deceased celebrities like Elvis Presley.  (Id.; Mins. of the Assembly Comm. on Commerce, 65th Sess., June 16, 1989.)

The history of the California statute, California Civil Code § 3344.1, after which the Nevada statute was patterned, also supports this conclusion.  After two courts ruled that California's statute did not apply to celebrities who already were dead upon enactment,[3] California's legislature quickly enacted a clarification that made it clear that the statute in fact did apply to pre-deceased celebrities, and always was meant to so apply to those individuals.  See Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., No. CV 05-02200 MMM (MCx), 2008 WL 655604, at *2 (C.D. Cal. Jan. 7, 2008) (unpublished).  In ruling on a motion for reconsideration in one of those cases following the legislature's action, the United States District Court for the Central District of California specifically held this was a "clarification" stating what the law always was, not an amendment to change the statute's original meaning.  See id. at *4-13 ("In sum, in passing SB 771, the 2007 California legislature clearly expressed an intent to clarify § 3344.1 as originally enacted.").  Nevada's statutory language already states that it applies to deceased persons, and as it was patterned after California's statute, Nevada need not adopt a clarifying amendment to make clear that it likewise always has intended its statute to apply to persons who died before enactment.

///

_____

[3] Shaw Family Archives Ltd. v. CMG Worldwide, Inc., 486 F. Supp. 2d 309, 314 (S.D.N.Y. 2007) (holding that because California statute post-dated Marilyn Monroe's death, she had no celebrity rights under California law to bequeath at her death); Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., No. CV 05-02200 MMM (MCx), 2008 WL 655604, at *1 (C.D. Cal. 2008) (unpublished) (reviewing history in the case in which court previously had ruled that because Marilyn Monroe pre-deceased enactment of the publicity rights statute in California, she had no rights to bequeath upon her death).

This interpretation of the statute does not make it retroactive.  Under Nevada law, "statutes operate prospectively, unless the Legislature clearly manifests an intent to apply the statute retroactively, or it clearly, strongly, and imperatively appears from the act itself that the Legislature's intent cannot be implemented in any other fashion."  Public Employees' Benefits Program v. Las Vegas Metro. Police Dep't, 179 P.3d 542, 553 (Nev. 2008) (quotation omitted).  However, a statute does not operate retroactively simply by drawing upon past facts.  Id.  Rather, "[a] statute has retroactive effect when it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past."  Id. at 553-54 (quotation omitted).  "That is, even though a statute operates only from the time of its enactment, it is retroactive if it impairs vested rights and past transactions."  Id.  To determine whether a statute applies retroactively, "courts are guided by fundamental notions of fair notice, reasonable reliance, and settled expectations."  Id. (quotation omitted).

Here, the Nevada publicity rights statute does not take away or impair vested rights, or place a new obligation, duty, or disability on transactions already past.  The statute was enacted long before Defendants' use of Marley's image on t-shirts, and thus does not retroactively impair Defendants' rights or impose new burdens on Defendants' past conduct.  Considering notions of fair notice, reasonable reliance, and settled expectations, the Nevada publicity rights statute does not operate retroactively simply because it takes account of past facts.

Genuine issues of material fact remain as to whether Plaintiffs timely registered their claims.  Additionally, the Nevada publicity rights statute applies to individuals who were deceased prior to the statute's enactment.  The Court therefore will deny Defendants' motion for summary judgment on this claim.

///

### D.  Count Five - Interference With Prospective Business Advantage

Defendants move for summary judgment on this claim, arguing that because it depends upon Plaintiffs' other claims, they are entitled to summary judgment on this claim as well.  As discussed above with respect to the Nevada right of publicity claim and below with respect to unfair competition, Plaintiffs have claims that survive summary judgment.  The Court therefore will deny Defendants' motion  for summary judgment on this claim as well.

## IV.  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Doc. #114)

Plaintiffs move for summary judgment on count two of their Amended Complaint, unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).  Plaintiffs contend no genuine issue of material fact remains that Defendants' use of Marley's image on the t-shirts falsely conveys to the customer that Plaintiffs approved the t-shirt. Defendants respond by arguing Plaintiffs never stated a false endorsement or false association claim in their Amended Complaint, and they cannot amend their pleadings at the summary judgment stage.  Defendants also contend that even if Plaintiffs pled the claim, it fails as a matter of law because using Marley's images on the shirts is not use of the images in advertising such that it would imply Marley endorsed the product.  Defendants argue that because Marley's image does not serve a source-identifying function, Plaintiffs fail to state a false endorsement claim.

