1   MANATT, PHELPS & PHILLIPS, LLP
    JILL M. PIETRINI (Bar No. CA 138335)  (admitted *pro hac vice*)
2     e-mail: jpietrini@manatt.com
    BARRY E. MALLEN (Bar No. CA 120005)  (admitted *pro hac vice*)
3     e-mail: bmallen@manatt.com
    PAUL A. BOST (Bar No. CA  261531)  (admitted *pro hac vice*)
4     e-mail:  pbost@manatt.com
    11355 West Olympic Boulevard
5   Los Angeles, CA  90064-1614
    Telephone:  (310) 312-4000
6   Facsimile:  (310) 312-4224

7   JOLLEY, URGA, WIRTH, WOODBURY & STANDISH
    WILLIAM R. URGA (Bar No. NV 1195)
8     email: wru@juww.com
    L. CHRISTOPHER ROSE (Bar No. NV 7500)
9     email: lcr@juww.com
    3800 Howard Hughes Pkwy.
10  Wells Fargo Tower, 16th Floor
    Las Vegas, NV 89169
11  Telephone:  (702) 699-7500
    Facsimile:  (702) 699-7555

12
    *Counsel for Plaintiffs and Counter-Defendants*
13  FIFTY-SIX HOPE ROAD MUSIC LIMITED and ZION
    ROOTSWEAR, LLC
14

15              **UNITED STATES DISTRICT COURT**

16                    **DISTRICT OF NEVADA**

| | |
|---|---|
| 17  Fifty-Six Hope Road Music, Ltd., a Bahamian corporation; and Zion Rootswear, LLC, a Florida limited liability company, | Case No. 2:08-cv-00105-PMP-GWF |
| 18 | **PLAINTIFFS' MOTION IN LIMINE #9 TO EXCLUDE CERTAIN DESIGNATED DEPOSITION TESTIMONY OF GREGG PARADISE BASED ON IT BEING IMPERMISSIBLE EXPERT TESTIMONY** |
| 19 | |
| 20                    Plaintiffs, | |
| 21          vs. | Pretrial Conference:  January 3, 2011 |
| 22  A.V.E.L.A., Inc., a Nevada corporation; Sci-Fi Productions, Inc. dba X One X Movie Archive, Inc., a Nevada corporation; JEM Sportswear, a California corporation; Central Mills, Inc. (Freeze), a New York corporation; and Leo Valencia, an individual, | Time:                        1:30 p.m. Location:                Courtroom 7C, Hon. Philip M. Pro |
| 23 | |
| 24 | |
| 25 | |
| 26                    Defendants. | |
| 27  AND RELATED COUNTERCLAIM. | |
| 28 | |

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

## I.    INTRODUCTION AND BACKGROUND

By this motion, Plaintiffs Fifty-Six Hope Road Music, Ltd. ("Fifty-Six Hope Road") and Zion Rootswear, LLC ("Zion") (collectively, "Plaintiffs") respectfully request the Court to enter an order barring Defendants A.V.E.L.A., Inc. ("AVELA"), Leo Valencia, Sci-Fi Productions, Inc., JEM Sportswear, and Central Mills, Inc. (Freeze) (collectively, "Defendants") from offering certain designated deposition testimony of Gregg Paradise.

First, Defendants seek to offer excerpts from Mr. Paradise's depositions that do not reflect advice or counsel which Mr. Paradise offered to Defendants but, rather, consist of Mr. Paradise offering his opinion on intellectual property law.  Such evidence must be excluded on at least two bases:  (1) Defendants failed to designate Mr. Paradise as an expert witness; and (2) even if Defendants had designated Mr. Paradise as an expert witness, he is not, as a so-called expert, permitted to testify as to what he happens to believe the relevant law is.  Defendants' attempts to offer expert testimony from Mr. Paradise on what he claims the law is improper and must be excluded.

Next, despite the dismissal of Plaintiffs' claims for Trademark Infringement under 15 U.S.C. § 1114, Trademark Infringement under the Common Law, and Unauthorized Commercial Use of Right of Publicity under NRS § 597.770, *et seq.* (collectively, "the Dismissed Claims"), Defendants have not withdrawn deposition designations that relate solely to advice Mr. Paradise gave Defendants regarding the Dismissed Claims.  This testimony is irrelevant to Plaintiffs' remaining claims, will almost certainly confuse the jury, and must be excluded.  Similarly, Defendants refuse to withdraw deposition designations that address the *Tunes* case (as defined *infra*), evidence of which, pursuant to the Court's granting of Plaintiffs' Motion *in Limine* No. 5, is excluded from trial.  This testimony must also be excluded.

## II.    SUMMARY OF MATERIAL FACTS

Although not plead as an affirmative defense (which it is), Defendants have alleged that they acted on the advice of counsel in connection with their unauthorized use of Bob Marley's image on apparel and merchandise.  Plaintiffs deposed Mr.

Paradise to elicit the content of the advice that Mr. Paradise gave AVELA regarding use of Bob Marley's image on apparel and merchandise.  Most of that testimony related to the right of publicity claim that had been alleged.  Subsequent to their depositions of Mr. Paradise <u>and</u> the parties' respective designations of excerpts from Mr. Paradise's depositions for presentation at trial, the Court dismissed Plaintiffs' right of publicity claim under NRS 597.770, *et seq.*  (Docket No. 224.)  In addition, since making said designations, the Court also granted Defendants' Motion *in Limine* No. 3 to exclude evidence of Plaintiffs' registrations of TUFF GONG & Design, ROOTS ROCK REGGAE, and CATCH A FIRE (Docket No. 210), and Plaintiffs' Motion *in Limine* No. 5 to exclude reference of or evidence related to *Fifty-Six Hope Road Music Limited v. Mayah Collections*, Case No. 2:05-CV-05-1059-KJD-GWF ("*Tunes*").  (Docket No. 204.)

Since then, and given the dismissal of the right of publicity claim and the Court's granting of Defendants' Motion *in Limine* No. 3 and Plaintiffs' Motion *in Limine* No. 5, Plaintiffs have sought to collaborate with Defendants on paring down their respective designations of excerpts from Mr. Paradise's depositions for presentation at trial. Specifically, Plaintiffs emailed Defendants a list of certain deposition designations that had been rendered irrelevant to Defendants' unpleaded advice of counsel affirmative defense due to these subsequent events.  (Pietrini Decl. ¶ 3, Ex. A.)  However, Defendants have refused to withdraw their designations for presentation at trial.  (Pietrini Decl. 4, Ex. B.)  The deposition excerpts at issue are attached hereto.  (Pietrini Decl. 5, Ex. C.)

Defendants have not designated any expert witnesses in this matter.  Defendants have never held Mr. Paradise out as an intellectual property law expert or represented that they were seeking expert testimony from Mr. Paradise.  (Pietrini Decl. ¶ 6.)  Yet that is what Defendants clearly intend to do by trying to use the contested deposition testimony of Mr. Paradise.

III.     **LEGAL ARGUMENT**

   A.     **Gregg Paradise's Testimony Is Improper Expert Opinion and Must Be Excluded**

Throughout his deposition, Mr. Paradise volunteered testimony that amounted to his opinion on what the law provides, as opposed to the actual advice he claims he offered Defendants.  Defendants now seek to offer this testimony, essentially turning Mr. Paradise into an undesignated expert designed to instruct the jury on what the law – purportedly – is.  This is improper.  Accordingly, the Court must preclude Defendants from presenting what is clearly intended as expert opinion of Mr. Paradise.  Mr. Paradise's testimony must be confined to matters relevant to Defendants' unpleaded advice of counsel affirmative defense.  As noted herein, in the event that the Court does allow Defendants to present the expert testimony of Mr. Paradise, Plaintiffs must, in turn, be allowed to present evidence of the fact that certain songs and albums titles of Bob Marley's that Defendants used on their merchandise in conjunction with images of Bob Marley were registered trademarks that Mr. Paradise ignored or never considered in his analysis.

   1.     **Defendants Have Not Designated Gregg Paradise as an Expert Witness**

"[A] party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  FRCP 26(a)(2).  "If a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  FRCP 37(c)(1).  Defendants have not designated any expert witnesses.  Rule 26 is clear that the portion of Mr. Paradise's testimony that constitutes expert opinion on the law must be excluded.  To allow Defendants, despite the aforementioned omissions, to use Mr. Paradise as an expert witness would be clearly inappropriate and prejudicial to Plaintiffs who have never had reason or cause to treat

1    Mr. Paradise as an expert witness, discover the content and bases of his now expert

2    opinion on intellectual property law, and designate a counter-expert designed to instruct

3    the jury on intellectual property law.

4              **2.      Even if Defendants Had Designated Gregg Paradise as an
                        Expert Witness, His Testimony Would be Inadmissible**
5

6         Expert testimony is not admissible to inform the jury as to the law that it will be

7    instructed to apply to the facts in deciding the case. That is a matter reserved exclusively

8    for the Court.  "Whether expert opinion testimony is 'otherwise admissible' depends, in

9    part, on whether it will 'assist the trier of fact' in either 'understanding the evidence or …

10   determining a fact in issue.' [Citation to FRE 702.]  Expert testimony that consists of

11   legal conclusions cannot properly assist the trier of fact in either respect, and thus it is

12   not 'otherwise admissible.'" *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d

13   1207, 1212 (D.C. Cir. 1997), *citing Torres v. County of Oakland*, 758 F.2d 147, 150 (6th

14   Cir. 1985).  "Each courtroom comes equipped with a 'legal expert,' called a judge, and it

15   is his or her province alone to instruct the jury on the relevant legal standards." *Burkhart*,

16   112 F.3d at 1213.