### A.  The Amended Complaint

Defendants contend Plaintiffs never asserted a false association or false endorsement claim in the Amended Complaint, and that Plaintiffs are trying to avoid summary judgment through amendment.  Plaintiffs respond that their Amended Complaint contains allegations regarding false endorsement or association, and in any event, Defendants are not prejudiced by any amendment because the parties have been litigating the same facts and issues all along.

Count two of the Amended Complaint alleges Defendants' use of the "Marley Intellectual Property" in connection with selling t-shirts "constitutes a false designation of origin and/or a false or misleading description or representation of fact, which is likely to cause confusion . . . as to affiliation, connection, or association with Plaintiffs, or as to the origin, sponsorship, or approval of Defendants' products or commercial activities by Plaintiffs." (Am. Compl. at 8.)  The Amended Complaint defines the "Marley Intellectual Property" as including but not limited to the particular registered marks.  (Id. at 4.)  Several allegations in the factual recitation also refer to false association or sponsorship.  For example, Plaintiffs allege they have spent substantial funds enforcing their rights in the Marley Intellectual Property and Defendants "were and are attempting to create an association between the Infringing Merchandise and the authorized Marley merchandise sold and licensed through Hope Road and Rootswear." (Id. at 4, 7.)  Plaintiffs also alleged that Defendants acted "with the bad faith intent to profit from the name and likeness of Robert Nesta Marley and the associated and registered Rights of Publicity owned by Hope Road." (Id.)  Additionally, the prayer for relief requested the Court permanently enjoin Defendants from "using Marley's name, voice, signature, photograph, or likeness in commerce . . . ." (Id. at 11.)

These allegations are sufficient to put Defendants on notice that a false association claim was at issue in the case.  The parties have litigated throughout this case not only whether Defendants used the BOB MARLEY mark, but also Defendants' use of Marley's image.  Even if the Amended Complaint's allegations did not adequately apprise Defendants of the claim, Defendants do not identify how they are prejudiced by Plaintiffs' pursuit of this theory.  See Mir v. Fosburg, 646 F.2d 342, 347 (9th Cir. 1980) (noting the "general principle" that the federal rules "evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will

1    not prejudice the other party in maintaining his defense upon the merits").

2        **B. Merits**

3        Some courts, including the United States Court of Appeals for the Ninth Circuit,

4    have held that under § 1125(a) of the Lanham Act, a celebrity may assert an unfair

5    competition claim where the defendant uses the celebrity's persona without permission to

6    suggest false endorsement or association.  For example, in Downing v. Abercrombie &

7    Fitch, a retailer used in its apparel catalog a picture of a famous surfer without his

8    permission.  265 F.3d 994, 1000 (9th Cir. 2001).   The surfer sued, asserting, among other

9    things, violation of § 1125(a) of the Lanham Act.  Id.  The Ninth Circuit adapted its test for

10   trademark infringement as set forth in AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir.

11   1979) (the "Sleekcraft factors"), indicating that for celebrity cases "the term 'mark' applies

12   to the celebrity's persona, the 'strength' of the mark refers to the level of recognition that

13   the celebrity has among the segment of the public to whom the advertisement is directed,

14   and the term 'goods' concerns the reasons for or source of the celebrity's fame."  Id. at

15   1007.  The Ninth Circuit held a genuine issue of material fact remained concerning a

16   likelihood of confusion as to whether the surfer endorsed the products in the catalog.  Id. at

17   1008-09.

18       Other cases have reached a similar result.  For example, in White v. Samsung

19   Electronics America, Inc., the defendant ran an advertisement for video-cassette recorders

20   ("VCRs") which depicted a robot dressed and posed to look like Vanna White standing next

21   to a Wheel of Fortune game board.  971 F.2d 1395, 1396 (9th Cir. 1992).  White did not

22   consent to the ads and was not paid.  Id.  White sued for, among other things, a violation

23   under § 1125(a).  Id.  The Ninth Circuit stated that to prevail on this claim, White "is

24   required to show that in running the robot ad, [the defendants] created a likelihood of

25   confusion . . . over whether White was endorsing [the defendants'] VCRs."  Id. at 1399-