17        Defendants have designated certain excerpts of Mr. Paradise's depositions that

18   seek to inform the jury as to the law it will be instructed to apply to the facts in deciding

19   the case.[1]  These excerpts do not relate to any advice Mr. Paradise provided Defendants

20   regarding their potential liability for false association and endorsement under 15 U.S.C. §

21   1125(a).  Mr. Paradise testified that he did not recall discussing 15 U.S.C. § 1125(a)

22   specifically with Mr. Valencia of AVELA.  (Pietrini Decl. ¶ 5, Ex. C, Paradise II, 39:6-12

23   and 39:21-23.)  Rather, these excerpts feature Mr. Paradise's opinions on liability under

24   15 U.S.C. § 1125(a), including whether the use of a musical artist's album and/or song

25   titles should or is likely to result in or factor into liability for false association and

26   endorsement.  However, all that matters is what Mr. Paradise specifically recalls directly

27   [1]    *See* Pietrini Decl. ¶ 5, Ex. C, Paradise II 23:4-9, 34:10-25, 35:2-25, 36:2-25, 37:2-
28   25, 38:2-25, 39:2-25, 40:2-11, 40:22-25, 41:2-8, 43:7-23, 44:5-25, 45:2-25, 46:2-25 and
     47:2-7.

discussing with Defendants about the claims and defenses asserted <u>in this case</u>.  Mr. Paradise's opinions on liability in general for uses of others' music titles in unfiled cases are inappropriate for jury consideration.  Not only has Mr. Paradise not been properly designated as an expert witness, but even had he been, this testimony impermissibly opines upon liability under 15 U.S.C. § 1125(a) and interferes with the Court's exclusive role as the decider of legal issues.

> **3.    If Defendants Are Not Precluded From Presenting Mr. Paradise as an Expert Witness, Plaintiffs Must be Allowed to Present Evidence of Certain Trademark Registrations Previously Ruled Inadmissible by the Court**

Mr. Paradise testified as to his opinion on whether the use of a musical artist's album and/or song titles is likely to result in or factor into liability for false association and endorsement.  Although Mr. Paradise's legal conclusions on this issue constitute an incorrect understanding of the law, even Mr. Paradise acknowledges that his opinion may change were he to learn that the songs and/or album titles were also registered trademarks.  (Pietrini Decl. ¶ C, Ex. 5, Paradise II 44:5-25.)  Accordingly, if Defendants are allowed to present this opinion testimony to the jury, Plaintiffs must, in turn, be allowed to present evidence of their registrations and applications to register the trademarks ROOTS ROCK REGGAE, CATCH A FIRE, ONE LOVE, and TUFF GONG & Design.  It would be patently unfair and prejudicial to Plaintiffs to allow Defendants to present expert testimony regarding Defendants' liability under 15 U.S.C. § 1125(a) for use of song and album titles without allowing Plaintiffs to present evidence of their trademark rights in certain song and album titles used by Defendants on their merchandise and apparel.  If Plaintiffs are precluded from presenting this evidence, the jury's assessment of how Defendants' use of Bob Marley's album and song titles on their merchandise impacts the likelihood of confusion analysis will be woefully incomplete, all to the prejudice of Plaintiffs.  Indeed, Plaintiffs believe they should be allowed to present this evidence in any event.  But regardless, allowing expert testimony from Mr. Paradise on the law allegedly is, is patently improper.

1

**B.    Gregg Paradise's Testimony Relating to Plaintiffs' Dismissed Claims is Irrelevant and Must Be Excluded**

2

3      Plaintiffs' claims that Defendants violated Plaintiffs' registration of their right of

4 publicity in Bob Marley and infringed Plaintiffs' BOB MARLEY trademark were dismissed

5 by the Court.  Nevertheless, Defendants refuse to withdraw designations of Mr.

6 Paradise's testimony that relate only or substantially to advice given by Mr. Paradise to

7 Defendants as to whether their actions violated Plaintiffs' registration of its right of

8 publicity or infringed Plaintiffs' BOB MARLEY word mark.[2]  This testimony is irrelevant to

9 Plaintiffs' remaining claims for false association and endorsement under 15 U.S.C. §

10 1125(a) and intentional interference with prospective economic advantage.  If

11 Defendants are permitted to introduce this evidence, it will result in significant jury

12 confusion, including, but not limited to, confusion as to which intellectual property rights

13 form the basis for Plaintiffs' claim under 15 U.S.C. § 1125(a).  As such, this testimony

14 must be excluded.

15

**C.    Gregg Paradise's Testimony Relating to the _Tunes_ Case Must Be Excluded**

16

17      In connection with a motion _in limine_, the Court has ordered the parties not to

18 present any evidence of or related to the _Tunes_ case.  Yet, even after obtaining that

19 ruling, Defendants stubbornly refuse to withdraw designations of Mr. Paradise's

20 testimony that specifically address and relate to the _Tunes_ case.[3]  Defendants' refusal is

21 inconsistent with the Court's ruling, and if Defendants are allowed to offer this evidence,

22 it will, undoubtedly, engender jury confusion.  As such, this testimony must be excluded.

23 / / /

24 / / /

25

26 [2]     _See_ Pietrini Decl. ¶ 5, Ex. C, Paradise I, 12:22-25, 13:2-7, 14:8-18, 19:2-5, 56:15-25, 57:1-3, 63:16-22, 93:8-25, 94:1-25, 95:2, 105:2-11, 105:23-25, 106:2-25, 116:22-25,

27 117:2-25, 118:2-25, 119:2-5, 126:20-25, 127:2, 133:14-23, 164:2-12, 166:22-25, 167:2-25, 168:2-13 and 173:4-16; Paradise II, 11:11-25, 12:2-5 and 16:5-22.

28 [3]     _See_ Pietrini Decl. ¶ 5, Ex. C, Paradise I, 93:8-25, 94:1-25, 95:2 and 115:9-14.

1

## IV.     **CONCLUSION**

2      For all the foregoing reasons, Plaintiffs respectfully request that the Court enter an

3   order precluding Defendants from presenting certain deposition testimony of Gregg

4   Paradise.

5                                                     Respectfully submitted,

6                                                     MANATT, PHELPS & PHILLIPS LLP

7   Dated:   January 3, 2011

8                                       By:   /s/Jill M. Pietrini
                                                    Jill M. Pietrini
                                                    *Attorneys for Plaintiffs and Counter-*
9                                                   *Defendants*
                                                    *FIFTY-SIX HOPE ROAD MUSIC*
10                                                  *LIMITED and ZION ROOTSWEAR, LLC*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## DECLARATION OF JILL M. PIETRINI

3      1.      I am over the age of 18, I have personal knowledge of the facts set forth

4 herein, and I make this Declaration in support of Plaintiffs motion *in limine* for an order

5 precluding Defendants from presenting certain testimony of Gregg Paradise.

6      2.      I am an attorney with Manatt, Phelps & Phillips, LLP ("Manatt") and am

7 counsel of record for Fifty-Six Hope Road in this matter.  I have personal knowledge of

8 the facts set forth herein, and if called upon to do so, I could and would competently

9 testify thereto.

10      3.      Due the Court's ruling on the parties motions *in limine* and the dismissal of

11 Plaintiffs' right of publicity claim, I sought to collaborate with Defendants' counsel, Doug

12 Winter, on paring down the parties' respective designations of excerpts from Mr.

13 Paradise's depositions for presentation at trial.  Specifically, on December 29, 2010, I

14 emailed Defendants' counsel, Doug Winter, a list of certain deposition designations that

15 had been rendered irrelevant to Defendants' unpleaded advice of counsel affirmative

16 defense due to the dismissal of Plaintiffs' right of publicity and trademark infringement

17 claims, and rulings on the parties' motions *in limine*.  A true and correct copy of my

18 December 29, 2010 email to Mr. Winter is attached hereto as **Exhibit A**.

19      4.      On December 30, 2010, Mr. Winter responded to my email and indicated

20 the deposition designations that Defendants would agree to withdraw.  A true and

21 correct copy of Mr. Winter's December 30, 2010 email is attached hereto as **Exhibit B**.

22      5.      The designations from Plaintiffs' depositions of Mr. Paradise at issue are

23 as follows: 12:22-25, 13:2-7, 14:8-18, 19:2-5, 56:15-25, 57:1-3, 63:16-22, 93:8-25, 94:1-

24 25, 95:2, 105:2-11, 105:23-25, 106:2-25, 115:9-14, 116:22-25, 117:2-25, 118:2-25,

25 119:2-5, 126:20-25, 127:2, 133:14-23, 164:2-12, 166:22-25, 167:2-25, 168:2-13 and

26 173:4-16 of Plaintiffs' deposition of Gregg Paradise on October 14, 2009 ("Paradise I);

27 and 11:11-25, 12:2-5, 16:5-22, 23:4-9, 34:10-25, 35:2-25, 36:2-25, 37:2-25, 38:2-25,

28 39:2-25, 40:2-11, 40:22-25, 41:2-8, 43:7-23, 44:5-25, 45:2-25, 46:2-25 and 47:2-7 of

Plaintiffs' deposition of Gregg Paradise on April 8, 2010.  These excerpts are attached hereto as **Exhibit C**.

6.      Defendants have not designated any expert witnesses in this matter. Defendants have never held Mr. Paradise out as an intellectual property law expert or represented that they were seeking expert testimony from Mr. Paradise.  Given the nature of the testimony of Mr. Paradise that Defendants refuse to withdraw, I believe that Defendants intend to use the challenged Paradise testimony to make Mr. Paradise their intellectual property law expert.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 3rd day of January, 2011 at Las Vegas, Nevada.

/s/Jill M. Pietrini
Jill M. Pietrini

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

10

(EXHIBIT A)

# EXHIBIT A

**Martin, Latrina**

| | |
|---|---|
| **From:** | Pietrini, Jill |
| **Sent:** | Wednesday, December 29, 2010 5:26 PM |
| **To:** | 'Doug Winter'; Bost, Paul |
| **Subject:** | RE: Exhibits, Deposition Designations and Financial Documents |
| **Attachments:** | Deposition Designations.pdf |

Doug:

There are a few points that we need to address before the trial, and we respond to your emails to Barry and I today. Note that we did respond to your initial email of December 23rd.

**Deposition Designations**

We will include our revised deposition designations along with the portions of Defendants' designations which overlap with ours. You are responsible for presenting the portions of your deposition designations that you intend to present to the jury.

Given the stipulation as to the financial numbers and the dismissal of the right of publicity and trademark infringement claims, we have pared down our designations to remove irrelevant or mooted testimony and we will be asserting additional objections to the testimony that Defendants have designated on the same grounds. We are attaching a chart of those deleted designations and the additional objected to designations of Defendants. We ask that you voluntarily agree to withdraw the designations that are identified in the attached chart, under Additional Objections to Defendants' Designations. Let us know immediately if you agree to do so.