26   1400 (internal citations omitted).  The Ninth Circuit applied the modified Sleekcraft factors

1   and held a genuine issue of material fact remained as to a likelihood of confusion as to

2   White's endorsement of the VCRs.  Id. at 1401.

3          Similarly, in Wendt v. Host International, Inc., actors George Wendt and John

4   Ratzenberger, "Norm" and "Cliff" from the television show "Cheers," sued a robot creator

5   who made robots based upon Wendt's and Ratzenberger's likenesses without their

6   permission and placed these robots in airport bars modeled upon the Cheers set.  125 F.3d

7   806, 809 (9th Cir. 1997).  The actors brought a claim under § 1125(a) for false

8   endorsement.  Id.  The Ninth Circuit stated that "[a] false endorsement claim based on the

9   unauthorized use of a celebrity's identity . . . alleges the misuse of a trademark, i.e., a

10  symbol or device such as a visual likeness, vocal imitation, or other uniquely distinguishing

11  characteristic, which is likely to confuse consumers as to the plaintiff's sponsorship or

12  approval of the product."  Id. at 812 (quotation omitted).  The Court again applied the

13  modified Sleekcraft factors and held a genuine issue of material fact remained as to whether

14  the robots created a likelihood of consumer confusion as to the actors' association with or

15  sponsorship of the bars.  Id. at 812-14.

16         In each of these cases, the Ninth Circuit set forth the Sleekcraft factors to

17  consider in determining whether a likelihood of confusion exists in a celebrity endorsement

18  or association case:

19             1. the level of recognition that the plaintiff has among the segment of
               the society for whom the defendant's product is intended;
20             2. the relatedness of the fame or success of the plaintiff to the
               defendant's product;
21             3. the similarity of the likeness used by the defendant to the actual
               plaintiff;
22             4. evidence of actual confusion;
               5. marketing channels used;
23             6. likely degree of purchaser care;
               7. defendant's intent on selecting the plaintiff; and
24             8. likelihood of expansion of the product lines.

25  Downing, 265 F.3d at 1007-08.  These factors are not necessarily of equal importance nor

26  will all necessarily apply in every case.  Id. at 1008.  For example, "[e]vidence of actual

1   confusion is persuasive proof that future confusion is likely." <u>Fuddruckers, Inc. v. Doc's</u>

2   <u>B.R. Others, Inc.</u>, 826 F.2d 837, 845 (9th Cir. 1987).  The inquiry is factual in nature, and

3   summary judgment therefore is not appropriate when a jury reasonably could conclude there

4   is, or is not, a likelihood of confusion.  <u>Downing</u>, 265 F.3d at 1007-08.

5          There is little dispute as to many of these factors.  Defendants do not dispute

6   Marley is a well known musician, and thus no genuine issue of material fact remains that

7   Marley has a strong level of recognition among the segment of the society for whom

8   Defendants' t-shirts are intended.  Marley's success is related to his talents as a musician.

9   As it is not at all unusual for musicians to be featured on t-shirts, Marley's success as a

10  singer is closely related to Defendants' t-shirts.  One retailer's website referred to one of

11  Defendants' t-shirts as a "concert" t-shirt.  Other t-shirts included song or album titles

12  directly on the shirt, thus further tying the products to Marley's status as a musician.  It is

13  undisputed that Defendants used an exact likeness of Marley on their t-shirts.  Further, the

14  parties agree purchasers are unlikely to exercise much care in the purchase of t-shirts.

15         As to the fifth factor, Defendants argue they use different marketing channels

16  because Plaintiffs specifically have averred they do not use mass market retailers and seek

17  to target only smaller shops.  Although Plaintiffs aver they are not interested in mass market

18  retail, both Plaintiffs and Defendants use the internet to advertise and sell their products.

19  The parties also both displayed their products at MAGIC trade shows.  Moreover, at least

20  one retailer, Wet Seal, indicated that it simultaneously stocked Plaintiffs' and Defendants'

21  products, but later switched to Defendants' products because they were less expensive.

22  (Pls.' MSJ, Pietrini Decl., Ex. W at 75-76.)  Although some of the marketing channels may

23  have been different, no genuine issue of material fact remains that both parties used the

24  internet, the MAGIC shows, and at least one similar retailer.