We will file our revised deposition designations with the Court shortly.

**Exhibits**

You have a list of the exhibits that we intend to introduce. We have made our trial binders with those exhibits, and we have not changed the exhibit numbers, as I stated to the Court. To the extent the parties are using the same exhibits, they will be included in our binders. If you are using additional exhibits, not on our list, we don't have them. We will make a set of trial exhibit books for the Court, the judge, and ourselves. You are responsible for making your own trial exhibit books. As for exhibits you claim that you do not have, please identify those to us and we will send you copies. We believe that we have produced all of the documents identified on our exhibit list.

**Stipulation of Fact on the Financial Information**

You probably noticed this, but just in case, the Court entered the stipulation today. We will include the Stipulation as an additional trial exhibit. We are still waiting for a response to Barry Mallen's email this morning about stipulating to the authenticity of the underlying financial documents to avoid unnecessary testimony at trial authenticating those documents. The purpose of having a stipulation as to authenticity of financial documents is if they are offered to prove something else, e.g., dates that items sold, etc. We don't know if they will be used for other purposes, but in case they are, we would prefer to have a stipulation as to their authenticity. Please let us know your position. Thank you.

**From:** Doug Winter [mailto:dwinter@balllawllp.com]
**Sent:** Wednesday, December 29, 2010 4:57 PM
**To:** Pietrini, Jill; Bost, Paul
**Subject:** FW: Exhibits

I left a voicemail for Paul yesterday, but no response.  I need to speak with someone regarding the exhibits.  It's been nearly a week now.  Please let me know when someone is available asap.


Thanks.


Douglas D. Winter
THE BALL LAW FIRM, LLP
10866 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90024
(310)446-6148
(310)441-5386 fax
www.balllawllp.com

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**From:** Doug Winter
**Sent:** Thursday, December 23, 2010 1:12 PM
**To:** 'Pietrini, Jill'
**Subject:** RE: Exhibits


Jill:

I just left you a message on your voicemail.  As to the stip, there are a few discrepancies with the numbers, and we can hopefully resolve that without a problem.  However, more fundamentally, as to gross receipts, the amount should be limited to Jem and Freeze, because they are the defendants in the case.  The receipts from non-party licensees are relevant for the purpose of calculating Avela's license fees.

As to the exhibits, if we are able to pare them down, are Plaintiffs anticipating changing any of their exhibit numbers from the PTO?  If not, it doesn't seem to me that we need to wait for the stip to be finalized.   Please let me know your thoughts on this.



Doug




Douglas D. Winter
THE BALL LAW FIRM, LLP
10866 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90024
(310)446-6148
(310)441-5386 fax
www.balllawllp.com

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**From:** Pietrini, Jill [mailto:JPietrini@manatt.com]
**Sent:** Wednesday, December 22, 2010 6:25 PM
**To:** Doug Winter
**Cc:** Bost, Paul; Mallen, Barry; Tim Ervin
**Subject:** Exhibits

Doug:

I received your voicemail yesterday about meeting about the trial exhibits.  We need your signature on the stipulation about sales and revenue before we can do anything about exhibits.  Assuming that you will actually sign the stipulation, that will eliminate a lot of trial exhibits both for live witnesses and for the deposition witnesses, and we can pare down the exhibits.  You need to send us the signed stipulation or tell us that you are not signing it.

Also, have you updated your exhibit list?

Jill Pietrini
manatt | phelps | phillips
11355 W. Olympic Blvd.
Los Angeles, CA  90064
(310) 312-4325 (direct dial)
(310) 312-4224 (main fax)
jpietrini@manatt.com

IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued treasury regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written by us, and cannot be used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another person any transaction or matter addressed herein. For information about this legend, go to http://www.manatt.com/circ230

1/3/2011

# DEPOSITION DESIGNATIONS

### WET SEAL – NICOLE BARKER

| Further Objections to Defendants' Designation |
| --- |
| 5:11-22 |
| 80:20-25,81:1 |
| 84:8-17 |
| |

| Withdraw of Plaintiffs' Objections |
| --- |
| 125:17-24 |
| 81:14-16, 18-22 |

| Financial Testimony & Documents to Delete |
| --- |
| 105:13-23 |
| 106:11-25 |
| 107:1-25 |
| 108:4-6, 10-12 |
| 109: 7-15,19-23 |
| |
| |

### ECKO LTD – ANDREW CUNNINGHAM

| Plaintiffs' Designations to Withdraw |
| --- |
| 6:18-23 |
| 22:19-25 |
| 23:2-4 |
| 56:11-23 |

| Additional Objections to Defendants' Designations |
| --- |
| 66:21 |
| |

### ECKO LTD. – STEVEN FEFFERMAN

| Additional Objections to Defendants' Designations |
| --- |
| 63:12-19 |
| 113:24-25; 114:2-4 |

### JGR COPA – JACOB GOLDZER

| Additional Designations by Plaintiffs |
| --- |
| 79:15-16 |

| Withdrawal of Plaintiffs' Designation |
| --- |
| 34:13-17 |
| 41:10-14 |
| 113:8-25; 114:1-25; 115:1-20 |
| |

| Additional Objections to Defendants' Designations |
| --- |
| 28:23-25, 29:1-2 |
| 58:22-25; 59:1-5 |
| 113:21-25, 114:1; 115:4-19 |

| Financial Testimony & Documents to Delete |
| --- |
| 64:1-25, Ex. 109; 65:1-25; 66:1-8; 69:5-25, 70:14-25; 71:1-15, 74:9-18, 22-25; 75:1-25 (Ex. 110); 76:1-25; 77:1-23; 78:1-25: 79:1-14; 81:21-25; 82:1-25; 83:1-18; 85:12-24 |
| |
| |
| |
| |
| |
| |

## JAMES PETTIT

| Additional Objections to Defendants' Designations |
| --- |
| 20:6 |

## THE HOUSE – RABINOWITZ

| Additional Objections to Defendants' Designations | Financial Testimony & Documents to Delete |
| --- | --- |
| 46:211 | 43:191-193; Ex. 3 |
| 47:214-217 | 44:194-197 |
| 61:283-285; 62:286-291; 63:292 | 45:206-207 |
| 64:301 | 49:223-224 |
| | 50: 224-230 |
| | 51:230-235 |
| | 52:236-239, Ex. 59 |

## TARGET – HEATHER VOGEL

| Additional Objections to Defendants' Designations | Financial Testimony & Documents to Delete |
| --- | --- |
| 70:13-16 | 99:17-25 |
| 83:8-17 | 100:1-24, Ex. 187 |
| 84:4-10 | 101: 10-25, Ex. 188 |
| 85:14-23 | 102:1-14 |
| 111:11-12 | 103:1-14 |
| | 104:1-25 |
| | 105:1-14, 17-25; Exs. 189, 190 |
| | 106:1, 16-25, Ex. 191 |
| | 107:1-25 |
| | 108:1-8 |
| | 109:1-8, 14-15 |
| | 110:10-21 |

**BALZOUT – SCOTT HOLROYD**

| Plaintiffs' Designations to Add | Financial Testimony & Documents to Delete |
|---|---|
| 9:18-12 | 107:25 |
| | 108:1-25 |
| **Additional  Objections to Defendants' Designations** | 109:1-23, Ex. 101 |
| | 111:15-25 |
| 57:8-17 | 112:1-9 |
| 89:4-12 | 112:14-19 (Ex. 102) |
| | 113:12-25 |
| | 114:1-7, 11-25 |
| | 115:1-3 |

**TARGET – ELIZABETH KINNEBERG**

| Plaintiffs' Designations to Delete | Financial Testimony & Documents to Delete |
|---|---|
| 70:3-15 | 116:1-12, 17, 24-25, Exs. 180 & 181 |
| 140:17-21 | 117:1-25 |
| | 118:1-4 |
| **Additional  Objections to Defendants' Designations** | 122:20-25 |
| | 123:1-25 |
| 70:12-15 | 124:1-17 |
| 74:2-6 | |
| 137:5-22 | |

**GREGG PARADISE**

| Additional Objections to Defendants' Designation | 166:22-25; 167:2-25; 168:2-13 |
|---|---|
| | 173:4-16 |
| 12:22-25; 13:2-7 | |
| 14:8-18 | **Day 2** |
| 19:2-5 | 11:11-25; 12:2-5 |
| 34:24-25; 35:2-4 | 14:11-25; 15:2-7 |
| 56:16-25; 57:1-3 | 16:5-22 |
| 63:16-22 | 23:4 |
| 93:8-25, 94:1-25; 95:2 | 28:12-22 |
| 96:18-25; 97:2-25; 98:2-25; 99:2-3 | 34:10-25; 35:2-25; 36:2-25; 37:2-25; 38:2-25; 39:2-25; 40:2-11 |
| 105:2-11, 23-25; 106:2-26 | 40:22-25; 41:2-8 |
| 115:9-14 | 43:7-23; 44:5-25; 45:1-25; 46:2-25; 47:2-7 |
| 116:22-25; 117:2-25; 118:2-25; 119:2-5, 15-19 | 61:7-25; 62:2-7 |
| 126:20-26; 127:2 | |
| 133:14-23 | |
| 164:2-12 | |

| **Plaintiff's Designations to Delete** |
| --- |
| 12:22-25; 13:2-17 |
| 14:3-18 |
| 19:2-5 |
| 49:6-25; 50:1-16 |
| 63:9-15 |
| 116:22-25; 117:2-25; 118:2-25; 119:2-19 |
| 124:14-19 |
| 125:6-13 |
| 126:13-16 |
| 129:14-25; 130:2-13 |
| 134:19-25; 135:2-17 |
| 138:11-25; 139:2-10 |
| 153:21-25; 154:2-20 |
| 162:5-15 |
| 164:2-12 |
| 169:22-25; 170:2-11 |
| 188:10-25; 189:2-5 |
| |
| **Day 2** |
| 11:2-25; 12:2-5 |
| 12:21-25 |
| 13:2-25; 14:2-7; Ex. 312 |
| 14:25; 15:2-7 |
| 17:23-25; 18:2-3 |
| 27:11-25; 28:2-22 |
| 29:7-25; 30:2-13 |
| 31:2-19 |
| 34:10-25; 35:2-25; 36:2-25 |
| 49:9-25; 50:2-5 |
| |

300194927.1

4

(EXHIBIT B)

# EXHIBIT B

**Martin, Latrina**

| | |
|---|---|
| **From:** | Doug Winter [dwinter@balllawllp.com] |
| **Sent:** | Thursday, December 30, 2010 1:21 PM |
| **To:** | Pietrini, Jill; Bost, Paul |
| **Subject:** | RE: Exhibits, Deposition Designations and Financial Documents |

In response to the Deposition Designations, Defendants additionally designate 115:24-116:16 from the Goldzer deposition.