25         However, viewing the evidence in the light most favorable to Plaintiffs on

26  Defendants' motion for summary judgment on this claim, genuine issues of material fact

remain on the issue of likelihood of confusion.  Plaintiffs present evidence of actual

confusion in the form of their survey.  The survey concluded twenty percent of the test

group was confused about Marley's association with or sponsorship of the t-shirts.  The

Ninth Circuit has held that surveys are an appropriate method of demonstrating consumer

confusion, and that a twenty-seven percent confusion rate was sufficient for a reasonable

jury to conclude actual confusion existed.  See Thane Int'l, Inc. v. Trek Bicycle Corp., 305

F.3d 894, 902-03 (9th Cir. 2002); see also Jada Toys, Inc. v. Mattell, Inc., 518 F.3d 628,

636 (9th Cir. 2008) (holding a reasonable trier of fact could find likelihood of trademark

dilution where surveys showed twenty-eight and seven percent confusion, respectively).

Therefore, Plaintiffs have presented sufficient evidence raising a genuine issue of material

fact of actual confusion to survive Defendants' motion for summary judgment.

Viewing the evidence in the light most favorable to Defendants on Plaintiffs'

motion for summary judgment, Defendants also have raised an issue of fact on actual

confusion.  Defendants note that many of the survey results do not show confusion as to

source, sponsorship, or association.  When asked who made or put out the t-shirt, seventeen

percent of the test group answered Avela or X One X and nine percent stated Bob Marley or

the person on the t-shirt.  Most people answered someone other than Defendants or

Plaintiffs to this question, thus suggesting no source confusion as between Defendants' and

Plaintiffs' products.  When asked whether the t-shirt maker received permission from

someone to put out the t-shirt, forty-one percent of test group said no.  Even of the group

who said the manufacturer needed someone's permission, only thirty-seven percent of the

test group answered Bob Marley or the person on the shirt.  Consequently, although a

reasonable juror could find actual confusion based on the survey data, that data is not so

compelling that a reasonable jury could not conclude the survey evidence is insufficient to

support a finding of likelihood of confusion.  Thane Int'l, Inc., 305 F.3d at 904 (holding

jury could give survey evidence "little or no credence" based on the defendant's criticisms

1   and lack of compelling data).

2       In addition to disputing the survey evidence, Defendants contend no genuine

3   issue of fact remains on likelihood of confusion under the reasoning in <u>Cairns v. Franklin</u>

4   <u>Mint Co.</u>, 292 F.3d 1139 (9th Cir. 2002).  In that case, the plaintiffs were the trustees of the

5   Diana Princess of Wales Memorial Fund ("the Fund") and the executors of Princess Diana's

6   estate.  <u>Cairns</u>, 292 F.3d at 1144.  The Fund sued the Franklin Mint, which used Diana's

7   image on  jewelry, plates, and dolls, and in ads for these products.  <u>Id.</u>  The Mint and other

8   companies had been using Diana's image on like products since she married Prince Charles

9   in 1981.  <u>Id.</u>  During her lifetime, "Princess Diana neither authorized nor objected to any of

10  these products."  <u>Id.</u>

11      After Diana's death, her estate exclusively authorized the Fund to use Diana's

12  name and likeness to accept donations for various charities with which Princess Diana was

13  associated during her lifetime.  <u>Id.</u>  The Fund in turn authorized certain other parties, but not

14  the Mint, to use Diana's name and likeness to sell products in the United States.  <u>Id.</u>  When

15  the Mint continued to use Diana's likeness on products following her death, the Fund sued

16  the Mint alleging, among other things, false endorsement and false advertising under

17  § 1125(a).  <u>Id.</u>

18      In reviewing the false endorsement claim under § 1125(a), the Ninth Circuit held

19  no genuine issue of material fact remained as to a likelihood of confusion that Diana

20  endorsed the products given the history of unauthorized products during her lifetime which

21  she neither objected to nor endorsed:

22      Between 1981 and 1997, many products, including some that were
    largely indistinguishable from Franklin Mint products, bore the name
23  and likeness of Princess Diana, who neither endorsed nor objected to
    any of these products.  Consumers, therefore, had no reason to believe
24  Franklin Mint's Diana-related products were endorsed by the Princess.
    This did not change when, following Princess Diana's death in 1997,
25  the Fund endorsed approximately twenty products-but not Franklin
    Mint's-amidst a flood of un-endorsed Diana-related memorabilia.
26  Under these circumstances, there was no likelihood of confusion as to

1    the origin of Franklin Mint's Diana-related products.