Defendants agree to withdraw the following designations:

Jacob Goldzer

28:23-25, 29:1-2

James Petit

20:6

Joel Rabinowitz

46:211
47:214-217

Greg Paradise (Day 1)

119:15-19

Greg Paradise (Day 2)

14:11-25; 15:2-7
28:12-22
61:7-25; 62:2-7


Douglas D. Winter
THE BALL LAW FIRM, LLP
10866 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90024
(310)446-6148
(310)441-5386 fax
www.balllawllp.com
This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**From:** Pietrini, Jill [mailto:JPietrini@manatt.com]
**Sent:** Wednesday, December 29, 2010 5:26 PM
**To:** Doug Winter; Bost, Paul
**Subject:** RE: Exhibits, Deposition Designations and Financial Documents


Doug:

Case 2:08-cv-00105-PMP-GWF   Document 251   Filed 01/03/11   Page 21 of 70

There are a few points that we need to address before the trial, and we respond to your emails to Barry and I today.  Note that we did respond to your initial email of December 23rd.

**Deposition Designations**

We will include our revised deposition designations along with the portions of Defendants' designations which overlap with ours. You are responsible for presenting the portions of your deposition designations that you intend to present to the jury.

Given the stipulation as to the financial numbers and the dismissal of the right of publicity and trademark infringement claims, we have pared down our designations to remove irrelevant or mooted testimony and we will be asserting additional objections to the testimony that Defendants have designated on the same grounds. We are attaching a chart of those deleted designations and the additional objected to designations of Defendants. We ask that you voluntarily agree to withdraw the designations that are identified in the attached chart, under Additional Objections to Defendants' Designations.  Let us know immediately if you agree to do so.

We will file our revised deposition designations with the Court shortly.

**Exhibits**

You have a list of the exhibits that we intend to introduce.  We have made our trial binders with those exhibits, and we have not changed the exhibit numbers, as I stated to the Court.  To the extent the parties are using the same exhibits, they will be included in our binders. If you are using additional exhibits, not on our list, we don't have them.  We will make a set of trial exhibit books for the Court, the judge, and ourselves. You are responsible for making your own trial exhibit books.  As for exhibits you claim that you do not have, please identify those to us and we will send you copies.  We believe that we have produced all of the documents identified on our exhibit list.

**Stipulation of Fact on the Financial Information**

You probably noticed this, but just in case, the Court entered the stipulation today. We will include the Stipulation as an additional trial exhibit. We are still waiting for a response to Barry Mallen's email this morning about stipulating to the authenticity of the underlying financial documents to avoid unnecessary testimony at trial authenticating those documents.  The purpose of having a stipulation as to authenticity of financial documents is if they are offered to prove something else, e.g., dates that items sold, etc.  We don't know if they will be used for other purposes, but in case they are, we would prefer to have a stipulation as to their authenticity.  Please let us know your position. Thank you.

---

**From:** Doug Winter [mailto:dwinter@balllawllp.com]
**Sent:** Wednesday, December 29, 2010 4:57 PM
**To:** Pietrini, Jill; Bost, Paul
**Subject:** FW: Exhibits

I left a voicemail for Paul yesterday, but no response.  I need to speak with someone regarding the exhibits.  It's been nearly a week now.  Please let me know when someone is available asap.

Thanks.

Douglas D. Winter
THE BALL LAW FIRM, LLP
10866 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90024
(310)446-6148
(310)441-5386 fax

www.balllawllp.com
This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**From:** Doug Winter
**Sent:** Thursday, December 23, 2010 1:12 PM
**To:** 'Pietrini, Jill'
**Subject:** RE: Exhibits

Jill:

I just left you a message on your voicemail.  As to the stip, there are a few discrepancies with the numbers, and we can hopefully resolve that without a problem.  However, more fundamentally, as to gross receipts, the amount should be limited to Jem and Freeze, because they are the defendants in the case.  The receipts from non-party licensees are relevant for the purpose of calculating Avela's license fees.

As to the exhibits, if we are able to pare them down, are Plaintiffs anticipating changing any of their exhibit numbers from the PTO?  If not, it doesn't seem to me that we need to wait for the stip to be finalized.   Please let me know your thoughts on this.


Doug




Douglas D. Winter
THE BALL LAW FIRM, LLP
10866 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90024
(310)446-6148
(310)441-5386 fax
www.balllawllp.com
This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**From:** Pietrini, Jill [mailto:JPietrini@manatt.com]
**Sent:** Wednesday, December 22, 2010 6:25 PM
**To:** Doug Winter
**Cc:** Bost, Paul; Mallen, Barry; Tim Ervin
**Subject:** Exhibits


Doug:

I received your voicemail yesterday about meeting about the trial exhibits.  We need your signature on the stipulation about sales and revenue before we can do anything about exhibits.  Assuming that you will actually sign the stipulation, that will eliminate a lot of trial exhibits both for live witnesses and for the deposition witnesses, and we can pare down the exhibits.  You need to send us the signed stipulation or tell us that you are not signing it.

Also, have you updated your exhibit list?

Jill Pietrini
manatt | phelps | phillips
11355 W. Olympic Blvd.
Los Angeles, CA  90064
(310) 312-4325 (direct dial)
(310) 312-4224 (main fax)
jpietrini@manatt.com

IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued treasury regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written by us, and cannot be used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another person any transaction or matter addressed herein. For information about this legend, go to http://www.manatt.com/circ230

IRS CIRCULAR 230 DISCLOSURE: To comply with requirements imposed by recently issued treasury regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written by us, and cannot be used by you, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another person any transaction or matter addressed herein. For information about this legend, go to http://www.manatt.com/circ230

(EXHIBIT C)

# EXHIBIT C

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA


- - - - - - - - - - - - - - - - - - - - - - - -x

FIFTY-SIX HOPE ROAD MUSIC LTD., and ZION
ROOTSWEAR,

                              Plaintiffs,

        -against-

A.V.E.L.A.,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - -x




            DEPOSITION OF GREGG PARADISE

              Westfield, New Jersey

            Wednesday, October 14, 2009




REPORTED BY:

DANIELLE GRANT

12

G. Paradise

1
2    litigated as a counselor, litigator or trial
3    lawyer?
4            A    Many.
5            Q    More than 20?  Just give me sort of
6    a ballpark figure?
7            A    More than 20.  I have never really
8    given thought to how many different cases I have
9    worked on.
10           Q    Okay.  And then I understand you
11   also do practice for the Trademark Trial and
12   Appeal Board?
13           A    Yes.
14           Q    And how many cases have you
15   litigated as a counselor, litigator or trial
16   lawyer in the TTAB?
17           A    Again, it's been many different
18   cases.  Really don't -- I've never thought of a
19   number.
20           Q    Okay.  More than 20?
21           A    I think that's safe to say.
22           Q    Has your practice exclusively been
23   in electrical property law since 1996?
24           A    Yes.
25           Q    How many right of publicity cases

Gregg Paradise

13

1                         G. Paradise

2       have you litigated as a counselor, litigator or

3       trial lawyer?

4              A     Cases in which right of publicity

5       was an issue, one of the issues you're asking?

6              Q     Right.

7              A     Probably five to ten.

8              Q     When was your first right of

9       publicity case?

10             A     I don't recall.

11             Q     Was it at Kenyon and Kenyon or

12      Lerner David?

13             A     It would have been at Kenyon and

14      Kenyon.

15             Q     How many right of publicity cases

16      have you had at Lerner David?

17             A     At least three or four.

18             Q     Have they all been for A.V.E.L.A.?

19             A     No.

20             Q     Do you refer to it as A.V.E.L.A. or

21      A.V.E.L.A.?  I get two different views on this

22      one.

23             A     I've -- usually refer to is as

24      A.V.E.L.A.

25             Q     Okay.  We'll use that, I think we're

Gregg Paradise

14

                        G. Paradise

 1

 2      getting more accustomed to that anyway.

 3              Okay.  Of the three or four that

 4      you've had right of publicity cases you've had

 5      at Lerner David, how many have been for

 6      A.V.E.L.A.?

 7          A    All but one of them.

 8          Q    Okay.  And how many right of

 9      publicity cases have you had under Nevada law?

10          A    I believe just the present case.  Or

11      the -- if you consider it one case or two cases,

12      I think there were two complaints that were filed

13      at different time, so there are two separate

14      cases.

15          Q    Okay.  And that's the one with the

16      Marley's, Marley Estate and Marley Company versus

17      A.V.E.L.A. and other defendants?

18          A    Correct.

19          Q    What other state laws have you done

20      right of publicity cases under?

21          A    There have been a number.  I can

22      think of offhand having looked into California,

23      New York, Indiana.  I know that there are other

24      states that have come up in cases and also some

25      foreign jurisdictions.

Gregg Paradise

19

1                          G. Paradise

2          Q     Okay.  Do you, as part of your

3    practice at Kenyon and Kenyon, did you register

4    trademarks?

5          A     I did.

6          Q     Okay.  And did you do registration

7    work for Mr. Valencia while at Kenyon?

8          A     I don't believe we registered any

9    trademarks for him.  We may have done some

10   copyright registrations.

11         Q     Yeah, that was my next question,

12   actually, whether you had done -- registered any

13   copyrights for him?

14         A     I don't recall myself doing it

15   personally, but there were other attorneys at

16   various different times over the years working on

17   A.V.E.L.A. matters.  And I have some recollection

18   of copyrights, but I don't remember right now if

19   Kenyon filed them or Mr. Valencia filed them

20   himself.

21         Q     Okay.  How many lawyers at Kenyon

22   were working on Mr. Valencia's matters?

23         A     Four or five at different times.

24         Q     Who was the primary person working

25   for Mr. Valencia while you were at Kenyon?