2    Id. at 1149-50 (emphasis omitted).

3          Here, the evidence is conflicting on whether Marley was aware of the

4    unauthorized use of his image on products like t-shirts or posters during his lifetime.

5    Rabanne wrote in a letter to Valencia that Marley was aware of Rabanne selling

6    photographs of Marley and that Marley approved of those sales and related sales on other

7    merchandise.  However, Rabanne recanted when he testified under oath, and instead stated

8    that he suspected Marley knew Rabanne was selling photos, but that Rabanne did not use

9    the photos to sell other merchandise, such as t-shirts.  Defendants present no other evidence

10   that during his lifetime, Marley neither endorsed nor objected to others' use of his image on

11   merchandise, such that, like the Princess, the consumer would not be confused as to his

12   endorsement of such products.  The evidence in the record suggests that following his

13   death, the owners of the Marley rights have made commercial use of his image and have

14   enforced their rights by seeking to preclude others' use of Marley's image on merchandise.

15   Consequently, this case is distinguishable from Cairns, and an issue of fact remains as to

16   whether consumers would be confused as to Plaintiffs' endorsement or association with t-

17   shirts bearing Marley's likeness.

18         Finally, Defendants argue celebrity claims are limited to use of the celebrity's

19   likeness in advertising to endorse another product, and do not extend to use of the

20   celebrity's likeness directly on the defendant's product.  However, the robots in Wendt were

21   not used in advertising.  Rather, the robots were placed inside the airport bars as part of the

22   bar decor.  Further, in Cairns, the Ninth Circuit did not indicate that use of the Princess's

23   image on the products themselves could not form the basis of a celebrity false association or

24   endorsement claim under § 1125(a).

25         Likewise, in Parks v. LaFace Records, the defendants were a rap music duo who

26   used Rosa Parks' name as a song title.  329 F.3d 437, 441, 442-43 (6th Cir. 2003).  The

defendants put a sticker on the album indicating the "Rosa Parks" song was a "hit single." Id. at 442.  The same sticker also contained a parental advisory for explicit lyrics.  Id.  Parks sued, contending use of her name was false advertising under § 1125(a), as well as violative of her rights of publicity under Michigan state law.  Id.  The Sixth Circuit stated that § 1125(a) "extends beyond disputes between producers of commercial products and their competitors.  It also permits celebrities to vindicate property rights in their identities against allegedly misleading commercial use by others."  Id. at 445.  The Sixth Circuit rejected the defendants' argument that Parks failed to state a claim under the Lanham Act because the defendants did not make a "trademark use" of her name.  Id. at 446-47.  The Sixth Circuit held that "even though Rosa Parks' name might not be eligible for registration as a trademark, and even though Defendants were not selling Rosa Parks-brand CD's, a viable cause of action also exists under § [1125(a)] if consumers falsely believed that Rosa Parks had sponsored or approved the song, or was somehow affiliated with the song or the album."  Id. at 447; see also ETW Corp., 332 F.3d at 924 (stating that the elements of a § 1125(a) false endorsement claim are similar to the elements of a state law right of publicity claim and therefore cases which address either type of claim would be instructive).

Consequently, celebrity false association cases are not limited to the situation where the defendant uses the celebrity to advertise another product.  Such cases may include use of the celebrity's persona directly on or as part of the defendant's product.

Genuine issues of fact remain as to Plaintiffs' and Defendants' motions for summary judgment on Plaintiffs' unfair competition claim in count two.  The Court therefore will deny both motions.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. #113) is hereby GRANTED in part and DENIED in part.  The motion is granted as to counts one and three of Plaintiffs' Amended Complaint.  The motion is denied

in all other respects.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Adjudication on Plaintiffs' False Association Claim Under 15 U.S.C. § 1125(a) (Doc. #114) is hereby DENIED.

IT IS FURTHER ORDERED that the parties shall file a proposed joint pretrial order on or before March 26, 2010.

IT IS FURTHER ORDERED that this case is set for Trial for Tuesday, July 13, 2010, at 9:00 a.m. in Courtroom 7C.  The parties shall appear for Calendar Call on Wednesday, July 7, 2010, at 9 a.m. in Courtroom 7C.

DATED:   February 25, 2010

_____
PHILIP M. PRO
United States District Judge