Gregg Paradise

56

G. Paradise

1

2    Q    Okay.  And on -- or in connection,

3    when you say "on," directly on the products

4    themselves?

5    A    Correct.

6    Q    Okay.  And when you say "in

7    connection with," what are you referring to?

8    A    Advertising that highlights Bob

9    Marley.

10   Q    What do you mean by that?

11   A    The advertising where it's, you

12   know, using the Bob Marley name in a trademark

13   sense.

14   Q    I'm not sure I'm following you on

15   the trademark sense.

16   A    I'm making the distinction between

17   trademark use of the name Bob Marley and a

18   factual or fair use, use of the name Bob Marley.

19   Q    Okay.  And you had a discussion with

20   Mr. Valencia about the distinction between a

21   trademark use and a descriptive use?

22   A    At some point I did, yes.

23   Q    Did you provide him with any cases?

24   A    I did provide him with cases.  I

25   don't recall if there were any specifically on

Gregg Paradise

57

G. Paradise

2  that subject, but I provided him with numerous

3  cases over time.

4        Q    Did you keep copies of those cases

5  in your file?

6        A    The -- some of the cases would have

7  been printed out; some of them I would have

8  electronic copies of.

9        Q    Do you keep a research clip when

10  you -- is it your normal practice to keep a

11  research clip or file when you do a project such

12  as this?

13        A    I often have in some manner either,

14  like you say, a clip where it's literally just a

15  binder clip that has cases, or sometimes a folder

16  labeled legal research.  I customarily do that.

17  Any cases that I sent to Mr. Valencia I would

18  have a copy of the e-mail sending it to him.

19        Q    At the time that you rendered your

20  first conclusion, did you have any proposed

21  advertising for the Marley products that

22  Mr. Valencia was going to put out or authorized

23  to be put out by licensees?

24        A    I don't believe I did.

25        Q    Did you at any point ask him for

Gregg Paradise

63

                        G. Paradise

1

2     ten.

3           Q     And that was all before August 2006,

4     that was the question in case I confused you,

5     which I apologize for.

6           A     Yes.  And it probably would be about

7     the same answer for even after that, but yes, I

8     was answering prior to August 2006.

9           Q     Okay.  For those celebrity estates,

10    did any of those issues involve right of

11    publicity?

12          A     Yes.

13          Q     Any in Nevada, other than the Marley

14    issue?

15          A     Not that I recall.

16          Q     When you were doing your analysis of

17    Nevada right of publicity, did you contact any

18    Nevada lawyers?

19          A     At some point in the process I did

20    have discussions with Nevada lawyers.  I don't

21    recall if it was before or after the litigation

22    started, though.

23          Q     Did you -- did you tell Mr. Valencia

24    the number of celebrity estates that you had

25    worked on before you did this analysis for the

Gregg Paradise

93

G. Paradise

1

2      A     I don't recall him ever asking me

3   that.

4      Q     Did he ever suggest the conclusion

5   that he wanted with respect to the Marley rights?

6      A      Well, I know that his desire was to

7   sell product.

8              Does that answer your question?

9      Q     Sort of.  Did he say, Look, you need

10   to find a waying, Gregg, that I can do this,

11   anything of that nature?

12      A     I don't recall him saying it

13   anything like that, but he, as many clients do,

14   ask, you know, is there some way I can do this?

15   You know, can you find a legal way to do this?

16              I don't recall -- I don't recall

17   him specifically asking anything like that.

18   However, I do know that this opinion evolved

19   over time and I do recall that there was

20   something of a back and forth where I had some

21   initial thoughts and opinions on the matter and

22   he came back with additional facts or would

23   question things and then I would question the

24   matter further.  And in some of those cases --

25   in this specific situation, I know that some of

Gregg Paradise

94

1          G. Paradise

2     my conclusions changed over time.

3          Q    And they changed in Mr. -- in favor

4     of using the images of Bob Marley?

5          A    It was more -- two things that I

6     remember.  One, I learned additional facts.  The

7     main one that I learned was that they were not

8     going to be using the Bob Marley name on the

9     products.  And I do know that changed my opinion

10    with respect to the -- the trademark issues.

11               And I also recall that there

12    were -- during this time period, two other

13    things.  One, there were some unrelated cases

14    on the right of publicity area.  The one I

15    recall specifically was the Marilyn Monroe Shaw

16    case decision that was issued.  And I also

17    recall learning during the process of the -- I

18    believe it was the Tunes litigation, that was

19    also in Nevada, also involving 56 Hope Road.

20    And information that I have learned from both

21    the -- some of the decisions and facts in those

22    cases and additional facts of what

23    Mr. Valencia's plans were changed my opinions

24    at times.

25               Q    And that was all after August '06?

Gregg Paradise

95

                            G. Paradise

1

2          A     Correct.

3          Q     Did you also commit your opinions to

4     writing as to the Marley rights after the lawsuit

5     was filed?

6          A     I don't recall ever doing that.

7          Q     So it was only before the first

8     lawsuit, the '07, where you had writings with

9     Mr. Valencia as to your conclusions and analysis

10    of the Marley rights?

11         A     There would have been after the

12    first lawsuit was filed, I'm sure.  I know there

13    were additional written communications with

14    Mr. Valencia, but none of them would take the

15    form of what I would consider to be an opinion

16    letter like I know exists from before that time.

17         Q     Were any writings that state or

18    express your conclusions or the reasons therefore

19    after the '07 case was filed?  And I'm saying

20    '07, I know it was filed in '06, it ended in '07.

21         A     I think we probably learned about it

22    in '07 maybe, I don't know.  I don't recall the

23    specific dates of those.  I do know that there

24    likely were writings regarding analysis of the

25    legal claims being made by 56 Hope Road in -- in

Gregg Paradise

104

G. Paradise

1    that I gained concerning use of the Bob Marley

2    name by various different people.

3

4         Q    Okay.  Let's break it out one at a

5    time.

6              The registrations that you saw,

7    you saw those going to the USPTO.gov web site?

8         A    I believe I saw -- I believe I

9    recall that there was at least one registration

10   for the name Bob Marley.  I would have found it

11   through the USPTO web site, yes.

12        Q    Did you conduct a more thorough

13   online search through Sagis or Dialogue or

14   anything along those lines for Bob Marley other

15   than your PTO search?

16        A    I regularly use Sagis, I don't

17   specifically recall if I used it in this case.  I

18   know that I did not get, for example, a Thompson

19   or Core Search comprehensive report ordered for

20   Bob Marley.

21        Q    Okay.  So no full trademark search

22   was ordered for Bob Marley?

23        A    That's correct.  I -- what I don't

24   recall is whether I just did a search on the

25   trademark office site or if I did that search

Gregg Paradise

105

1    G. Paradise

2    through Sagis.

3           Q    Did you -- when did you your search

4    on the PTO web site or if you did it on Sagis,

5    did you search just for the words "Bob Marley"?

6           A    I know I certainly searched for

7    those words or probably would have just searched

8    Marley alone more broadly.  I don't recall right

9    now whether I searched anything.  I don't recall

10   if I researched anything else.  I believe I also

11   searched for registrations owned by 56 Hope Road.

12          Q    So you did what would be

13   characterized as an owner as e-search on the PTO

14   web site?

15          A    Yes.

16          Q    Did you search for any other related

17   entities of 56 Hope Road?

18          A    I recall at one time I did a --

19   either a PTO or Sagis owner name search for a

20   related entity, Tuff Gong, that I believe was

21   owned by one of the Marley children, Rohan

22   Marley.

23          Q    Did you ever search, do an owner as

24   an e-search for the Robert Marley foundation?

25          A    I don't specifically recall that,

Gregg Paradise

106

G. Paradise

1

2      but again, my owner as an e-search most likely

3      would have been just for the Marley name, not Bob

4      Marley.  It was either for the -- I probably did

5      several.  I -- I don't recall specifically, but I

6      believe -- my best recollection is that I would

7      have searched both Marley and 56 Hope Road as an

8      owner asignee, and at least Marley as a

9      trademark.

10         Q    So to try to cover both bases,

11     looking for the word mark itself, Marley or Bob

12     Marley, looking for ownership by 56 Hope Road or

13     Tuff Gong?

14         A    Right.  My goal was to identify any

15     trademark registrations that could possibly be

16     asserted by anyone claiming rights in this area.

17         Q    Okay.  And which, you said you found

18     one registration for Bob Marley, did you have

19     find any other registrations owned by 56?

20         A    I don't have a recollection at this

21     time.

22         Q    What about Tuff Gong, what

23     registrations did you find for Tuff Gong?  Or

24     applications?

25         A    I have a vague recollection of

115

G. Paradise

1

2    knowledge that I learned probably first through

3    the Tunes case, that there were rights being

4    asserted by 56 Hope Road and I believe at least

5    one of their licensees, which indicated that

6    there were product in the marketplace.

7         Q     With the name Bob Marley on it?

8         A     I believe so.

9         Q     Okay.  And what about any images of

10   Bob Marley?

11        A     I have a recollection of merchandise

12   with the image on it, with some images of Bob

13   Marley.  So I have knowledge that there was such

14   merchandise in the marketplace.

15        Q     That was put out by 56 or it's

16   licensees?

17        A     Again, I believe I learned that

18   through the Tunes case.  My hesitation is whether

19   that knowledge wasn't actually learned until the

20   lawsuit against A.V.E.L.A. was filed.  And I

21   learned about the licensee and -- I have

22   forgotten which licensee was on which side of the

23   matter, but I know there was a licensee -- I

24   think it was Zion Rootswear, but I always forget

25   if it was Zion or Fame, which one was -- who's

Gregg Paradise

116

G. Paradise

1

2   licensee.

3            But I did certainly learn through

4   the litigation involving A.V.E.L.A. that 56

5   Hope Road had a licensee who had merchandise in

6   the marketplace.  I don't -- that's -- that's

7   why I have the hesitation that I'm not 100

8   percent positive that I learned it from the

9   Tunes case.

10       Q    Okay.  So when you said that you

11   reached a conclusion that there were trademark

12   rights in Bob Marley based on the registrations

13   and the use, is it you just can't remember what

14   that use was?

15       A    I can't remember what the use was

16   or -- or when it was or if that came about later

17   on.  For purposes of reaching my initial

18   conclusion about trademark rights, you know, and

19   the first opinion letter that I wrote, I didn't

20   feel I needed anything more than the registration

21   to know that there were rights in the name.

22       Q    Okay.  Did you reach a conclusion

23   for the Marley rights analysis, did you reach a

24   conclusion as to whether the Marley Estate family

25   had any right of publicity of rights?

Gregg Paradise

117

G. Paradise

1

2       A     Yes.

3       Q     What was your conclusion?

4       A     At what time?

5       Q     In August of '06.

6       A     What I don't recall because I -- I

7   remember that there were several -- as we have

8   talked about -- several e-mail written opinion

9   letters on this subject that I transmitted to

10  Mr. Valencia at different times.  I don't recall

11  which ones specifically were in August and which

12  ones were later than that, because I believe it

13  occurred over a three month or four-month period

14  of time.

15             I initially reached the conclusion

16  that there was some question based on the

17  unknown fact of what state's law or what

18  country's law would apply to this situation.

19  And I believe I laid out the various scenarios

20  that could occur under different states' law

21  because there is the question of which -- a

22  choice of law question and then sort of a

23  two-level choice of question here.  We don't

24  know what choice of law rules would be applied,

25  and then we don't know what law the court

Gregg Paradise

118

```
1                     G. Paradise
2    handling -- at this time -- a hypothetical
3    matter would choose to apply in this case.  And
4    I believe I pointed out that the outcome would
5    be potentially different, depending on which
6    state or country's law applied in this case.
7          Q    Okay.  And that was in -- and we'll
8    go over some of your e-mails on this.  But you
9    stated that there could be various scenarios
10   depending on which law applied?
11         A    Yes.
12         Q    That there could -- was it your
13   conclusion that there could be rights of
14   publicity in certain areas, but not in others for
15   Bob Marley?
16         A    When you say "areas," are you
17   referring to jurisdictions?
18         Q    Right, right.
19         A    My conclusion was that if certain
20   states or country's law were applied, there was a
21   much higher likelihood that right of publicity
22   rights would be found to exist that potentially
23   were possessed by someone.
24         Q    Okay.  And you expressed this
25   conclusion to Mr. Valencia, both in writing and
```

Gregg Paradise

119

1         G. Paradise

2    on the phone?

3         A    I know for sure it was in writing.

4    I believe we also had discussions about it, so

5    yes.

6         Q    Was it your understanding that

7    Mr. Valencia understood that there was a risk,

8    that the rights of publicity would be found

9    depending on which law was applied whether it was

10   Jamaica or another state?

11             MR. WINTER:  Objection; calls for

12        speculation.

13        A    I have no reason to believe that

14   Mr. Valencia did not understand my advice.

15        Q    And your advice was there was a

16   potential for rights of publicity, that rights of

17   publicity could be found for Bob Marley if

18   certain laws applied?

19        A    Yes.

20             MS. PIETRINI:  Let's mark as Exhibit

21        160 an e-mail produced to us dated August

22        14th, 2006.  And it was produced as

23        A001037 through 1038, and it's from Gregg

24        Paradise to Leo V.

25             (August 14, 2006 E-mail, Bates

Gregg Paradise

126

1    G. Paradise

2    publicity was approved?  Or approved with risk?

3    Or really, I can't say one way or the other?

4           A    At this time I had not rendered an

5    approved or not approved opinion.  It was more of

6    a what rights are out there and what can I think

7    about.  My understanding was that there -- you

8    know, there -- there -- there wasn't a set

9    concept here yet, or at least I wasn't aware of

10   it at least, initially.  So it really wasn't --

11   it was in the sense of a -- what rights are there

12   out there?

13          Q    Okay.  It wasn't -- would you

14   characterize Exhibit 160 as an approval or a go

15   ahead on the right of publicity?

16          A    I wouldn't characterize it that way.

17          Q    Would you characterize it more as "I

18   need to do more investigation before you can

19   proceed" type e-mail?

20          A    I didn't really reach a firm

21   conclusion at this time on the right of publicity

22   issue.  This was more, as I read it, a statement

23   of the -- the legal issues in connection with

24   right of publicity.  You know, I had reached a

25   pretty firm conclusion on the trademark side, so

Gregg Paradise

127

G. Paradise

1

2    I didn't pursue it further at this time.

3         Q    Okay.  And were there any -- did you

4    reach any conclusions as of August 14th, '06

5    about the copyright issues?

6         A    My inquiry was based on the stated

7    assumption that there were no copyright rights in

8    the images of Bob Marley that were going to be

9    used.  I think at this time -- and I'm just

10   looking at what I stated here -- my understanding

11   was public domain images including Bob Marley's

12   name and/or likeness.

13        Q    How did you know that the images

14   were subject to public domain and no longer

15   subject to or were never protected under

16   copyright?

17        A    At this time I was told that by

18   Mr. Valencia.  It was an assumption in my initial

19   work.

20        Q    Okay.  And at that point he didn't

21   give you copies of every image that he -- before

22   you made this analysis?  He didn't give you

23   copies of every image he intended to use?

24        A    I believe I got images later on.

25        Q    Okay.  Would it be fair to say that

Gregg Paradise

133

                        G. Paradise

1

2    about that comment?

3         A    There were certainly further

4    discussions about licensing, because there were

5    many months of negotiations with various

6    representatives of the Marley rights.  So I know

7    there were other discussions.  I don't recall

8    this specific concept, though.

9         Q    When you read this comment in the

10   August 15th, 2006 e-mail from Mr. Valencia, did

11   you understand that he was trying to use the

12   license as a bargaining chip?

13        A    That's not how I understood it.

14        Q    Okay.  What was your understanding

15   then, because this is August '06.  I'm talking

16   about the deals you may have had or discussions

17   later on.

18        A    My understanding was that he was

19   looking to work out the license.  The license

20   wasn't the bargaining chip.  The rights in the

21   U.S. and the possible ability to engage in

22   activities outside of the U.S. were the

23   bargaining chips.

24        Q    Okay.  Did you understand that

25   Mr. Valencia had done any research himself on the

Gregg Paradise

164

G. Paradise

1

2      Q    Okay.  And are you restating your

3   opinion that you stated previously to

4   Mr. Valencia, that it -- depending on the

5   jurisdiction, there would be rights of publicity

6   associated with Bob Marley?

7      A    Portions of this e-mail are

8   restating portions of my prior opinions.

9   Portions of this are either further elaborating

10  on the same points or responding to different

11  points raised in Mr. Valencia's e-mail from the

12  day before.

13     Q    Okay.  And between -- I know that

14  you've got information and -- from Mr. Valencia

15  starting in August of '06, and then you've got

16  subsequent information.

17          The opinion that you have in your

18  February 20th e-mail, was it based on any new

19  information that you had received from

20  Mr. Valencia since the August 14th, 15th series

21  of e-mails?

22     A    I don't recall whether there was

23  additional information received from

24  Mr. Valencia.  But as I believe this was after

25  the lawsuit filed, there was additional

Gregg Paradise

166

G. Paradise

1
2       apply.

3              Q      Anything else?

4              A      I don't recall if I received

5       anything else at this time.

6              Q      Did you communicate that to -- or

7       this e-mail, the February 20th e-mail that's

8       communicating that point to Mr. Valencia,

9       correct?

10             A      The point about the court in the

11      Tunes case applying the Nevada law was

12      communicated in this e-mail; that's one of the

13      things communicated, yes.

14             Q      Did you ever tell Mr. Valencia that

15      there were other decisions in the Ninth Circuit

16      that had a different view, that were looking at

17      the place of domicile of the celebrity?

18             A      I believe right in this e-mail I

19      mention the -- that there are Ninth Circuit cases

20      that apply the law of the jurisdiction of the

21      decedent.

22             Q      Would you characterize this e-mail

23      as a -- an approval to go ahead or to continue

24      with using Bob Marley's image on merchandise

25      without violating rights of publicity?

Gregg Paradise

167

                    G. Paradise

1

2          A     Again, I wasn't asked in an approval

3    or disapproval standpoint.  It was more of a

4    general legal advice regarding the matter.  And

5    at this point, we already had litigation.  So it

6    was just commenting on the law and my opinions as

7    to the likely outcome of the litigation.

8          Q     Okay.  So you didn't view this

9    e-mail as giving Mr. Valencia the green light to

10   continue his activities?

11         A     I don't view this as giving him any

12   colored light for continuing with the activities.

13    It's -- it's -- I don't think this it's as

14   easily categorized in that manner as a green

15   light or an approval.

16         Q     Well, how would you -- would you

17   characterize this e-mail any differently than you

18   characterize your August 14th and 15th series of

19   e-mails?

20         A     Well, this is a little different,

21   because at this point we now have actual

22   litigation and a complaint setting forth causes

23   of action that I am responding to and a pending

24   motion for preliminary injunction.  Before, it

25   was -- in the abstract, a -- we're thinking of

                           G. Paradise

1   coming out with a product like this, what do you

2   think?  This is comments on, I got sued, what do

3   you think?

4       Q    Okay.  Did you see the -- at the

5   time you sent the February 20th e-mail, did you

6   see any of the artwork or photographs that

7   Mr. Valencia was using?

8       A    I don't recall exactly when I saw

9   the photographs or artwork.  I know at various

10  times I saw that.  That should be reflected in

11  communications, either documents in the file or

12  e-mail communications.

13      Q    And if they haven't been produced to

14  us, then they're being withheld on privilege?

15      A    I have no idea.

16      Q    Okay.  Did you specifically ask

17  Mr. Valencia to provide you samples of what he

18  was going or -- or examples of what he was doing

19  before you sent this February 20th e-mail?

20      A    I don't recall if it was before or

21  after this e-mail because I don't recall the

22  exact date of the complaint and the other

23  activities around that time.  But I know that

24  when the complaint came in -- which I believe had

Gregg Paradise

173

1           G. Paradise

2    and it also provided more facts to draw further

3    conclusions from.

4           Q    But did it -- it didn't change the

5    actual analysis that you had back in August

6    '06 -- or conclusions, I should say?

7           A    The difficulty is in conclusions,

8    because there weren't conclusions reached on

9    necessarily all of the issues.  We've talked

10   about how the right of publicity was something of

11   an open issue.  This provided some additional

12   material from which, you know, it seemed that

13   there was a pretty explicit consent from Bob

14   Marley to Roberto Robon to use and merchandise

15   photographs of Bob Marley -- these particular

16   photographs of Bob Marley.

17          Q    You're looking at the second page of

18   your memorandum where it says that Robon said he

19   sold copies of pictures of Marley at numerous Bob

20   Marley shows?

21          A    Yes.

22          Q    Did Mr. Rabon tell you that he sold

23   any merchandise -- t-shirts, mugs, anything like

24   that bearing Mr. Marley's image?

25          A    I don't recall him saying that.

Gregg Paradise

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

CASE NO.: 2:08-CV-00105-PMP-GWF

- - - - - - - - - - - - - - - - - - - - - - - -x

FIFTY-SIX HOPE ROAD MUSIC LTD., a Bahamian
corporation; and ZION ROOTSWEAR, LLC a Florida
limited liability company,

                    Plaintiffs,

            -against-

A.V.E.L.A., Inc., a Nevada corporation; X ONE X
Movie Archive, Inc., a Nevada corporation; Jem
Sportswear, a California corporation; Central
Mills, Inc. (Freeze), a New York corporation; and
Leo Valencia, an individual,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - -x

            AND RELATED COUNTERCLAIM.

- - - - - - - - - - - - - - - - - - - - - - - -x

            DEPOSITION OF GREGG PARADISE

                New York, New York

            Thursday, April 8, 2010

REPORTED BY:

DANIELLE GRANT

                                                        1

Gregg Paradise

```
1                    G. Paradise

2        Q    If you look at the bottom part of

3   the e-mail which is under -- it looks like it's

4   an e-mail from Mr. Valencia to you dated

5   September 19, '06, he states, "On the Bob Marley,

6   we should not have any issues with trademark if

7   we leave his name off any products since we do

8   not have any right of publicity issues, correct?"

9             Did you -- and I'm looking at your

10  response above about right of publicity.  Were

11  you advising Mr. Valencia that there were no

12  rights of publicity associated with Bob Marley?

13       A    That is not what I was saying in

14  this e-mail.

15       Q    What were you conveying?  What was

16  the message you were trying to or that you were

17  conveying to Mr. Valencia?

18       A    I was conveying to Mr. Valencia that

19  different courts ruled differently on right of

20  publicity issues, and it was something of a legal

21  issue in flux.  And depending on which state a

22  suit was filed in and how the different facts and

23  laws came out, the ruling could be different.

24            I was opining here that -- or

25  really just discussing a court decision from a
```

11

Gregg Paradise

```
 1                        G. Paradise
 2    court in Nevada and its holdings that in that
 3    case were favorable to Mr. Valencia's possible
 4    use of images of Bob Marley and right of
 5    publicity.
 6           Q    So is it fair that your e-mail was
 7    telling Mr. Valencia that there may, in fact, be
 8    a right of publicity associated with Bob Marley,
 9    depending on whose law applied?
10           A    I don't know if that's how I would
11    put it.  You know, in theory there should be
12    something of an answer.  It's part of the
13    frustration of this issue where during this time
14    period courts and legislatures change the law at
15    times, you know.
16                It's not so much that there could
17    be a right of publicity, it's that maybe one
18    court would find that there is one based on one
19    set of laws and another court would find that
20    there isn't based on another set of laws.
21           Q    These e-mails were not -- I want to
22    be clear on this point -- were not telling Mr.
23    Valencia that there absolutely was no right of
24    publicity associated with Bob Marley?
25           A    That's a fair statement.
```

12

Gregg Paradise

                              G. Paradise

 1

 2     action by legislatures that happened that I

 3     believed happened after this date.  So there

 4     were -- it was an evolving process.

 5          Q    Okay.  And the facts and the court

 6     decisions that you uncovered after the series of

 7     e-mails, did that change your opinion or analysis

 8     that there may be -- or that a court could rule

 9     that rights of publicity were associated with Bob

10     Marley?

11                    (The requested portion of the

12                     record was read back.)

13          A    I don't believe it changed my

14     opinion as to what I thought the answer should

15     be.  I believe, if I am remembering the

16     chronology right, that the Shaw case involving

17     Marilyn Monroe, that there were decisions after

18     this time that strengthened my belief that a

19     court would find no right of publicity; however,

20     there were also developments in the laws in

21     California that if California law were to apply,

22     which I didn't think it would in this case or

23     should in this case, but if it did apply would

24     change the result and possibly find that there

25     was a right of publicity.

                                                        16

Gregg Paradise

```
1                       G. Paradise

2    Marley's image?

3         A    I don't know that I provided that

4    specific advice.  I do know that I advised Mr.

5    Valencia that terms such as this, if they had

6    been used as a trademark previously by another

7    entity could be problematic, but that if they

8    hadn't been, then there were no trademark

9    problems.

10         Q    Do you know who Mr. Valencia was

11   licensing this image to?

12             MR. WINTER:  Objection, lacks

13        foundation.

14        A    I don't recall whether Mr. Valencia

15   had actually licensed the image or was just

16   making it available for licensing, and I remember

17   that there was another entity involved who was

18   the co-defendant in the first case that was

19   displaying this image at their booth at the trade

20   show.  But I don't know if there was a formal

21   license in place at that time or it was just an

22   offer to license and they were looking to see if

23   there was anyone interested in merchandising the

24   design.

25             Q    Was it your understanding that this
```

                                                                23

Gregg Paradise

```
1                           G. Paradise

2      right of publicity issue.

3           Q    Did it also apply to the use of song

4      titles?

5           A    Without being able to see if the

6      redacted section discussed legal issues relating

7      to song titles, I don't know.  If that -- it

8      would only have related to what was in this

9      e-mail.

10          Q    Do you recall ever telling Mr.

11     Valencia or anyone else at A.V.E.L.A. that it was

12     okay to use song titles of a celebrity directly

13     on products?

14          A    I recall discussions with Mr.

15     Valencia about that issue.  My advice

16     consistently was, it depends on what the prior

17     use or rights through obtaining a registration of

18     any other entity, not necessarily just the, you

19     know, the singer or songwriter but production

20     company or even some third party.  It depended on

21     if anyone had previously made trademark use of

22     that song title.  If it was merely the title of a

23     song on an album.  It was my opinion that that

24     alone did not result in trademarks rights in the

25     song title.
```

34

Gregg Paradise

G. Paradise

1

2      Q    If the song title was also used

3  directly on clothing, would you consider that a

4  trademark use?

5      A    It would depend on how it was used.

6  It's hard to say in the abstract because there

7  are a lot of times where you may have a concert

8  T-shirt that lists the ten songs on an album on

9  the back of a T-shirt.  I would not consider that

10  to be a trademark use.

11           It would also depend on, was it

12  part of some other work of art that it just

13  appeared in?  There are a lot of factors that

14  would go into whether it's actually a trademark

15  use and whether someone has, by that use,

16  generated trademark rights in the song title.

17      Q    Okay.  What about with the song

18  title appearing underneath an image of the

19  celebrity?  By itself, not in a context of

20  listing, like the example you gave on the back of

21  the shirt.

22           MR. WINTER:  Objection, incomplete

23      hypothetical.

24      A    That is something of a, I would have

25  to say, borderline case because there are other

35

Gregg Paradise

G. Paradise

1

2  issues.  If it appeared as part of -- like I'm

3  saying, if it appeared as part of some prior

4  work, it might be considered to be either a fair

5  use or still not trademark use, you know.

6          Traditionally trademark use is a

7  brand association.  If you use that -- you

8  know, the clear cases are you use it on a hang

9  tag or on a label in a trademark fashion, that

10  would clearly be trademark use.  Just printing

11  the name of something on a T-shirt, in a lot of

12  cases it wouldn't be.  If you do it and you're

13  Nike and you write Nike with a swoosh and

14  that's what's on the front of the shirt, that

15  probably is a trademark use in association with

16  clothing.

17          But, for example, in the case of

18  Exhibit 314 and the image there, that's less of

19  a clear question.  You know, I recall that the

20  advice that I provided to Mr. Valencia was that

21  I thought that on whole, without anything else,

22  that that should not be a trademark use but

23  that it was a closer call and depending on

24  other facts courts could go either way on that

25  type of an issue.

36

```
1                          G. Paradise

2          Q      And you're referring to the use of

3    "One Love" underneath Mr. Marley's image?

4          A      Correct.

5          Q      Okay.  And that your advice to Mr.

6    Valencia was, that could be considered a

7    trademark use or it may not?

8          A      My advice was that, I did not

9    believe it should be considered a trademark use,

10   but that it's something that courts -- it's in

11   the realm of possibility that courts could find

12   it to be trademark use, especially depending on

13   what other facts there were relevant to the

14   matter.

15         Q      And did you consider in rendering

16   that advice that one could establish trademark

17   rights in a use of a name on the front of a

18   T-shirt and through proof of secondary meaning?

19         A      Well, if someone could establish

20   secondary meaning, and that secondary meaning

21   would have to be not just that "One Love" is

22   associated with Mr. Marley, but that use of "One

23   Love" is exclusively associated with the

24   distributor of whatever goods there are because

25   the T-shirt, the distributor of the T-shirt or
```

37

Gregg Paradise

G. Paradise

1

2    some licensing entity that has rights to it, if

3    that could be established then, yes, you could

4    establish trademark rights.  My belief was that

5    would be extremely difficult to establish based

6    on just use like this.

7         Q    And did you tell Mr. Valencia that

8    there was a risk that this could be considered

9    trademark use?

10        A    I believe we discussed that there

11   certainly were risks associated with this.

12   Courts gets things wrong all the time.  And there

13   could be other facts that come to bear that

14   influence this, but just based on applying a song

15   title to a T-shirt, if that's the only fact, it's

16   my opinion that that should not -- is not a

17   trademark use and should not generate trademark

18   rights for anyone.

19        Q    But you did -- you did advise that

20   there were risks associated with it too, Mr.

21   Valencia?

22        A    Based upon the unknown and the

23   vagaries of the court systems, yes.

24        Q    Did you ever consider whether the

25   use of a song title on the front of a T-shirt

38

```
1                      G. Paradise

2     would create liability under Section 43(a), false

3     association or false endorsement?

4          A    In any analysis of trademark rights,

5     you're always looking at those kinds of, sort of,

6     generic 43(a) claims.  I don't recall if I

7     specifically advised him separately as to

8     liability under Section 1114 for trademark

9     infringement versus 1125(a) for a false

10    association or some other kind of general unfair

11    competition, but I would always consider both of

12    those issues in reaching a legal conclusion.

13         Q    Did you advise Mr. Valencia that

14    there was a risk that his use of song titles

15    could create liability for him under Section

16    439(a) of the Lanam Act (phonetic)?

17         A    If a third party could establish

18    superior trademark rights -- oh, you're limiting

19    this to 43(a) now?

20         Q    Yes.

21         A    I don't recall discussing it

22    specifically with him as a separate cause of

23    action.  You know, it's something that

24    experienced trademark practitioners easily

25    disassociate but is, I guess, less easy to
```

39

Gregg Paradise

1                              G. Paradise

2     understand for a lay practitioner.  But my -- you

3     know, my opinion on this was that use of a song

4     title in that manner would not cause a false

5     association.  The false associate still needs to

6     be, you know, somehow related to rights or, you

7     know, a belief that the entities are related,

8     affiliated, sponsored, licensed, something like

9     that.  It's not licensed, but -- so my opinion

10    was, just use of a song title in this manner

11    would not be -- should not be actionable.

12           Q    Do you understand Roots Rock Reggae

13    to be a song title of Bob Marley?

14           A    I don't know that I ever had that

15    understanding, and I don't recall that today.

16           Q    But you understand that's a

17    registered mark, based on the exhibit we've

18    looked at, the PTO Exhibit 311; right?

19           A    Yes.  Based on my review of 311,

20    Exhibit 311, as of July 1, 2008, this Roots Rock

21    Reggae was a registered mark.

22           Q    And have you ever registered a name

23    that appears on the front of a T-shirt in your

24    practice?

25           A    I am sure I have registered marks

                                                          40

Gregg Paradise

```
 1                          G. Paradise

 2     because I know I've registered many marks in the

 3     clothing field where that mark would appear on

 4     the front of a shirt.  I don't recall registering

 5     one where that was the only use.  My

 6     recollections are that I would register ones

 7     where it appeared on a hang tag or a label or

 8     both.

 9              Q    So you've never registered anything

10     that -- where it's just a name on the front of a

11     T-shirt without use on a hang tag or a label?

12              A    Not that I can recall.  And it would

13     be surprising because I don't know think the

14     trademark office would except that as a specimen.

15              Q    If you look back at Exhibit 311,

16     which is the specimen that was printed from the

17     PTO website.

18              A    Um-hmm.

19              Q    And you see the use of Roots Rock

20     Reggae is on the front of the T-shirt; correct?

21              A    Yes.  It's actually Roots Rock

22     Reggae Festival.

23              Q    Right.  Do you do much work for --

24     registration work for musicians or entertainment

25     properties?
```

41

Gregg Paradise

```
 1                         G. Paradise

 2              hypothetical, calls for speculation,

 3              lacks foundation.

 4         A    It would depend on whether there

 5    were any other facts that would call into

 6    question a registration.

 7         Q    Assume that a song title is a

 8    Federally registered trademark and Mr. Valencia

 9    wants to use it right underneath the image of the

10    particular celebrity whose song it is, would you

11    advise Mr. Valencia that that was permissible?

12              MR. WINTER:  Same objections,

13              incomplete hypothetical, lacks

14              foundation.

15         A    I recall actually having

16    discussions of -- I don't know if it was -- if

17    there was an actual registration in place, but

18    the question of what constitutes trademark use

19    and whether use in that manner was trademark use.

20    It's my opinion that merely placing a song title

21    on the front of a T-shirt is not trademark use.

22    If it's not trademark use, it shouldn't be a

23    trademark infringement.

24         Q    Well, do you -- I understand from

25    your e-mails you advised Mr. Valencia that he
```

43

Gregg Paradise

```
1                          G. Paradise

2      could not use Bob Marley directly on the

3      merchandise that he was licensing; right?

4              A    Yes, I advised against doing that.

5              Q    Okay.  And Bob Marley is a

6      registered trademark as you found from your

7      searches through the Patent and Trademark Office;

8      correct?

9              A    I believe that's what I found, yes.

10             Q    So Mr. Valencia absolutely could not

11     use Bob Marley's registered trademark on the

12     clothing, but it could be okay if he used a

13     registered trademark that was also a song title?

14             A    That's not -- I see where the

15     disconnect is here.

16                  I advised him that he shouldn't

17     use the trademark Bob Marley.  I believe my

18     advice would be the same for any registered

19     trademark that there was a great risk if you

20     use, whether it was a song title, the name or

21     any word fanciful, arbitrary or otherwise, if

22     someone has a registered trademark for

23     clothing, your use in a prominent fashion on

24     clothing of that mark is inadvisable because

25     there's a great risk.
```

44

G. Paradise

2                 At the same time, it's my opinion

3    that simply putting that name in a

4    non-trademark fashion on piece of clothing, not

5    in a way that is typically used by a trademark.

6                 For example, trademark owners will

7    often put it on a breast patch or on a pocket

8    or something like that.  That's, you know, like

9    the polo logo.  I don't have one on my current

10   shirt, but the one I wore yesterday I know had

11   the logo image on the breast area.  That's a

12   typical way that trademarks are used.

13                It's my belief that using a name,

14   whether it's registered trademark or not, in

15   another fashion is not a trademark use and

16   should not subject you to liability.  However,

17   it's a -- what I'd say, a dangerous area

18   because if there are any other facts that work

19   against you, it's going to push you over the

20   edge very quickly, so it's not an advisable way

21   to proceed.

22                So there's a difference between my

23   advice, which is often from a practical

24   business standpoint of, it's just too likely

25   you're going to get whether you ultimately

45

Gregg Paradise

```
1                      G. Paradise
2    should prevail on that suit or not, it's not
3    worth it, you shouldn't do it versus what I
4    think the law it.
5         Q    Okay.  And you provided that advice
6    or you did not provide that advice to Mr.
7    Valencia in terms of there could be a substantial
8    risk by using a registered trademark on the front
9    of the clothing?
10        A    I do not recall having that
11   discussion in connection with anything other than
12   the words "Bob Marley," which I clearly advised
13   you shouldn't do.
14             The issue, you know -- so I know I
15   definitely advised him that it's certainly not
16   suggested and I advised that that was not a
17   good way to proceed.  But I don't believe I
18   ever told him that any use of Bob Marley in any
19   form on clothing would absolutely be an
20   infringement.  There's two different things.
21             Mr. Valencia, his primary interest
22   was in getting legal advice but with an idea of
23   how he's trying to conduct business and, you
24   know, selling these T-shirts but paying a
25   million dollars in legal fees to defend
```

46

Gregg Paradise

1                        G. Paradise

2    yourself, even if you ultimately win, is a loss

3    at the end of the day.  So he tried to steer

4    clear of things that even if he technically

5    might be right, he might choose not to do it

6    for business reasons because people would file

7    overzealous lawsuits.

8              MS. PIETRINI:  Could you read back

9              that answer please?  Sorry, it was too

10             long.

11                  (The requested portion of the

12                  record was read back.)

13        Q     When we were talking about the

14   specimen for the Roots Rock Reggae registration

15   which I think we've marked as Exhibit 311, do you

16   understand the term specimen to refer to the

17   evidence of use provided to the U.S. Patent and

18   Trademark Office?

19        A     Yes, I do.

20        Q     And is it also your understanding

21   that the Trademark Office bases its decision on

22   whether to register a mark in part on the

23   evidence of use that's submitted?

24        A     The Trademark Office makes an

25   evaluation of whether the specimen shows use of

                                                    47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I, LaTrina A. Martin, declare as follows:

I am employed in Los Angeles County, Los Angeles, California.  I am over the age of eighteen years and not a party to this action.  My business address is MANATT, PHELPS & PHILLIPS, LLP, 11355 West Olympic Boulevard, Los Angeles, California 90064-1614.  On January 3, 2011, I caused the forgoing document:

**PLAINTIFFS' MOTION IN LIMINE #9 TO EXCLUDE CERTAIN DESIGNATED DEPOSITION TESTIMONY OF GREGG PARADISE BASED ON IT BEING IMPERMISSIBLE EXPERT TESTIMONY**

including any and all exhibits, to be electronically filed with the Clerk of Court using the CM/ECF system, which will effectuate service of said document upon the following counsel of record:

Douglas D. Winter (dwinter@balllawllp.com)
THE BALL LAW FIRM, LLP
10866 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90024

Counsel for Defendants and
Counterclaimants A.V.E.L.A., INC., LEO
VALENCIA, CENTRAL MILLS (FREEZE)

Daniel T. Hayward (dhayward@laxalt-nomura.com)
LAXALT & NOMBRA
9600 Gateway Drive
Reno, Nevada 89521
Telephone: (775) 322.1170
Facsimile: (775) 322.1865  Email:

Counsel for Defendant A.V.E.L.A., INC.

William R. Urga L. (wru@juww.com)
Christopher Rose (lcr@juww.com)
Jolley, Urga, Wirth, Woodbury & Standish
3800 Howard Hughes Pkwy.
Wells Fargo Tower, 16th Floor
Las Vegas, NV 89169

Co-Counsel for Attorneys for Plaintiffs and
Counter-Defendants FIFTY-SIX HOPE ROAD
MUSIC LIMITED and ZION ROOTSWEAR

Timothy J. Ervin, Esq. (tim@gallant-ervin.com)
Gallant & Ervin, LLC
One Olde North Road, Suite 103
Chelmsford, MA 01824

Co Counsel for Attorneys for Plaintiff and
Counter-Defendant ZION ROOTSWEAR

William H. Doyle, Esq. (wdoyle@dbglawfirm.com)
DOYLE BERMAN MURDY, P.C.
3295 N. Fort Apache Rd., Suite 110
Las Vegas, NV  89129

Counsel for Defendant JEM SPORTSWEAR

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made and that the foregoing is true and correct.

Executed on January 3, 2011, at Los Angeles, California.

/s/ LaTrina A. Martin
LaTrina A. Martin

300195412.2

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES