1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2      Including Professional Corporations
   JILL M. PIETRINI, Cal. Bar No. 138335
3        jpietrini@sheppardmullin.com
   PAUL A. BOST, Cal. Bar No. 261531
4        pbost@sheppardmullin.com
   1901 Avenue of the Stars, Suite 1600
5  Los Angeles, California  90067-6055
   Telephone:    (310) 228-3700
6  Facsimile:    (310) 228-3701

7  JOLLEY, URGA, WIRTH, WOODBURY & STANDISH
   WILLIAM R. URGA (Bar No. NV 1195)
8     email: wru@juww.com
   L. CHRISTOPHER ROSE (Bar No. NV 7500)
9     email: lcr@juww.com
   3800 Howard Hughes Pkwy.
10 Wells Fargo Tower, 16th Floor
   Las Vegas, NV 89169
11 Telephone:  (702) 699-7500
   Facsimile:  (702) 699-7555

12
   *Counsel for Plaintiffs and Counter-Defendants*
13 FIFTY-SIX HOPE ROAD MUSIC LIMITED and ZION
   ROOTSWEAR, LLC
14

15              **UNITED STATES DISTRICT COURT**

16                  **DISTRICT OF NEVADA**

17 | Fifty-Six Hope Road Music, Ltd., a | Case No. 2:08-cv-00105-PMP-GWF |
   Bahamian corporation; and Zion
18 Rootswear, LLC, a Florida limited | **PLAINTIFFS FIFTY-SIX HOPE ROAD**
   liability company, | **MUSIC LIMITED'S AND ZION**
19 | **ROOTSWEAR, LLC'S NOTICE OF CROSS**
              Plaintiffs, | **APPEAL AND REPRESENTATION**
20 | **STATEMENT**
        vs.
21
   A.V.E.L.A., Inc., a Nevada corporation;
22 Sci-Fi Productions, Inc. dba X One X
   Movie Archive, Inc., a Nevada
23 corporation; JEM Sportswear, a
   California corporation; Central Mills,
24 Inc. (Freeze), a New York corporation;
   and Leo Valencia, an individual,
25
              Defendants.
26

27 AND RELATED COUNTERCLAIM.

28

1    Notice is hereby given that Plaintiffs Fifty-Six Hope Road Music Limited and Zion

2    Rootswear, LLC in the above named case hereby cross appeal to the United States

3    Court of Appeals for the Ninth Circuit from the July 3, 2012 Judgment of the Court, and

4    the orders subsumed therein, including, but not limited to, the Court's orders dated July

5    3, 2012, January 19, 2012, November 2, 2012, and February 25, 2010.  True and

6    correct copies of the July 3, 2012 Judgment, July 3, 2012 Order, January 19, 2012

7    Order, November 2, 2012 Order, and February 25, 2010 Order are attached hereto as

8    **Exhibits A, B, C, D,** and **E**, respectively.

9    Defendants A.V.E.L.A., Inc., Sci-Fi-Productions, Inc., Leo Valencia, and Central

10   Mill, Inc. (Freeze) filed their notice of appeal on November 7, 2012, and this notice of

11   cross-appeal is timely pursuant to FRAP 4(a)(3).

12                                              Respectfully submitted,

13                                              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

14

15   Dated:  November 21, 2012          By  /s/Jill M. Pietrini

16                                              JILL M. PIETRINI

17                                              Plaintiffs and Counter-Defendants FIFTY-SIX
                                                HOPE ROAD MUSIC LIMITED and ZION
18                                              ROOTSWEAR, LLC

19

20

21

22

23

24

25

26

27

28

1

## REPRESENTATION STATEMENT

2       Pursuant to Circuit Rule 3-2, Plaintiffs Fifty-Six Hope Road Music Limited and

3   Zion Rootswear, LLC submit this Representation Statement that identifies all parties to

4   the action along with the names, addresses and telephone numbers of their respective

5   counsel.

6

7   Jill M. Pietrini                                    Email: jpietrini@sheppardmullin.com
    Paul A. Bost                                        Email: pbost@sheppardmullin.com
8   SHEPPARD MULLIN RICHTER HAMPTON, LLP
    1901 Avenue of the Stars, Suite 1600                Counsel for Plaintiff and Counter-
9   Los Angeles, CA 90067                               Defendant FIFTY-SIX HOPE ROAD
    Telephone:  (310) 228-3700; Facsimile:  (310) 228-3701   MUSIC

10  Timothy J. Ervin                                    Email:  tim@gallant-ervin.com
    GALLANT & ERVIN, LLC
11  One Olde North Road, Suite 103                      Counsel for Plaintiff and Counter-
    Chelmsford, MA 01824                                Defendant ZION ROOTSWEAR, LLC
12  Telephone:  (978) 256-6041; Facsimile:  (978) 256-7977

13  William R. Urga                                     Email: wru@juww.com
    L. Christopher Rose                                 Email: lcr@juww.com
14  JOLLEY, URGA, WIRTH,
      WOODBURY & STANDISH                               Counsel for Plaintiffs and Counter-
15  3800 Howard Hughes Pkwy.                            Defendants FIFTY-SIX HOPE ROAD
    Wells Fargo Tower, 16th Floor                       MUSIC LIMITED and ZION
16  Las Vegas, NV 89169                                 ROOTSWEAR, LLC
    Telephone:  (702) 699-7500; Facsimile:  (702) 699-7555
17

18  Melissa W. Woo-Allen                                Email:  melissaw@counselatlaws.com
    2647 Gateway Road, Suite 105-550
19  Carlsbad, CA 92009                                  Counsel for Defendants and
    Telephone:  (877) 787-4855; Facsimile:  (877) 787-6855   Counterclaimants A.V.E.L.A., INC., SCI-
20                                                      FI PRODUCTIONS, INC., and LEO
                                                        VALENCIA and for Defendant CENTRAL
21                                                      MILLS, INC. (FREEZE)

22  Peter Brown                                         Email:  pbrown@bremerandwhyte.com
    BREMER WHYTE BROWN & O'MEARA, LLP
23  7670 West Lake Mead Boulevard, Suite 225            Counsel for Defendants and
    Las Vegas, NV 89128                                 Counterclaimants A.V.E.L.A., INC., SCI-
24  Telephone:  (702) 258-6665; Facsimile:  (702) 258-6662   FI PRODUCTIONS, INC., and LEO
                                                        VALENCIA and for Defendant CENTRAL
25                                                      MILLS, INC. (FREEZE)

26  Jeffrey R Albregts                                  Email: jalbregts@nevadafirm.com
    SANTORO, DRIGGS, WALCH,
27  KEARNEY, HOLLEY & THOMPSON                          Counsel for Defendant JEM
    400 South Fourth Street, Third Floor                SPORTSWEAR
28  Las Vegas, NV 89101
    Telephone:  (702) 791-0308; Facsimile:  (702) 791-1912

1

2   John R. Yates                                    Email: jyates@greenbass.com
    GREENBERG & BASS, LLP
3   16000 Ventura Boulevard                          Counsel for Defendant JEM
    Encino, CA 90077                                 SPORTSWEAR
4   Telephone:  (818) 382-6200; Facsimile:  (818) 986-6534

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

AO450 (Rev. 5/85)   Judgment in a Civil Case

# UNITED STATES DISTRICT COURT

DISTRICT OF                    Nevada

Fifty-Six Hope Road Music, Ltd. et al.,

                            Plaintiffs,

                V.

AVELA., Inc. et al.,

                    Defendants.

## JUDGMENT IN A CIVIL CASE

Case Number:   2:08-cv-00105-PMP -GWF

☐ **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and  a decision has been rendered.

☐ **Notice of Acceptance with Offer of Judgment.**  A notice of acceptance with offer of judgment has been filed in this case.

IT IS ORDERED AND ADJUDGED

Judgment has been entered in favor of Plaintiffs Fifty-Six Hope Road Music, Ltd.  and Zion Rootswear, LLC  and against JEM  in the amount of $413,638.29, against Freeze in the amount of $19,246.54, and against defendant AVELA in the amount of $348,543.00.

July 3, 2012

Date

/s/ Lance S. Wilson

Clerk

/s/ Summer Rivera

(By) Deputy Clerk

# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | | |
|---|---|---|
| FIFTY-SIX HOPE ROAD MUSIC, LTD., *et al.*, | ) ) ) | 2:08-cv-00105-PMP-GWF |
| Plaintiffs, | ) ) | **ORDER** |
| v. | ) ) | |
| A.V.E.L.A., INC., *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

On January 21, 2011, the Jury returned verdicts in favor of Plaintiffs, finding that Defendants A.V.E.L.A., ("AVELA"), Leo Valencia, Sci-Fi Productions, Inc., dba X One X Movie Archive, Inc., ("X1X") (collectively the "AVELA Defendants"), JEM Sportswear, Inc. ("JEM") and Central Mills, Inc. ("Freeze") willfully infringed Plaintiffs' rights in the persona and identity of Bob Marley. (Doc. #301). On February 14, 2011, the Court entered a Partial Monetary Judgment and Permanent Injunction (Doc. #307), and in accord with the verdict of the Jury, entered an Monetary Judgment in the amount of $300,000.00 in favor of Plaintiffs and against the AVELA Defendants.

On June 21, 2011, Plaintiffs filed a Motion for Entry of Judgment for an Award of Defendants Profits and Increased Profits and For Increased Profits Pursuant to 15 U.S.C. §1117 (Doc. #329). Post-trial discovery has been taken concerning this matter, and on May 16, 2012, the Court conducted a hearing regarding the foregoing motion. (Doc. #377).

/ / /

1       Title 15, U.S.C. §1117(a) permits an award to Plaintiffs of Defendants' profits

2  based on a violation of the Lanham Act, in the Court's discretion, and subject to principles

3  of equity. Plaintiffs correctly argue that Defendants' gross revenues are established by the

4  Stipulation Re: Defendants' Gross Sales and Gross Receipts (Doc. #247), at $362,280.00

5  for the AVELA Defendants, $64,029.00 for Freeze, and $2,791,232.00 for JEM.

6  Defendants contend the foregoing gross revenues must be reduced by deductible costs

7  incurred in generating the gross profits. In this regard, Defendants correctly argue that they

8  successfully prevailed before trial on three of the five claims brought by Plaintiffs in this

9  action. Additionally, Defendants argue that the $300,000.00 damages award on the

10  interference claim already made by the Jury, and the injunctive relief granted by the Court,

11  are sufficient to satisfy any claim for damages Plaintiffs are shown to have suffered. Thus,

12  argue Defendants, the Court should exercise its discretion under §1117(a) and deny

13  Plaintiffs' motion for an award of Defendants' profits and for enhanced profits.

14       The Court rejects JEM's argument that the evidence at trial was insufficient to

15  support the Jury's verdicts. The evidence that JEM acted with an intent to deceive

16  consumers or that JEM caused actual money or reputational damages to Plaintiffs or to the

17  Marley persona is weak, and in the view of this Court does not warrant a request for an

18  enhanced award against JEM. The Court concludes that any award of profits generated by

19  JEM by the sale of Marley products should be limited to $413,638.29 which the Court finds

20  represents JEM's net gross profits after deduction of all direct costs established in the

21  record before the Court.

22       Similarly, the Court finds that the stipulated gross revenues garnered by Freeze

23  from the sale of Marley t-shirts of $64,029.00 should be reduced by $44, 753.46 incurred as

24  costs of production and royalties, warranting a recovery in favor of Plaintiffs only of

25  Freeze's net profits in the amount of $19,246.54.

26  / / /

2

1         The Court considers the evidence adduced at trial to be significantly stronger

2   with respect to the willfulness of the AVELA Defendants.  Nonetheless, the award of

3   $300,000.00 against the AVELA Defendants on the interference claim is significant.   The

4   Court further finds that beyond the $15,000.00 royalty paid to Roberto Rabanne, the

5   AVELA Defendants have failed to demonstrate entitlement to deductions against gross

6   revenue incurred with respect to V International Publishing, Inc., or for purported trade

7   show overhead.  The Court thus finds the AVELA Defendants' net profits of $348,543.00

8   are attributable to their infringement, are hence ill-gotten profits which should, in accord

9   with §1117(a) be disgorged to Plaintiffs. The Court, however, rejects Plaintiff's arguments

10  for an additional enhanced profits award against the AVELA Defendants.

11        **IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Entry Of Judgment

12  For An Award Of Defendants' Profits (Doc. #329) is **GRANTED** to the extent that

13  Defendant JEM shall, within 30 days of the date of this Order pay to Plaintiffs the sum of

14  $413,638.29,  Defendant Freeze shall, within 30 days of the date of this Order pay to

15  Plaintiffs the sum of  $19,246.54, the AVELA Defendants shall, within 30 days of this

16  Order pay to Plaintiffs the sum of $348,543.00 as and for lost profits.

17        **IT IS FURTHER ORDERED** that Plaintiffs' Motion for Entry of Judgment for

18  an Award of Defendants Profits and Increased Profits and For Increased Profits Pursuant to

19  15 U.S.C. §1117 (Doc. #329) is **DENIED** in all other respects.

20        **IT IS FURTHER ORDERED** that the Clerk of Court shall forthwith enter

21  Judgment in accord with the monetary awards Ordered above.

22  DATED: July 3, 2012.

23

24                            _____

                               PHILIP M. PRO

25                                 United States District Judge

26

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
LAS VEGAS, NEVADA

FIFTY-SIX HOPE ROAD MUSIC, )
LTD., et al., )
                         )
                         )
   Plaintiff(s),      )
                         )
vs.                        )    2:08-CV-105-PMP-GWF
                         )
A.V.E.L.A., et al.,        )    MINUTES OF THE COURT
                         )
   Defendant(s).      )    DATED: January 19, 2011

PRESENT: THE HONORABLE PHILIP M. PRO, UNITED STATES DISTRICT JUDGE

DEPUTY CLERK: Donna Sherwood    RECORDER: Summer Rivera

COUNSEL FOR PLAINTIFF(S): Jill M. Pietrini, Barry E. Mallen
Timothy J. Ervin

COUNSEL FOR DEFENDANT(S): Byron T. Ball, Douglas D. Winter

PROCEEDINGS: **MOTION HEARING AND HEARING TO SETTLE JURY INSTRUCTIONS**

9:10 a.m. Court convenes.

The Court places its findings of fact and conclusions of law on the record.

**IT IS ORDERED** Defendants' Rule 50 Motion for Judgment as a Matter of law is granted and denied as stated on the record.

The Court reserves on the issue of disgorgement of profits after the jury verdict, if appropriate.

The Court advises counsel the Court will be in recess until 11:00 a.m. to allow the Court additional time to review the latest filings of proposed jury instructions.

9:30 a.m. Court stands at recess.

11:00 a.m. Court reconvenes.

**2:08-CV-105-PMP-GWF**
**1/19/2011**
**Page 2**
_____

The Court hears the arguments of counsel and rules on objections to the proposed jury instructions.

11:25 a.m. Court stands at recess.

1:10 p.m. Court reconvenes.

The Court hears the arguments of counsel and rules on objections to the proposed jury instructions.

The Court instructs counsel to return tomorrow morning at 8:30 a.m. to continue with argument to the proposed jury instructions.

4:45 p.m. Court adjourns.

                          LANCE S. WILSON, CLERK
                          By:
                          _____/s/_____
                          Donna Sherwood, Deputy Clerk

# EXHIBIT D

1

2

3

4                           UNITED STATES DISTRICT COURT

5                                  DISTRICT OF NEVADA

6                                           * * *

7   FIFTY-SIX HOPE ROAD MUSIC, LTD.,   )
    a Bahamian corporation; and ZION   )         2:08-CV-00105-PMP-PAL
8   ROOTSWEAR, LLC, a Florida Limited  )
    Liability company,                 )
9                                      )
                                       )
            Plaintiffs,                )
10                                     )
    v.                                 )
11                                     )         **ORDER**
    A.V.E.L.A., INC., a Nevada corporation, )
12  SCI-FI PRODUCTIONS, INC., dba X    )
    One X Movie Archive, Inc., a Nevada )
13  corporation, JEM SPORTSWEAR, a     )
    California corporation, CENTRAL    )
14  MILLS, INC. (Freeze), a New York   )
    corporation, and LEO VALENCIA,     )
15  an individual,                     )
                                       )
16          Defendants.                )
    _____ )
17                                     )
    AND RELATED COUNTERCLAIM.          )
18  _____ )

19          Before the Court for consideration is Plaintiffs' fully-briefed Motion to

20  Submit Additional Evidence Re: Order Adjudicating Defendants' Motion for

21  Summary Judgment as to Plaintiffs' Right of Publicity Claim (Doc. #218) filed

22  October 1, 2010.

23          When this Court previously ruled on Defendants' Motion for Summary

24  Judgment regarding Plaintiffs' Right of Publicity Claim, the Court held Plaintiffs

25  were obligated to register their rights under Nevada's Right of Publicity Statute

26  within six months of the first use in Nevada of which they knew, or reasonably

1  should have known.  (Doc. #145).  The Court further held that genuine issues of

2  material fact existed as to when Plaintiffs first discovered or should have discovered

3  a use in Nevada.  As a result, the Court denied Defendants' summary judgement

4  motion as to Plaintiffs' Right of Publicity Claim.

5      Plaintiffs now move to supplement the evidence with two letters which

6  indicate Plaintiffs knew of third-parties' use of Marley's publicity rights in Nevada

7  more than six months before they registered for publicity rights in Nevada.  Plaintiffs

8  produced those documents to Defendants more than a year before Defendants'

9  motion for summary judgment, but neither Defendants nor Plaintiffs presented the

10  letters to the Court in connection with the prior summary judgment motion.

11  Plaintiffs state they "stand ready" to brief whether these letters reflect a "commercial

12  use" by the third-parties under the Nevada publicity rights Statute such that the

13  registration requirement was triggered.

14      Defendants respond that they are now entitled to summary judgment on the

15  Nevada Publicity Rights Claim, as no issue of fact remains that Plaintiffs were aware

16  of third-party use of Marley's publicity rights more than six months prior to their

17  registration.  Defendants also seek sanctions under Rule 11 of the Federal Rules of

18  Civil Procedure, under 28 U.S.C. §1927, and under the Court's inherent powers,

19  based on Plaintiffs' failure to bring forth these letters at summary judgment and

20  forcing Defendants to incur continued expense litigating this claim.

21      The Court finds the two letters now establish that Plaintiffs were aware of

22  third-party use of Marley's image in Nevada more than six months prior to their

23  registration.  Consequently, by their failure to register within those six months,

24  Plaintiffs have waived their publicity rights in Marley's image under Nevada law and

25  Defendants are entitled to summary judgment on the Nevada Publicity Rights Claim.

26  The Court further finds it unnecessary for the parties to brief whether these third-

1    party uses were "commercial uses" as the Nevada statute applies to "any commercial

2    use" within the State. Nev.Rev.Stat. §597.780. "Commercial use means using the

3    persons name, voice, signature, photograph or likeness" on or in any product,

4    merchandise or goods or for the purposes for advertising, selling or soliciting the

5    purchase of any product, merchandise, goods or service." Id. §597.770(1). The

6    Court finds both letters clearly reference commercial use.

7         The Court further finds, however, there is no basis to sanction Plaintiffs.

8    Plaintiffs did not fail to disclose the documents to Defendants. Defendants had them

9    approximately a year before Defendants moved for summary judgment and

10   Defendants failed to bring them to the Court's attention as well. Moreover, without

11   any prodding from Defendants, Plaintiffs corrected their oversight. Thus the Court

12   finds no basis for sanctions under §1927, or under the inherent authority of the

13   Court. Finally, Defendants have no basis to seek sanctions under Rule 11 as they

14   have not complied with the requirements of that Rule in seeking the sanctions

15   requested.

16      **IT IS THEREFORE ORDERED** that Plaintiffs' Motion to Submit

17   Additional Evidence Re: Order Adjudicating Defendants' Motion for Summary

18   Judgment as to Plaintiffs' Right of Publicity Claim (Doc. #218) is **GRANTED.**

19      **IT IS FURTHER ORDERED** that summary judgment is hereby entered

20   in favor of Defendants and against Plaintiffs on Plaintiffs' claim for violation of

21   Publicity Rights under Nevada law.

22   ///

23   ///

24   ///

25   ///

26   ///

1    **IT IS FURTHER ORDERED** that Defendants' Request for Sanctions

2    (Doc. #221) is **DENIED**.

3

4    DATED: November 2, 2010.

5

6    _____

7    PHILIP M. PRO
     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT E

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| FIFTY-SIX HOPE ROAD MUSIC, LTD.; )<br>ZION ROOTSWEAR, LLC; and ROBERT )<br>MARLEY FOUNDATION, LTD., )<br> )<br> Plaintiffs, )<br> )<br>v. )<br> )<br>A.V.E.L.A., INC.; LEO VALENCIA; X )<br>ONE X MOVIE ARCHIVE, INC.; JEM )<br>SPORTSWEAR; and CENTRAL MILLS )<br>(FREEZE), )<br> )<br> Defendants. )<br>_____)<br> )<br>A.V.E.L.A., INC. and LEO VALENCIA, )<br> )<br> Counterclaimants, )<br> )<br>v. )<br> )<br>FIFTY-SIX HOPE ROAD MUSIC, LTD. )<br>and ZION ROOTSWEAR, LLC, )<br> )<br> Counterdefendants. )<br>_____) | 2:08-CV-00105-PMP-GWF<br><br>ORDER |

Presently before the Court is Defendants' Motion for Summary Judgment (Doc. #113), filed on November 30, 2009. Plaintiffs filed an Opposition (Doc. #127) on December 18, 2009. Defendants filed a Reply (Doc. #133) on January 11, 2010.

///

1    Also before the Court is Plaintiffs' Motion for Summary Adjudication on

2 Plaintiffs' False Association Claim Under 15 U.S.C. § 1125(a) (Doc. #114), filed on

3 November 30, 2009.  Defendants filed an Opposition (Doc. #126) on December 18, 2009.

4 Plaintiffs filed a Reply (Doc. #134) and Response to Objections (Doc. #135) on January 11,

5 2010.

6 **I. BACKGROUND**

7    Bob Marley was a world-famous singer, songwriter, performer, and guitarist.

8 (Pls.' Mot. Summ. J. (Doc. #114) ["Pls.' MSJ"], Decl. of Doreen Crujeiras ("Crujeiras

9 Decl.") at 3.)  He has sold millions of albums and has several well-known songs, including

10 "I Shot the Sheriff," "No Woman, No Cry," and "One Love."  (Id.)  Bob Marley died

11 intestate in 1981.  (Id. at 2.)

12    Plaintiff Fifty-Six Hope Road Music, Ltd. ("Hope Road") is named after the

13 location of Bob Marley's residence in Jamaica.  (Id. at 4.)  Hope Road is composed of and

14 owned by Bob Marley's children.  (Id. at 5.)  Hope Road owns U.S. Trademark Registration

15 No. 2,349,361 for "BOB MARLEY" in eleven classes of goods, including t-shirts.  (Pls.'

16 MSJ, Decl. of Jill Pietrini ("Pietrini Decl.") at 2 & Ex. A.)  Hope Road has applied for the

17 trademark "MARLEY" for clothing.  (Pietrini Decl. at 2 & Ex. C.)  Plaintiffs have

18 registered for Marley's publicity rights in several states, including Nevada.  (Pls.' Opp'n to

19 Defs.' Mot. Summ. J. (Doc. #127) ["Pls.' Opp'n"], Ex. K at 117.)

20    In 1999, Hope Road granted Plaintiff Zion Rootswear, LLC ("Zion") an

21 exclusive world-wide license to design, manufacture, and sell t-shirts bearing Marley's

22 image, likeness, and other manifestations of his identity.  (Crujeiras Decl. at 7.)  Hope Road

23 licenses the manufacture of many products bearing the Marley intellectual property,

24 including hats, posters, calendars, key chains, and beach towels.  (Crujeiras Decl. at 7 &

25 Exs. I, J.)  Plaintiffs market these items through websites, an eBay online store, catalogs,

26 and at trade shows.  (Crujeiras Decl. at 4 & Ex. D; Defs.' Opp'n to Pls.' Mot. Summ. J.

2

1    (Doc. #126) ["Defs.' Opp'n"], Conley Decl. at 2-3.)

2          Hope Road authorizes Zion to use from three to five hundred different

3    photographs of Marley for use on t-shirts.  (Defs.' Mot. Summ. J. (Doc. #113) ["Defs.'

4    MSJ"], Ex. H.)  Zion's 2009 catalog included t-shirts displaying Marley's image and name,

5    but not all t-shirts displayed the words "Marley" or "Bob Marley," or an image of Bob

6    Marley.  (Defs.' MSJ, Ex. I.)  The decision whether to include the words "Bob Marley" or

7    Marley's image on the t-shirts was an artistic decision.  (Defs.' MSJ, Ex. J.)

8          Over the years, Plaintiffs have enforced their rights in the Bob Marley intellectual

9    property, sending out approximately four hundred cease and desist letters and filing over

10   twenty trademark, copyright, and right of publicity suits.  (Crujeiras Decl. at 8-9 & Ex. M;

11   Pls.' MSJ, Ervin Decl. at 3 & Ex. E.)  For example, in March 2004, Plaintiffs learned The

12   Tunes Company, a Florida corporation, was displaying Marley-related goods on its website,

13   and Plaintiffs sent a cease and desist letter.  (Pls.' Opp'n, Ervin Decl. at 3.)

14         Plaintiffs first encountered Defendant A.V.E.L.A., Inc. ("Avela") at the February

15   2005 MAGIC apparel trade show in Las Vegas.  Avela is in the business of publishing and

16   licensing artwork for distribution in the retail marketplace.  (Defs.' MSJ, Valencia Decl. at

17   1.)  Avela collects and restores artwork and images related to classic movies, television

18   programs, and other entertainment.  (Id.)  Defendant Leo Valencia ("Valencia") is the

19   president and owner of Defendants Avela and X One X Movie Archive, Inc. ("X One X").

20   (Id.)  Defendant X One X previously was involved in restoring movie posters and reselling

21   them at auction.  (Pls.' MSJ, Pietrini Decl., Ex. F at 35.)  Avela acts as a licensing agent for

22   X One X.  (Id. at 41.)

23         The parties dispute the circumstances surrounding their first interaction.  The

24   parties agree that Michael Conley ("Conley") of Zion met Valencia at the 2005 MAGIC

25   show, Valencia showed Conley some images, and the two agreed to discuss further a

26   possible licensing arrangement.  However, the parties dispute what was contained in those

3

images.  According to Conley, none of the images he viewed in Valencia's portfolio depicted Bob Marley.  (Pls.' Opp'n, Bost Decl., Ex. G at 58.)  Likewise, Val Formica ("Formica") of Gateway Licensing, an entity working with Zion, also avers that Valencia did not show him any photographs of Bob Marley.  (Pls.' Opp'n, Formica Decl. at 2.)  Rather, Formica and Conley contend that their discussions with Valencia concerned Zion's potential licensing of Avela's movie-based properties.  (Pls.' Opp'n, Bost Decl., Ex. G at 54-56.)

According to Valencia, Avela's portfolio at the 2005 MAGIC show included certain images of Marley which Avela had obtained from a photographer named Roberto Rabanne ("Rabanne").  (Defs.' MSJ, Valencia Decl. at 1-2; Pls.' MSJ, Ex. H at 79-80.)  Valencia avers that Conley viewed the portfolio including the Marley images.  (Defs.' MSJ, Valencia Decl. at 3.)  However, Kimberly Mileski of Defendant Central Mills, Inc. d/b/a Freeze ("Freeze") testified that she viewed Avela's binder at the 2005 MAGIC show, but it did not contain any Marley images at that time, and the first time Valencia showed her photographs of Marley was in 2007.  (Pls.' Opp'n, Bost Decl., Ex. H at 33-34, 43-44.)  Liza Acuna, Avela's licensing agent, also testified she did not believe Valencia showed or sent to Conley any Marley images at the 2005 MAGIC show or in follow-up emails.  (Pls.' Opp'n, Bost Decl., Ex. I at 286-87.)  After the MAGIC show, the parties continued to discuss a potential licensing arrangement, but no licensing agreement was reached.  (Defs.' MSJ, Valencia Decl. at 2; Pls.' Opp'n, Formica Decl. at 1-2.)

At the same 2005 MAGIC trade show, Zion and Hope Road discovered another company, Legends4Life.com ("Legends"), was displaying a Bob Marley t-shirt.  (Pls.' Opp'n, Ervin Decl. at 2.)  Zion and Hope Road subsequently commenced suit against Legends and several other parties that were offering Marley goods at the 2005 show.  (Id. at 2-3.)  Plaintiffs thereafter filed an application to register the rights of publicity for Bob Marley with the Nevada Secretary of State's Office on January 24, 2006.  (Id. at 4.)

4

1    In addition to disputing when Avela first displayed to others any Marley

2  photographs, the parties dispute when Avela first obtained the photographs from Rabanne.

3  According to Valencia, he was introduced to Rabanne in 2004. (Defs.' MSJ, Valencia

4  Decl. at 1.) Rabanne showed Valencia photographs of Bob Marley, which Rabanne stated

5  he took with Bob Marley's permission. (Id.) Rabanne agreed to allow the Marley images

6  to be used in Avela's portfolio to see if any potential licensees were interested in using the

7  photos. (Id.) According to Valencia, Rabanne repeatedly told him both orally and in

8  writing that Bob Marley had given Rabanne express permission to sell the photographs and

9  to use them in merchandising products such as t-shirts and posters. (Id. & Ex. D; Pls.' MSJ,

10  Pietrini Decl., Ex. G at 105, Ex. S at 335-36, 361.)

11    However, Rabanne testified that he first met Valencia in June 2006, about a

12  month before he signed a July 2006 contract with Valencia. (Pls.' Opp'n, Bost Decl., Ex. A

13  at 54-55.) Rabanne denies he met Valencia in 2004. (Id. at 55.) According to Rabanne,

14  after litigation commenced in another lawsuit involving the Marley photographs, Valencia

15  sent him contracts dated 2003 and 2004. (Id. at 123-24.) Rabanne testified that Valencia

16  sent him these contracts because Valencia "needed to backdate the actual contract" that

17  Valencia and Rabanne originally had signed in an effort to show Valencia and Rabanne's

18  relationship dated back to 2003 or 2004. (Id. at 124; see also Pls.' Opp'n, Bost Decl., Ex.

19  B.) Rabanne declined to sign the documents. (Pls.' Opp'n, Bost Decl., Ex. A at 125-26.)

20    Rabanne also denied that he told Valencia that Bob Marley had approved

21  Rabanne's use of the photos for merchandising other products. According to Rabanne,

22  Valencia "coached" him to say that Marley was aware that Rabanne sold photos of Marley.

23  (Pls.' Opp'n, Bost Decl., Ex. C at 82-83.) According to Rabanne, Marley never actually

24  saw Rabanne selling pictures, but it was Rabanne's impression that Marley knew he was

25  selling pictures. (Id.) Further, Rabanne testified that he did not sell t-shirts or posters when

26  Marley was alive, and hence Marley did not approve of that use for any of Rabanne's

1   photographs. (Id. at 87-88.)  Rather, Rabanne sold only fine art prints during that time.

2   (Id.)

3          According to Avela's former counsel, Gregg Paradise ("Paradise"), Valencia first

4   requested he do work related to the Marley rights in August 2006. (Pls.' Opp'n, Bost Decl.,

5   Ex. E at 38-39; Pls.' MSJ, Pietrini Decl., Ex. T.)  Paradise understood that Valencia was

6   looking into marketing t-shirts depicting Marley photographs, and that the t-shirts were not

7   in the marketplace at that time. (Pls.' Opp'n, Bost Decl., Ex. E at 39-40.)

8          In the fall of 2006, Valencia discussed a possible licensing agreement with Rohan

9   Marley ("Rohan"), one of the Marley children. (Pls.' MSJ, Pietrini Decl., Ex. V.)

10  According to Valencia, he discussed with Rohan only a possible license to use the words

11  "Bob Marley," but he was not seeking a licence to use Marley images on apparel. (Defs.'

12  Opp'n, Valencia Decl. at 4.)  According to Rohan, Valencia mentioned that he wanted to

13  produce t-shirts to mass market retailers, but Rohan indicated the Marleys were not

14  interested in mass market sales. (Pls.' Opp'n, Bost Decl., Ex. F at 102-03.)  According to

15  Rohan, Valencia responded that he came to the family out of respect, but that if the family

16  did not want to participate, Valencia could market the t-shirts without them. (Id.)  Rohan

17  asked Valencia how he could do that, to which Valencia replied that he could do it in

18  certain territories, including Las Vegas, without the family's permission. (Id.)  No licensing

19  agreement was reached between Rohan and Valencia.

20         On February 7, 2007, Plaintiffs filed a complaint and sought a temporary

21  restraining order against Fame Jeans, Inc. ("Fame"), Avela, and Valencia for trademark and

22  rights of publicity infringement. (Crujeiras Decl. at 9; Pls.' MSJ, Ervin Decl, Ex. A.)  The

23  suit alleged Fame, Avela, and Valencia were marketing Marley products without a license

24  at the 2007 MAGIC trade show in Las Vegas. (Pls.' MSJ, Ervin Decl., Ex. A.)  This Court

25  granted an ex parte motion for temporary restraining order. (Pls.' MSJ, Ervin Decl., Ex. B.)

26  During the parties' settlement negotiations, Fame stated it never made any Bob Marley

6

1   related products, and it displayed only one Marley photograph at the 2007 MAGIC trade

2   show, which Fame had licensed from Avela. (Crujeiras Decl. at 9.) Fame did not take any

3   orders for a Marley product, and agreed it would not make any such products in the future.

4   (Id.) Plaintiffs contend they believed the Fame incident was the extent of Avela's and

5   Valencia's use of Marley-related images. (Id.) Plaintiffs thereafter dismissed the 2007

6   lawsuit without prejudice. (Pls.' MSJ, Ervin Decl., Ex. D.)

7            Fame was not Avela's only customer for Marley-related products, however.

8   Avela licensed Marley images to Defendants Jem Sportswear ("Jem") and Freeze, as well

9   as others not named as defendants in this suit. (Defs.' MSJ, Valencia Decl. at 2.) In mid-

10  January 2008, Plaintiffs learned Avela and Valencia were licensing the Rabanne

11  photographs of Marley to different manufacturers who were selling Marley products

12  through retailers such as Target and Wet Seal. (Crujeiras Decl. at 10.)

13           Target listed for sale on its website a t-shirt identified as "Marley Vintage Tee,"

14  and another as "Licensed Black Marley Raibow [sic] Monster Tee." (Defs.' MSJ, Ex. G.)

15  At stores, Target listed the product on shelf labels identifying the item as "Bob Marley

16  black." (Pls.' MSJ, Pietrini Decl., Ex. N at 97-98.) According to Target buyer Elizabeth

17  Kinneberg, Target used these designations as "the item description, which is just that

18  general description," and as "just a descriptor of who's on the t-shirt." (Id. at 54, 57-58.)

19  Both shirts contain an image of Marley, but do not contain any graphic text. (Defs.' MSJ,

20  Ex. G.) The t-shirts' neck tags have Avela logos. (Pls.' MSJ, Pietrini Decl., Ex. N at 100-

21  01.) Target obtained the shirts from Jem, and sold the shirts from October 2008 to the

22  summer of 2009. (Id. at 57, 59-61, 95, 99 & Dep. Ex. 185.)

23           Wal-Mart advertised on its website several Marley "hoodies" and t-shirts. (Defs.'

24  MSJ, Ex. G.) The hoodies and t-shirts displayed images of Marley. (Id.) Two t-shirts also

25  displayed words, but the shirts do not display the name Bob Marley. (Id.) Wal-Mart

26  advertised these products as "Bob Marley - Men's Zip Hoodie," "Jimi Hendrix Bob Marley

1   - Big Men's Mock-Layer Tee," "Bob Marley - Men's Short-Sleeve Graphic Tee," and "Bob

2   Marley - Men's Mock-Layer Tee."  (Id.)

3          Wet Seal advertised on its website a "Bob Marley Rasta Tee," a "Marley Concert

4   Tank," and a "Bob Marley Peace Tee."  (Pls.' MSJ, Ex. O.)  One of these shirts contained

5   only Marley's image.  (Id.)  Another displayed his image along with the words "Stand Up"

6   and "Stand Up for Your Rights," which are words from a Marley song.  (Id.; Pls.' Reply

7   (Doc. #134), Supplemental Bost Decl., Ex. E at 54.)  The third shirt contained a Marley

8   image and the words "Peace" and "Love."  (Pls.' MSJ, Ex. O.)

9          Another retailer, Balzout, sold t-shirts containing Bob Marley's image as well as

10  the words "One Love," a Marley song title, and "Catch a Fire," a Marley album title.  (Pls.'

11  Reply, Supplemental Bost Decl., Ex. A at 64-66, 108-09.)  The House, Inc. sold boxer

12  shorts with the song title "Soul Revolution" and a Marley image.  (Id., Ex. C at 43-45.)

13         According to Valencia, Avela "takes careful steps to make sure that in licensing

14  or otherwise using images and artwork it does not infringe others' intellectual property

15  rights."  (Defs.' MSJ, Valencia Decl. at 1.)  Valencia researched the United States Patent

16  and Trademark Office registrations prior to any manufacture of products using the Marley

17  images, and found Plaintiffs' registration for the trademark "BOB MARLEY."  (Id. at 2-3.)

18  Valencia avers that due to this registration, Avela made it clear to its licensees that no items

19  ever could be sold with the words MARLEY or BOB MARLEY on the product.  (Id. at 3.)

20  Avela had an approval process for any licensed items using the Marley images, and Avela

21  disapproved an item proposed by Freeze because it contained the words "Bob Marley."  (Id.

22  & Ex. E.)  According to Valencia, Avela never has received a complaint or correspondence

23  indicating there has been consumer confusion in the marketplace as to the source, origin,

24  affiliation, or sponsorship of any of Defendants' licensed products bearing the Marley

25  images.  (Valencia Decl. at 3.)

26  ///

8

1    However, Plaintiffs retained an expert in this case, E. Deborah Jay ("Jay") of

2  Field Research Corporation, who conducted a survey in August 2009 of potential

3  purchasers of graphic t-shirts.  (Pls.' MSJ, Pietrini Decl., Ex. DD.)  The survey's purpose

4  was "to determine whether potential purchasers of graphic or screened T-shirts are likely to

5  mistakenly believe that the heirs, estate or agents of Robert Nesta Marley ('Bob Marley')

6  are the source or the sponsor of, or are affiliated with, A.V.E.L.A. T-shirts bearing Bob

7  Marley's image."  (Id. at 402.)  Jay conducted 509 face-to-face interviews with potential

8  graphic t-shirt purchasers.  (Id.)  Jay split the group into a control group, which was shown

9  a fictitious Avela t-shirt bearing the image of an unknown African-American male with

10  dreadlocks, and a test group, which was shown an actual Avela t-shirt bearing Marley's

11  image.  (Id. at 402-03.)  Both t-shirts contained the Avela neck label, stated that the designs

12  were the property of X One X, and indicated a 1976 copyright for Rabanne.  (Id. at 403.)

13    Jay had the respondents look at either the test or control t-shirt, and then

14  interviewers posed a series of questions about the shirt.  Interviewers asked who the

15  respondents thought made the t-shirt, whether the respondents thought the t-shirt makers

16  received permission from anyone else to make the t-shirt, and whether the respondents

17  thought the t-shirt maker produces something other than t-shirts.  (Id. at 403-04.)  Neither

18  the interviewers nor the respondents were told the name of Jay's client or that the survey

19  was being used in connection with litigation.  (Id. at 404.)

20    When asked who made or put out the t-shirt, seventeen percent of the test group

21  answered Avela or X One X and nine percent stated Bob Marley or the person on the t-

22  shirt.[1]  (Id. at 418.)  In the control group, twenty-two percent answered Avela, and two

23  percent answered Marley or the person on the shirt.  (Id.)  When asked whether the t-shirt

24  _____

25    [1] Other answers included Hot Topic, Spencer's, or other retailers such as Wal-Mart or Target.
   Twenty-nine percent of the test group answered they did not know.  Thirty-four percent of the control
26  group answered they did not know.

1   maker received permission from someone to put out the t-shirt, of those who said yes,

2   thirty-seven percent of the test group answered Bob Marley or the person on the shirt,

3   whereas twenty percent of the control group answered Marley or the person on the shirt.

4   (Id. at 419.)  Forty-one percent of the respondents in the test group and fifty-nine percent of

5   the respondents in the control group answered that the t-shirt maker did not have to receive

6   approval from anyone or the respondents had no opinion on the question.  (Id.)  Overall,

7   forty-two percent of the test group said Marley or the person on the shirt was the source or

8   sponsor of the shirt, while twenty-two percent of the control group thought so.  (Id. at 420.)

9   These results led Jay to conclude that forty-two percent of respondents in the test group

10  mistakenly believed Marley, his heirs, or the person on the shirt were the source or sponsor

11  of the t-shirt.  (Id. at 422.)  The comparable percentage for the control group was twenty-

12  two percent.  (Id.)  Jay thus concluded that twenty percent of the test group was confused as

13  to source of the actual Avela t-shirt because it bears Marley's image.  (Id.)  Jay opined there

14  is a likelihood of confusion as to the source or sponsor of the Avela t-shirts due to the use

15  of Marley's image thereon.  (Id.)

16          Upon discovering the shirts on sale at Target, Plaintiffs initiated this action in this

17  Court on January 23, 2008, against Avela and Valencia.  (Compl. (Doc. #1).)  Plaintiffs also

18  moved ex parte for a temporary restraining order.  The Court ordered the motion served,

19  held a hearing, and denied the motion for temporary restraining order and the motion for

20  preliminary injunction.  Avela and Valencia answered and asserted counterclaims for

21  interference with contractual relations, interference with prospective economic advantage,

22  declaratory judgment of non-infringement, and cancellation of trademarks.[2]  (Ans. &

23  Countercl. (Doc. #23).)  On December 29, 2008, Plaintiffs amended their Complaint,

24  adding X One X, Jem, and Freeze as defendants.  (Am. Compl. (Doc. #61).)  Plaintiffs

25  _____

26          [2]  Avela and Valencia also asserted counterclaims for Nevada unfair trade practices and
      Sherman Act violations, but later agreed to dismiss these claims.  (Doc. #41, #42.)

                                                    10

1   assert in their Amended Complaint claims for trademark infringement under the Lanham

2   Act (count one); unfair competition under the Lanham Act (count two); common law

3   trademark infringement (count three); unauthorized commercial use of right of publicity

4   under Nevada law (count four); and intentional interference with prospective economic

5   advantage (count five).

6          Defendants now move for summary judgment on all of Plaintiffs' claims.

7   Defendants argue they are entitled to summary judgment on Plaintiffs' trademark and unfair

8   competition claims because Plaintiffs own the trademark in the words "Bob Marley" and

9   Defendants do not use those words on any of their products.  Defendants contend Plaintiffs

10   do not own a trademark in Marley's image or any particular photograph of Marley, and

11   Plaintiffs do not make consistent use of any single Marley image as a trademark.

12   Defendants also argue they do not use Marley's image as a source indicator, and thus their

13   use does not constitute trademark use.

14          As to Plaintiffs' right of publicity claim under Nevada law, Defendants argue

15   Plaintiffs waived any right of publicity by failing to timely register their rights in Nevada.

16   Defendants also argue their use pre-dated Plaintiffs' registration, and hence statutorily

17   Plaintiffs cannot assert their publicity rights against Defendants.  Defendants contend the

18   Nevada statute does not grant rights to persons who died before the act was passed.  Finally,

19   Defendants assert the intentional interference claim fails because it is based on the

20   trademark and right of publicity claims.

21          Plaintiffs respond that they have a trademark right in Marley's identity and

22   persona.  Plaintiffs also argue that even if the respective mark is only Bob Marley's name, a

23   genuine issue of material fact remains that Defendants have used Marley's name to

24   advertise the t-shirts and that such use does not constitute fair use.  Plaintiffs also argue

25   Marley's image is the same as his name under the doctrine of equivalents.  As to the right of

26   publicity claim, Plaintiffs argue they need not register with Nevada within six months of

11

1    any unauthorized use.  Rather, they must do so only within six months of a particular

2    defendant's unauthorized use.  Plaintiffs further argue they registered their claim within six

3    months of their knowledge of unauthorized use in Nevada by Legends at the August 2005

4    MAGIC show, and thus their registration was timely even under Defendants' interpretation

5    of the statute.  Plaintiffs also contend the Nevada statute applies to celebrities who died

6    prior to the statute's enactment.

7            Plaintiffs also move for summary judgment, but only as to count two, unfair

8    competition under the Lanham Act for designation of false origin or association.  Plaintiffs

9    argue they own the rights in Marley's identity, Plaintiffs consistently have used his image

10   and likeness to market apparel and other merchandise for many years, and Plaintiffs have

11   policed others' attempts at using Marley's image or likeness.  Plaintiffs further argue

12   Defendants have sold Marley images, including images with Marley song and album titles

13   and lyrics, to others to place on t-shirts and beach towels.  Plaintiffs argue that Defendants'

14   conduct of using Marley's image and likeness on the same products for which Plaintiffs use

15   the images and likeness falsely associate Defendants' products with Plaintiffs.  Plaintiffs

16   contend the survey results show a likelihood of confusion as to the source or affiliation of

17   Defendants' t-shirts with Plaintiffs.

18           Defendants respond that Plaintiffs did not plead in their Amended Complaint a

19   false association claim, and Plaintiffs should not be able to amend their Amended

20   Complaint at summary judgment.  Defendants further argue that even if the Amended

21   Complaint could be construed to have a false association claim, a Lanham Act claim still

22   requires Plaintiffs to make a trademark use of Marley's image, which Plaintiffs have not

23   done because Plaintiffs do not consistently use any particular image of Marley on their

24   products.  Defendants also argue that this is not a right of publicity case under the Lanham

25   Act, because those cases all concern the situation where the defendant used the celebrity's

26   image to falsely portray the image that the celebrity endorsed the product.  Defendants

1    contend they did not use Marley's image in commercial advertising to promote the product.

2    Defendants also argue there is no evidence in this case of actual customer confusion, and

3    the survey does not sufficiently raise issues of fact on confusion.

4    **II. LEGAL STANDARD**

5           Summary judgment is appropriate "if the pleadings, the discovery and disclosure

6    materials on file, and any affidavits show that there is no genuine issue as to any material

7    fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

8    A fact is "material" if it might affect the outcome of a suit, as determined by the governing

9    substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is

10   "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the

11   non-moving party. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir.

12   2002). Initially, the moving party bears the burden of proving there is no genuine issue of

13   material fact. Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002). After the

14   moving party meets its burden, the burden shifts to the non-moving party to produce

15   evidence that a genuine issue of material fact remains for trial. Id. The Court views all

16   evidence in the light most favorable to the non-moving party. Id.

17   **III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. #113)**

18          **A. Count One - Trademark Infringement - 15 U.S.C. § 1114 & Count Three**
             **- Common Law Trademark Infringement**
19

20          In count one of Plaintiffs' Amended Complaint, Plaintiffs allege Defendants have

21   used in commerce merchandise bearing the "Marley Intellectual Property," and thus have

22   infringed on the federally registered trade mark "BOB MARLEY." The Amended

23   Complaint defines "Marley Intellectual Property" as "including but not limited to" (1)

24   common law rights in the name Bob Marley in association with music and entertaining and

25   merchandise promoting the same; (2) the federally registered BOB MARLEY mark; and (3)

26   the Nevada registered rights of publicity. The parties dispute whether Plaintiffs can claim a

1   mark in all depictions of Marley, whether Marley's picture is the equivalent of the mark on

2   his name, whether Defendants used the BOB MARLEY mark, and if so, whether

3   Defendants' use of Marley's name is fair use.

4          1.  The Mark

5          Title 15 U.S.C. § 1114 provides for a private right of action in favor of a

6   trademark registrant against "[a]ny person who shall, without the consent of the registrant"–

7               (a) use in commerce any reproduction, counterfeit, copy, or
    colorable imitation of a registered mark in connection with the sale,
8   offering for sale, distribution, or advertising of any goods or services
    on or in connection with which such use is likely to cause confusion, or
9   to cause mistake, or to deceive; or
                (b) reproduce, counterfeit, copy, or colorably imitate a
10  registered mark and apply such reproduction, counterfeit, copy, or
    colorable imitation to labels, signs, prints, packages, wrappers,
11  receptacles or advertisements intended to be used in commerce upon or
    in connection with the sale, offering for sale, distribution, or
12  advertising of goods or services on or in connection with which such
    use is likely to cause confusion, or to cause mistake, or to deceive.
13

14  A "trademark" means "any word, name, symbol, or device, or any combination thereof"

15  which a person uses "to identify and distinguish his or her goods . . . from those

16  manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127.

17  A trademark thus is "a limited property right in [a] particular word, phrase, or symbol . . .

18  that is used to identify a manufacturer or sponsor of a good or the provider of a service."

19  Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792, 806 n.12 (9th Cir. 2003) (quotation

20  and internal citation omitted).  The limited purpose of the Lanham Act's trademark

21  protection is "to avoid confusion in the marketplace by allowing a trademark owner to

22  prevent others from duping consumers into buying a product they mistakenly believe is

23  sponsored by the trademark owner." Id. at 806 (quotation and alteration omitted).

24          To prevail on a trademark claim, a plaintiff must show that the alleged mark at

25  issue is a cognizable trademark, i.e., that the public recognizes the symbol as identifying the

26  plaintiff's goods or services and distinguishes those goods or services from those of others.

14

1   Comedy III Prods., Inc. v. New Line Cinema, 200 F.3d 593, 594-95 (9th Cir. 2000).  A

2   plaintiff may meet this burden by showing either that its symbol is inherently distinctive, or

3   that even if not inherently distinctive, the symbol has become distinctive through the

4   acquisition of secondary meaning.  Id.  If the plaintiff establishes it has a cognizable mark,

5   it then must show the defendant's use of the plaintiff's trademark is "likely to cause

6   confusion or to cause mistake, or to deceive as to the affiliation, connection, or association

7   of the two products."  Mattel, Inc., 353 F.3d at 807 (quotation omitted).

8         Plaintiffs' registered mark consists of the words BOB MARLEY.  Plaintiffs also

9   contend, however, that their mark consists of any visual depiction of Marley.  Every court to

10  consider the issue has held there is no cognizable trademark in every single photograph ever

11  taken of a famous person.  For example, in ETW Corp. v. Jireh Publishing, Inc., the

12  plaintiff owned the exclusive licensing rights to exploit Tiger Woods' name, image,

13  likeness, and signature.  332 F.3d 915, 918 (6th Cir. 2003).  The plaintiff owned a

14  registered trademark for the mark "TIGER WOODS."  Id.  The defendant published a

15  painting entitled "The Masters of Augusta," which commemorated Woods' victory at the

16  Masters Tournament.  Id.  The painting depicted Woods in three different poses, and

17  included the likenesses of famous golfers of the past looking down on Woods.  Id.  The

18  limited edition prints of the painting were enclosed in a white envelope, which contained

19  the words "Tiger Woods" under the flap on the back of the envelope.  Id. at 918-19. Woods'

20  name also appeared in a narrative description of the painting.  Id. at 918.

21        In reviewing the plaintiff's Lanham Act trademark claim, the United States Court

22  of Appeals for the Sixth Circuit rejected as "untenable" the plaintiff's claim of trademark

23  protection "for any and all images of Tiger Woods."  Id. at 922.  As the Sixth Circuit put it,

24  the plaintiff--

25         asks us, in effect, to constitute Woods himself as a walking, talking
           trademark.  Images and likenesses of Woods are not protectable as a
26         trademark because they do not perform the trademark function of

> designation.  They do not distinguish and identify the source of goods.
> They cannot function as a trademark because there are undoubtedly
> thousands of images and likenesses of Woods taken by countless
> photographers, and drawn, sketched, or painted by numerous artists,
> which have been published in many forms of media, and sold and
> distributed throughout the world.  No reasonable person could believe
> that merely because these photographs or paintings contain Woods's
> likeness or image, they all originated with Woods.

Id.  The Sixth Circuit thus held that "as a general rule, a person's image or likeness cannot

function as a trademark," except perhaps in the limited circumstance where one specific

photograph consistently is used as a mark.  Id. at  922-23.

The Second Circuit reached a similar conclusion in Pirone v. MacMillan, Inc.,

894 F.2d 579 (2d Cir. 1990).  In that case, Babe Ruth's daughter brought suit against the

publisher of a baseball calendar which included three photographs of Babe Ruth.  Id. at 581.

Ruth's daughter did not claim any ownership in the particular photographs, but instead

objected to the use of Ruth's likeness, arguing she owned a trademark in Ruth's likeness,

even though the registered mark was only for the words "BABE RUTH."  Id.  The Second

Circuit rejected this claim:

> Although its registration is limited to the words "Babe Ruth," Pirone
> would have us read her rights in that word mark to include every
> photograph of Ruth ever taken.  We decline to do so.
>     . . .  Pirone's position finds support in neither precedent nor
> common sense.  Every case in which the owner of a word mark
> received protection against infringing use of a picture mark, or vice
> versa, involved a true picture mark, a single pictorial representation
> used repeatedly as an indication of origin. . . .
>     Unlike a stylized flying horse or similar picture marks, an
> individual's likeness is not a consistently represented fixed image–
> different photographs of the same person may be markedly dissimilar.
> Thus a photograph of a human being, unlike a portrait of a fanciful
> cartoon character, is not inherently "distinctive" in the trademark sense
> of tending to indicate origin.

Id. at 583.  The Second Circuit noted that a person's photograph may be a valid trademark

"if, for example, a particular photograph was consistently used on specific goods."  Id.  But

"[w]hatever rights Pirone may have in the mark 'Babe Ruth,' [the defendant's] use of

16

1   Ruth's name and photographs can infringe those rights only if that use was a 'trademark

2   use,' that is, one indicating source or origin.  As the district court correctly determined,

3   there was no 'trademark use' here."  Id.; see also Estate of Presley v. Russen, 513 F. Supp.

4   1339, 1363-64 (D.N.J. 1981) (rejecting a claim by Elvis Presley's estate that his image and

5   likeness was a valid mark, except for one particular image of Presley that consistently had

6   been used in the advertising and sale of Elvis Presley entertainment services to identify

7   those services).

8            Consistent with the above case law, Plaintiffs' registered mark BOB MARLEY

9   does not grant Plaintiffs a trademark in any and all photographs of Marley.  The evidence in

10   the record shows Plaintiffs use hundreds of different photographs of Marley on t-shirts and

11   other merchandise.  Thus, no single picture represents a Marley mark for Plaintiffs which

12   would act as a source identifier that is the equivalent to the word mark BOB MARLEY.

13   Plaintiffs' trademark claims in this case thus are limited to the registered word mark BOB

14   MARLEY.

15                    2.  Picture Equivalent

16            Plaintiffs argue that a picture can be the equivalent of a word mark and thereby

17   be entitled to trademark protection.  Defendants respond that the name of a celebrity as a

18   trademark does not equate with every single photo ever taken of that celebrity.

19            Some courts have held that a picture can be the equivalent of a registered word

20   mark.  For example, in Mobil Oil Corp. v. Pegasus Petroleum Corp., the Second Circuit

21   considered whether Mobil's use of a flying horse symbol was infringed by another company

22   calling itself Pegasus Petroleum.  818 F.2d 254, 255-56 (2d Cir. 1987).  The Second Circuit

23   concluded that while "words and their pictorial representations should not be equated as a

24   matter of law, a district court may make such a determination as a factual matter."  Id. at

25   257; see also Beer Nuts, Inc. v. King Nut Co., 477 F.2d 326, 329 (6th Cir. 1973) (holding

26   that picture of overflowing stein of beer on nuts package infringed on "BEER NUTS" word

1    mark).

2          While in some cases a word and its pictorial depiction may be equivalent, there is

3    no genuine issue of material fact that the Marley pictures are not the equivalent of the

4    registered word mark BOB MARLEY.  The pictorial equivalent cases are limited to a true

5    picture mark consisting of a single pictorial representation used repeatedly as an indication

6    of origin.  In the case of a human being, a picture of the person and the word mark are

7    equivalent only if the same picture consistently is used as a source indicator.  Because, as

8    discussed above, Plaintiffs did not use a single picture of Marley as a source indicator, any

9    and all pictures of Marley are not the pictorial equivalent of the word mark BOB MARLEY

10   as a matter of law.

11         3.  Use of the BOB MARLEY Mark

12         As a result of the above discussion, Defendants' use of Marley's image is not

13   actionable under trademark law.  However, Plaintiffs contend Defendants used the BOB

14   MARLEY word mark in connection with advertising the products, such as on websites and

15   on store signage.  Defendants respond that they did not use the mark, the retailers did, and

16   any such use is fair use of the mark to describe Defendants' product, and not as a source

17   indicator.

18         No genuine issue of material fact remains that Defendants did not use the

19   registered word mark BOB MARLEY.  The evidence in the record indicates that retailers

20   such as Target or Wet Seal used the words "Bob Marley" to describe the product.

21   However, Plaintiffs have presented no evidence that Defendants used the word mark on any

22   product or advertisement.  The only evidence Plaintiffs present of Defendants' use of

23   Marley's name consists of an unauthenticated, unidentified document, which appears to be

24   an internal Jem sales analysis report.  (Pls.' Opp'n, Ex. N.)  This document, even if

25   admissible, would not raise a genuine issue of fact as to trademark infringement because

26   Jem's use of the Marley name on an internal sales report does not show Jem used the mark

18

1   as a source indicator.  Additionally, the internal sales report would not cause any customer

2   confusion as there is no evidence it ever was shown to a customer.  Because Plaintiffs

3   present no evidence raising a genuine issue of material fact that Defendants used the BOB

4   MARLEY mark, and the word mark is the only viable trademark at issue in this case, the

5   Court will grant Defendants' motion for summary judgment on counts one and three of

6   Plaintiffs' Amended Complaint.

7   **B.  Count Two - Unfair Competition Under 15 U.S.C. § 1125(a)**

8              As discussed more fully below with respect to Plaintiffs' motion for summary

9   judgment, the Court will deny Defendants' motion for summary judgment on this claim.

10   **C.  Count Four - Nevada Rights of Publicity**

11             Defendants argue Plaintiffs have waived any rights to publicity they may have in

12   the State of Nevada because they did not timely register their claim as required under the

13   Nevada statute.  According to Defendants, Plaintiffs learned of unauthorized activity in

14   Nevada as early as 2001, but did not register until January 2006.  Defendants contend that

15   because the statute requires registration within six months of an unauthorized use, Plaintiffs

16   failed to timely register.  Defendants also argue that even if Plaintiffs are correct that

17   registration is required within six months of a particular defendant's use, Plaintiffs knew of

18   Defendants' use as early as February 2005, and thus their January 2006 registration is

19   untimely.  Defendants further contend that their use pre-dates Plaintiffs' registration, and

20   thus Plaintiffs cannot preclude their use under the Nevada statute.  Finally, Defendants

21   argue that the statute does not apply to individuals who died before the statute was enacted.

22             Plaintiffs respond that Defendants are misreading the statute, and that it does not

23   require registration within six months of the first unauthorized use or rights are forever

24   waived.  Rather, Plaintiffs argue, they need register only within six months of a particular

25   unauthorized use.  Plaintiffs contend an issue of fact remains as to when they first learned

26   of Defendants' use, as they dispute that Avela and Valencia even possessed Marley photos

19

1   in February 2005, much less showed them at the MAGIC show.  Plaintiffs also dispute they

2   knew of infringing activity in Nevada as early as 2001 because the evidence in the prior

3   case showed only that Plaintiffs were aware of infringing activity outside the state, and such

4   activity would not trigger the registration requirement in Nevada.

5          Nevada has enacted a statutory cause of action for the unauthorized use of a

6   person's rights of publicity in his or her name, voice, signature, photograph, or likeness.

7   Nev. Rev. Stat. § 597.770 et seq.  The right of publicity "endures for a term consisting of

8   the life of the person and 50 years after his death, regardless of whether the person

9   commercially exploits the right during his lifetime." Nev. Rev. Stat. § 597.790(1).  Others

10  cannot make commercial use of a person's rights of publicity without written consent of the

11  person or his successor in interest absent a few exceptions not relevant here.  Id.

12  § 597.790(2).  "Commercial use" means using the person's name, voice, signature,

13  photograph or likeness "on or in any product, merchandise or goods or for the purposes of

14  advertising, selling or soliciting the purchase of any product, merchandise, goods or

15  service." Id. § 597.770(1).  The statutory provisions "apply to any commercial use within

16  this state of a living or deceased person's name, voice, signature, photograph or likeness

17  regardless of the person's domicile." Id. § 597.780.

18         A successor in interest or a licensee of a deceased person may register their claim

19  to the deceased person's publicity rights by filing an application with Nevada's Secretary of

20  State.  Id. § 597.800(3).  The registration serves a notice function, as the statute requires

21  others wishing to make commercial use of a deceased person's publicity rights first to make

22  a reasonable, good faith effort to discover the identity of anyone who qualifies as a

23  successor in interest to the deceased person.  Id. § 597.800(5).  The statute places

24  consequences on the failure to register.  A successor in interest of a deceased person may

25  not assert any right against any unauthorized commercial use of the deceased person's

26  publicity rights that begins before the successor has filed an application to register his

20

1    claim.  Id. § 597.800(4).  Moreover,

2          [a] person claiming to be a successor in interest to a deceased person
       must, within 6 months after the date he becomes aware or should
3          reasonably have become aware of an unauthorized commercial use of
       the deceased person's name, voice, signature, photograph or likeness,
4          register a claim with the Secretary of State pursuant to subsection 3.
       Failure to register shall be deemed a waiver of any right of publicity.
5

6    Id. § 597.800(5).

7                        1.  Timely Registration

8          The parties dispute the statute's meaning, specifically the provision which

9    requires the timely registration within six months of an unauthorized use.  Defendants

10   contend that the statute requires registration within six months of any unauthorized use by

11   any person, or all rights to publicity in Nevada are waived forever.  Plaintiffs argue the

12   statute requires registration within six months of any particular use, or the rights are waived

13   only with respect to that particular use.

14         Nevada has not addressed this issue.  "Where the state's highest court has not

15   decided an issue, the task of the federal courts is to predict how the state high court would

16   resolve it."  Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007)

17   (quotation omitted).  "In answering that question, this court looks for 'guidance' to

18   decisions by intermediate appellate courts of the state and by courts in other jurisdictions."

19   Id. (quotation omitted).

20         Under Nevada law, statutory construction is a question of law for the Court.

21   Richardson Constr., Inc. v. Clark County Sch. Dist., 156 P.3d 21, 23 (Nev. 2007).  The

22   Court should construe the statute to give effect to the Legislature's intent.  Id.  The Court

23   begins with the statute's plain statutory language, giving effect to any unambiguous

24   language.  Id.  If the statutory language is ambiguous, the Court must "examine the statute

25   in the context of the entire statutory scheme, reason, and public policy to effect a

26   construction that reflects the Legislature's intent."  Id.

                                        21

1    By the statute's plain language, a successor in interest to a deceased person

2  "must" register their claim within six months of the date he became aware or reasonably

3  should have become aware of an unauthorized commercial use.  Failure to do so waives

4  "any" right of publicity.  Thus, upon discovering an unauthorized use by anyone, a

5  successor must register within six months or forever waive his claim to publicity rights in

6  the deceased person.  Registration is permissive until the successor learns of an

7  unauthorized use, at which point it becomes mandatory or the successor waives the claim to

8  publicity rights in Nevada.  The statutory scheme fosters certainty in the claims surrounding

9  publicity rights of a deceased person.  It encourages early registration by prohibiting a

10  successor from asserting rights against a use that began before registration.  And it

11  encourages registration upon learning of an unauthorized use by tying forfeiture of the right

12  to a failure to register.  The statute thus encourages registration both to protect successors'

13  rights, and to give potential users notice of prohibited uses.

14    However, the registration requirement is not triggered by a use outside of the

15  State.  Although § 597.800(5) references "an" unauthorized use, which does not clearly

16  limit it to Nevada, § 597.780 provides that the right of publicity statutory provisions "apply

17  to any commercial use within this state . . . ."  Consequently, the unauthorized use

18  triggering the registration requirement must be in Nevada.

19    Plaintiffs filed their registration on January 24, 2006.  To avoid forfeiture of their

20  publicity rights in Nevada, Plaintiffs must not have been aware, nor reasonably should have

21  been aware, of an unauthorized use of Marley's rights in Nevada prior to July 26, 2005.

22  Genuine issues of material fact remain as to when Plaintiffs first became aware of an

23  unauthorized use in Nevada.  Defendants have presented evidence that Plaintiffs were

24  aware of internet advertisements by Florida-based companies as early as 2001 and 2004.

25  Whether such internet activity constitutes a use "within" Nevada of which Plaintiffs were

26  aware or reasonably should have been aware is a question of fact for the jury.  Defendants

22

1   also have presented evidence that Valencia showed Plaintiffs' representatives the Marley

2   photos in February 2005.  However, Plaintiffs present evidence that the images they viewed

3   in February 2005 did not include any Marley images.  Plaintiffs also present evidence those

4   images could not have included Marley images because Rabanne testified he did not even

5   meet Valencia until July 2006.  Genuine issues of material fact therefore remain as to when

6   Plaintiffs first discovered or reasonably should have discovered an unauthorized use in

7   Nevada.

8          For these same reasons, genuine issues of material fact also remain as to whether

9   Defendants' use of the Marley images began before Plaintiffs' registration.  Plaintiffs

10   present evidence Defendants did not even meet Rabanne until six months after Plaintiffs'

11   registration, and thus could not have been using the Marley photos on merchandise prior to

12   Plaintiffs' registration.

13          2.  Application to Persons Who Died Before the Statute was Enacted

14          Defendants argue that even if Plaintiffs timely registered their rights of publicity,

15   the statute does not apply to a person who died before Nevada enacted the statute.

16   Defendants argue retroactive application of the statute would be inappropriate.  Plaintiffs

17   respond that by the statute's plain language, and by the Legislature's intent, it applies to

18   persons who pre-deceased enactment.  Plaintiffs also argue the retroactivity argument is a

19   red herring, as the statute was enacted long before Defendants' alleged unauthorized use,

20   and hence is not an attempt to retroactively apply the law to Defendants' conduct.

21          Nevada's statute states that it applies to "any commercial use within this state of

22   a living or deceased person's name, voice, signature, photograph or likeness regardless of

23   the person's domicile."  Nev. Rev. Stat. § 597.780.  Because the statute applied to a

24   deceased person upon enactment, it would apply to persons who were deceased prior to

25   enactment.  This understanding is supported by the legislative history, which discussed

26   Orson Welles' estate's difficulty policing the use of his image following his death, and that

1   this bill would stop such activity. (Mins. of the S. Comm. on Commerce & Labor, 65th

2   Sess. June 2, 1989.) Liberace and Elvis Presley also were referenced, including the

3   potential impact of the bill on impersonators of already-deceased celebrities like Elvis

4   Presley. (Id.; Mins. of the Assembly Comm. on Commerce, 65th Sess., June 16, 1989.)

5           The history of the California statute, California Civil Code § 3344.1, after which

6   the Nevada statute was patterned, also supports this conclusion. After two courts ruled that

7   California's statute did not apply to celebrities who already were dead upon enactment,[3]

8   California's legislature quickly enacted a clarification that made it clear that the statute in

9   fact did apply to pre-deceased celebrities, and always was meant to so apply to those

10  individuals. See Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., No. CV 05-

11  02200 MMM (MCx), 2008 WL 655604, at *2 (C.D. Cal. Jan. 7, 2008) (unpublished). In

12  ruling on a motion for reconsideration in one of those cases following the legislature's

13  action, the United States District Court for the Central District of California specifically

14  held this was a "clarification" stating what the law always was, not an amendment to

15  change the statute's original meaning. See id. at *4-13 ("In sum, in passing SB 771, the

16  2007 California legislature clearly expressed an intent to clarify § 3344.1 as originally

17  enacted."). Nevada's statutory language already states that it applies to deceased persons,

18  and as it was patterned after California's statute, Nevada need not adopt a clarifying

19  amendment to make clear that it likewise always has intended its statute to apply to persons

20  who died before enactment.

21  ///

22

23      [3] Shaw Family Archives Ltd. v. CMG Worldwide, Inc., 486 F. Supp. 2d 309, 314 (S.D.N.Y.
    2007) (holding that because California statute post-dated Marilyn Monroe's death, she had no celebrity
24  rights under California law to bequeath at her death); Milton H. Greene Archives, Inc. v. CMG
    Worldwide, Inc., No. CV 05-02200 MMM (MCx), 2008 WL 655604, at *1 (C.D. Cal. 2008)
25  (unpublished) (reviewing history in the case in which court previously had ruled that because Marilyn
    Monroe pre-deceased enactment of the publicity rights statute in California, she had no rights to
26  bequeath upon her death).

1        This interpretation of the statute does not make it retroactive.  Under Nevada law,

2   "statutes operate prospectively, unless the Legislature clearly manifests an intent to apply

3   the statute retroactively, or it clearly, strongly, and imperatively appears from the act itself

4   that the Legislature's intent cannot be implemented in any other fashion." Public

5   Employees' Benefits Program v. Las Vegas Metro. Police Dep't, 179 P.3d 542, 553 (Nev.

6   2008) (quotation omitted).  However, a statute does not operate retroactively simply by

7   drawing upon past facts. Id. Rather, "[a] statute has retroactive effect when it takes away

8   or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a

9   new duty, or attaches a new disability, in respect to transactions or considerations already

10  past." Id. at 553-54 (quotation omitted).  "That is, even though a statute operates only from

11  the time of its enactment, it is retroactive if it impairs vested rights and past transactions."

12  Id. To determine whether a statute applies retroactively, "courts are guided by fundamental

13  notions of fair notice, reasonable reliance, and settled expectations." Id. (quotation

14  omitted).

15       Here, the Nevada publicity rights statute does not take away or impair vested

16  rights, or place a new obligation, duty, or disability on transactions already past.  The statute

17  was enacted long before Defendants' use of Marley's image on t-shirts, and thus does not

18  retroactively impair Defendants' rights or impose new burdens on Defendants' past

19  conduct.  Considering notions of fair notice, reasonable reliance, and settled expectations,

20  the Nevada publicity rights statute does not operate retroactively simply because it takes

21  account of past facts.

22       Genuine issues of material fact remain as to whether Plaintiffs timely registered

23  their claims.  Additionally, the Nevada publicity rights statute applies to individuals who

24  were deceased prior to the statute's enactment.  The Court therefore will deny Defendants'

25  motion for summary judgment on this claim.

26  ///

### D.  Count Five - Interference With Prospective Business Advantage

Defendants move for summary judgment on this claim, arguing that because it depends upon Plaintiffs' other claims, they are entitled to summary judgment on this claim as well.  As discussed above with respect to the Nevada right of publicity claim and below with respect to unfair competition, Plaintiffs have claims that survive summary judgment. The Court therefore will deny Defendants' motion  for summary judgment on this claim as well.

## IV.  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Doc. #114)

Plaintiffs move for summary judgment on count two of their Amended Complaint, unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).  Plaintiffs contend no genuine issue of material fact remains that Defendants' use of Marley's image on the t-shirts falsely conveys to the customer that Plaintiffs approved the t-shirt. Defendants respond by arguing Plaintiffs never stated a false endorsement or false association claim in their Amended Complaint, and they cannot amend their pleadings at the summary judgment stage.  Defendants also contend that even if Plaintiffs pled the claim, it fails as a matter of law because using Marley's images on the shirts is not use of the images in advertising such that it would imply Marley endorsed the product.  Defendants argue that because Marley's image does not serve a source-identifying function, Plaintiffs fail to state a false endorsement claim.

### A.  The Amended Complaint

Defendants contend Plaintiffs never asserted a false association or false endorsement claim in the Amended Complaint, and that Plaintiffs are trying to avoid summary judgment through amendment.  Plaintiffs respond that their Amended Complaint contains allegations regarding false endorsement or association, and in any event, Defendants are not prejudiced by any amendment because the parties have been litigating the same facts and issues all along.

1    Count two of the Amended Complaint alleges Defendants' use of the "Marley

2  Intellectual Property" in connection with selling t-shirts "constitutes a false designation of

3  origin and/or a false or misleading description or representation of fact, which is likely to

4  cause confusion . . . as to affiliation, connection, or association with Plaintiffs, or as to the

5  origin, sponsorship, or approval of Defendants' products or commercial activities by

6  Plaintiffs." (Am. Compl. at 8.)  The Amended Complaint defines the "Marley Intellectual

7  Property" as including but not limited to the particular registered marks.  (Id. at 4.)  Several

8  allegations in the factual recitation also refer to false association or sponsorship.  For

9  example, Plaintiffs allege they have spent substantial funds enforcing their rights in the

10  Marley Intellectual Property and Defendants "were and are attempting to create an

11  association between the Infringing Merchandise and the authorized Marley merchandise

12  sold and licensed through Hope Road and Rootswear." (Id. at 4, 7.)  Plaintiffs also alleged

13  that Defendants acted "with the bad faith intent to profit from the name and likeness of

14  Robert Nesta Marley and the associated and registered Rights of Publicity owned by Hope

15  Road." (Id.)  Additionally, the prayer for relief requested the Court permanently enjoin

16  Defendants from "using Marley's name, voice, signature, photograph, or likeness in

17  commerce . . . ." (Id. at 11.)

18    These allegations are sufficient to put Defendants on notice that a false

19  association claim was at issue in the case.  The parties have litigated throughout this case

20  not only whether Defendants used the BOB MARLEY mark, but also Defendants' use of

21  Marley's image.  Even if the Amended Complaint's allegations did not adequately apprise

22  Defendants of the claim, Defendants do not identify how they are prejudiced by Plaintiffs'

23  pursuit of this theory.  See Mir v. Fosburg, 646 F.2d 342, 347 (9th Cir. 1980) (noting the

24  "general principle" that the federal rules "evince a belief that when a party has a valid

25  claim, he should recover on it regardless of his counsel's failure to perceive the true basis of

26  the claim at the pleading stage, provided always that a late shift in the thrust of the case will

27

1   not prejudice the other party in maintaining his defense upon the merits").

2       **B. Merits**

3          Some courts, including the United States Court of Appeals for the Ninth Circuit,

4   have held that under § 1125(a) of the Lanham Act, a celebrity may assert an unfair

5   competition claim where the defendant uses the celebrity's persona without permission to

6   suggest false endorsement or association.  For example, in Downing v. Abercrombie &

7   Fitch, a retailer used in its apparel catalog a picture of a famous surfer without his

8   permission.  265 F.3d 994, 1000 (9th Cir. 2001).   The surfer sued, asserting, among other

9   things, violation of § 1125(a) of the Lanham Act.  Id.  The Ninth Circuit adapted its test for

10  trademark infringement as set forth in AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir.

11  1979) (the "Sleekcraft factors"), indicating that for celebrity cases "the term 'mark' applies

12  to the celebrity's persona, the 'strength' of the mark refers to the level of recognition that

13  the celebrity has among the segment of the public to whom the advertisement is directed,

14  and the term 'goods' concerns the reasons for or source of the celebrity's fame."  Id. at

15  1007.  The Ninth Circuit held a genuine issue of material fact remained concerning a

16  likelihood of confusion as to whether the surfer endorsed the products in the catalog.  Id. at

17  1008-09.

18         Other cases have reached a similar result.  For example, in White v. Samsung

19  Electronics America, Inc., the defendant ran an advertisement for video-cassette recorders

20  ("VCRs") which depicted a robot dressed and posed to look like Vanna White standing next

21  to a Wheel of Fortune game board.  971 F.2d 1395, 1396 (9th Cir. 1992).  White did not

22  consent to the ads and was not paid.  Id.  White sued for, among other things, a violation

23  under § 1125(a).  Id.  The Ninth Circuit stated that to prevail on this claim, White "is

24  required to show that in running the robot ad, [the defendants] created a likelihood of

25  confusion . . . over whether White was endorsing [the defendants'] VCRs."  Id. at 1399-

26  1400 (internal citations omitted).  The Ninth Circuit applied the modified Sleekcraft factors

1   and held a genuine issue of material fact remained as to a likelihood of confusion as to

2   White's endorsement of the VCRs. Id. at 1401.

3        Similarly, in Wendt v. Host International, Inc., actors George Wendt and John

4   Ratzenberger, "Norm" and "Cliff" from the television show "Cheers," sued a robot creator

5   who made robots based upon Wendt's and Ratzenberger's likenesses without their

6   permission and placed these robots in airport bars modeled upon the Cheers set. 125 F.3d

7   806, 809 (9th Cir. 1997). The actors brought a claim under § 1125(a) for false

8   endorsement. Id. The Ninth Circuit stated that "[a] false endorsement claim based on the

9   unauthorized use of a celebrity's identity . . . alleges the misuse of a trademark, i.e., a

10  symbol or device such as a visual likeness, vocal imitation, or other uniquely distinguishing

11  characteristic, which is likely to confuse consumers as to the plaintiff's sponsorship or

12  approval of the product." Id. at 812 (quotation omitted). The Court again applied the

13  modified Sleekcraft factors and held a genuine issue of material fact remained as to whether

14  the robots created a likelihood of consumer confusion as to the actors' association with or

15  sponsorship of the bars. Id. at 812-14.

16       In each of these cases, the Ninth Circuit set forth the Sleekcraft factors to

17  consider in determining whether a likelihood of confusion exists in a celebrity endorsement

18  or association case:

19      1. the level of recognition that the plaintiff has among the segment of
    the society for whom the defendant's product is intended;
20      2. the relatedness of the fame or success of the plaintiff to the
    defendant's product;
21      3. the similarity of the likeness used by the defendant to the actual
    plaintiff;
22      4. evidence of actual confusion;
        5. marketing channels used;
23      6. likely degree of purchaser care;
        7. defendant's intent on selecting the plaintiff; and
24      8. likelihood of expansion of the product lines.

25  Downing, 265 F.3d at 1007-08. These factors are not necessarily of equal importance nor

26  will all necessarily apply in every case. Id. at 1008. For example, "[e]vidence of actual

1   confusion is persuasive proof that future confusion is likely." <u>Fuddruckers, Inc. v. Doc's</u>

2   <u>B.R. Others, Inc.</u>, 826 F.2d 837, 845 (9th Cir. 1987).  The inquiry is factual in nature, and

3   summary judgment therefore is not appropriate when a jury reasonably could conclude there

4   is, or is not, a likelihood of confusion.  <u>Downing</u>, 265 F.3d at 1007-08.

5          There is little dispute as to many of these factors.  Defendants do not dispute

6   Marley is a well known musician, and thus no genuine issue of material fact remains that

7   Marley has a strong level of recognition among the segment of the society for whom

8   Defendants' t-shirts are intended.  Marley's success is related to his talents as a musician.

9   As it is not at all unusual for musicians to be featured on t-shirts, Marley's success as a

10  singer is closely related to Defendants' t-shirts.  One retailer's website referred to one of

11  Defendants' t-shirts as a "concert" t-shirt.  Other t-shirts included song or album titles

12  directly on the shirt, thus further tying the products to Marley's status as a musician.  It is

13  undisputed that Defendants used an exact likeness of Marley on their t-shirts.  Further, the

14  parties agree purchasers are unlikely to exercise much care in the purchase of t-shirts.

15         As to the fifth factor, Defendants argue they use different marketing channels

16  because Plaintiffs specifically have averred they do not use mass market retailers and seek

17  to target only smaller shops.  Although Plaintiffs aver they are not interested in mass market

18  retail, both Plaintiffs and Defendants use the internet to advertise and sell their products.

19  The parties also both displayed their products at MAGIC trade shows.  Moreover, at least

20  one retailer, Wet Seal, indicated that it simultaneously stocked Plaintiffs' and Defendants'

21  products, but later switched to Defendants' products because they were less expensive.

22  (Pls.' MSJ, Pietrini Decl., Ex. W at 75-76.)  Although some of the marketing channels may

23  have been different, no genuine issue of material fact remains that both parties used the

24  internet, the MAGIC shows, and at least one similar retailer.

25         However, viewing the evidence in the light most favorable to Plaintiffs on

26  Defendants' motion for summary judgment on this claim, genuine issues of material fact

1   remain on the issue of likelihood of confusion.  Plaintiffs present evidence of actual

2   confusion in the form of their survey.  The survey concluded twenty percent of the test

3   group was confused about Marley's association with or sponsorship of the t-shirts.  The

4   Ninth Circuit has held that surveys are an appropriate method of demonstrating consumer

5   confusion, and that a twenty-seven percent confusion rate was sufficient for a reasonable

6   jury to conclude actual confusion existed.  See Thane Int'l, Inc. v. Trek Bicycle Corp., 305

7   F.3d 894, 902-03 (9th Cir. 2002); see also Jada Toys, Inc. v. Mattell, Inc., 518 F.3d 628,

8   636 (9th Cir. 2008) (holding a reasonable trier of fact could find likelihood of trademark

9   dilution where surveys showed twenty-eight and seven percent confusion, respectively).

10   Therefore, Plaintiffs have presented sufficient evidence raising a genuine issue of material

11   fact of actual confusion to survive Defendants' motion for summary judgment.

12          Viewing the evidence in the light most favorable to Defendants on Plaintiffs'

13   motion for summary judgment, Defendants also have raised an issue of fact on actual

14   confusion.  Defendants note that many of the survey results do not show confusion as to

15   source, sponsorship, or association.  When asked who made or put out the t-shirt, seventeen

16   percent of the test group answered Avela or X One X and nine percent stated Bob Marley or

17   the person on the t-shirt.  Most people answered someone other than Defendants or

18   Plaintiffs to this question, thus suggesting no source confusion as between Defendants' and

19   Plaintiffs' products.  When asked whether the t-shirt maker received permission from

20   someone to put out the t-shirt, forty-one percent of test group said no.  Even of the group

21   who said the manufacturer needed someone's permission, only thirty-seven percent of the

22   test group answered Bob Marley or the person on the shirt.  Consequently, although a

23   reasonable juror could find actual confusion based on the survey data, that data is not so

24   compelling that a reasonable jury could not conclude the survey evidence is insufficient to

25   support a finding of likelihood of confusion.  Thane Int'l, Inc., 305 F.3d at 904 (holding

26   jury could give survey evidence "little or no credence" based on the defendant's criticisms

31

1   and lack of compelling data).

2         In addition to disputing the survey evidence, Defendants contend no genuine

3   issue of fact remains on likelihood of confusion under the reasoning in Cairns v. Franklin

4   Mint Co., 292 F.3d 1139 (9th Cir. 2002). In that case, the plaintiffs were the trustees of the

5   Diana Princess of Wales Memorial Fund ("the Fund") and the executors of Princess Diana's

6   estate. Cairns, 292 F.3d at 1144. The Fund sued the Franklin Mint, which used Diana's

7   image on jewelry, plates, and dolls, and in ads for these products. Id. The Mint and other

8   companies had been using Diana's image on like products since she married Prince Charles

9   in 1981. Id. During her lifetime, "Princess Diana neither authorized nor objected to any of

10  these products." Id.

11        After Diana's death, her estate exclusively authorized the Fund to use Diana's

12  name and likeness to accept donations for various charities with which Princess Diana was

13  associated during her lifetime. Id. The Fund in turn authorized certain other parties, but not

14  the Mint, to use Diana's name and likeness to sell products in the United States. Id. When

15  the Mint continued to use Diana's likeness on products following her death, the Fund sued

16  the Mint alleging, among other things, false endorsement and false advertising under

17  § 1125(a). Id.

18        In reviewing the false endorsement claim under § 1125(a), the Ninth Circuit held

19  no genuine issue of material fact remained as to a likelihood of confusion that Diana

20  endorsed the products given the history of unauthorized products during her lifetime which

21  she neither objected to nor endorsed:

22      Between 1981 and 1997, many products, including some that were
        largely indistinguishable from Franklin Mint products, bore the name

23      and likeness of Princess Diana, who neither endorsed nor objected to
        any of these products. Consumers, therefore, had no reason to believe

24      Franklin Mint's Diana-related products were endorsed by the Princess.
        This did not change when, following Princess Diana's death in 1997,

25      the Fund endorsed approximately twenty products-but not Franklin
        Mint's-amidst a flood of un-endorsed Diana-related memorabilia.

26      Under these circumstances, there was no likelihood of confusion as to

1   the origin of Franklin Mint's Diana-related products.

2   Id. at 1149-50 (emphasis omitted).

3   Here, the evidence is conflicting on whether Marley was aware of the

4   unauthorized use of his image on products like t-shirts or posters during his lifetime.

5   Rabanne wrote in a letter to Valencia that Marley was aware of Rabanne selling

6   photographs of Marley and that Marley approved of those sales and related sales on other

7   merchandise.  However, Rabanne recanted when he testified under oath, and instead stated

8   that he suspected Marley knew Rabanne was selling photos, but that Rabanne did not use

9   the photos to sell other merchandise, such as t-shirts.  Defendants present no other evidence

10  that during his lifetime, Marley neither endorsed nor objected to others' use of his image on

11  merchandise, such that, like the Princess, the consumer would not be confused as to his

12  endorsement of such products.  The evidence in the record suggests that following his

13  death, the owners of the Marley rights have made commercial use of his image and have

14  enforced their rights by seeking to preclude others' use of Marley's image on merchandise.

15  Consequently, this case is distinguishable from Cairns, and an issue of fact remains as to

16  whether consumers would be confused as to Plaintiffs' endorsement or association with t-

17  shirts bearing Marley's likeness.

18  Finally, Defendants argue celebrity claims are limited to use of the celebrity's

19  likeness in advertising to endorse another product, and do not extend to use of the

20  celebrity's likeness directly on the defendant's product.  However, the robots in Wendt were

21  not used in advertising.  Rather, the robots were placed inside the airport bars as part of the

22  bar decor.  Further, in Cairns, the Ninth Circuit did not indicate that use of the Princess's

23  image on the products themselves could not form the basis of a celebrity false association or

24  endorsement claim under § 1125(a).

25  Likewise, in Parks v. LaFace Records, the defendants were a rap music duo who

26  used Rosa Parks' name as a song title.  329 F.3d 437, 441, 442-43 (6th Cir. 2003).  The

33

1  defendants put a sticker on the album indicating the "Rosa Parks" song was a "hit single."

2  Id. at 442. The same sticker also contained a parental advisory for explicit lyrics. Id. Parks

3  sued, contending use of her name was false advertising under § 1125(a), as well as violative

4  of her rights of publicity under Michigan state law. Id. The Sixth Circuit stated that

5  § 1125(a) "extends beyond disputes between producers of commercial products and their

6  competitors. It also permits celebrities to vindicate property rights in their identities against

7  allegedly misleading commercial use by others." Id. at 445. The Sixth Circuit rejected the

8  defendants' argument that Parks failed to state a claim under the Lanham Act because the

9  defendants did not make a "trademark use" of her name. Id. at 446-47. The Sixth Circuit

10 held that "even though Rosa Parks' name might not be eligible for registration as a

11 trademark, and even though Defendants were not selling Rosa Parks-brand CD's, a viable

12 cause of action also exists under § [1125(a)] if consumers falsely believed that Rosa Parks

13 had sponsored or approved the song, or was somehow affiliated with the song or the

14 album." Id. at 447; see also ETW Corp., 332 F.3d at 924 (stating that the elements of a

15 § 1125(a) false endorsement claim are similar to the elements of a state law right of

16 publicity claim and therefore cases which address either type of claim would be instructive).

17        Consequently, celebrity false association cases are not limited to the situation

18 where the defendant uses the celebrity to advertise another product. Such cases may

19 include use of the celebrity's persona directly on or as part of the defendant's product.

20        Genuine issues of fact remain as to Plaintiffs' and Defendants' motions for

21 summary judgment on Plaintiffs' unfair competition claim in count two. The Court

22 therefore will deny both motions.

## IV. CONCLUSION

24        IT IS THEREFORE ORDERED that Defendants' Motion for Summary

25 Judgment (Doc. #113) is hereby GRANTED in part and DENIED in part. The motion is

26 granted as to counts one and three of Plaintiffs' Amended Complaint. The motion is denied

Case 2:08-cv-00105-PMP-GWF   Document 145   Filed 02/25/10   Page 35 of 35

1   in all other respects.

2        IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Adjudication

3   on Plaintiffs' False Association Claim Under 15 U.S.C. § 1125(a) (Doc. #114) is hereby

4   DENIED.

5        IT IS FURTHER ORDERED that the parties shall file a proposed joint pretrial

6   order on or before March 26, 2010.

7        IT IS FURTHER ORDERED that this case is set for Trial for Tuesday, July 13,

8   2010, at 9:00 a.m. in Courtroom 7C.  The parties shall appear for Calendar Call on

9   Wednesday, July 7, 2010, at 9 a.m. in Courtroom 7C.

10

11  DATED:   February 25, 2010

12

13                                              PHILIP M. PRO
                                            United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

1

2

3

4

SERVICE LIST FOR:

Fifty-Six Hope Road Music, Ltd., et al.
vs.
A.V.E.L.A., Inc., a Nevada corporation; et al.,
And Related Counterclaim.
Case No. 2:08-cv-00105-PMP-GWF

| | |
|---|---|
| 5 | Melissa W. Woo-Allen<br>2647 Gateway Road, Suite 105-550 |
| 6 | Carlsbad, CA 92009<br>Telephone: (877) 787-4855 |
| 7 | |
| 8 | |
| 9 | William R. Urga<br>L. Christopher Rose<br>JOLLEY, URGA, WIRTH, |
| 10 | WOODBURY & STANDISH<br>3800 Howard Hughes Pkwy. |
| 11 | Wells Fargo Tower, 16th Floor<br>Las Vegas, NV 89169 |
| 12 | Telephone: (702) 699-7500; Facsimile: (702) 699-7555 |

5   Melissa W. Woo-Allen
    2647 Gateway Road, Suite 105-550
6   Carlsbad, CA 92009
    Telephone: (877) 787-4855
7

8

9   William R. Urga
    L. Christopher Rose
    JOLLEY, URGA, WIRTH,
10   WOODBURY & STANDISH
    3800 Howard Hughes Pkwy.
11  Wells Fargo Tower, 16th Floor
    Las Vegas, NV 89169
12  Telephone: (702) 699-7500; Facsimile: (702) 699-7555

13  Timothy J. Ervin, Esq.
    GALLANT & ERVIN, LLC
14  One Olde North Road, Suite 103
    Chelmsford, MA 01824
15  Telephone: (978) 256-6041; Facsimile: (978) 256-7977

16  Jeffrey R Albregts
    SANTORO, DRIGGS, WALCH,
17  KEARNEY, HOLLEY & THOMPSON
    400 South Fourth Street, Third Floor
18  Las Vegas, NV 89101
    Telephone: (702) 791-0308; Facsimile: (702) 791-1912

19  John R. Yates
    GREENBERG & BASS, LLP
20  16000 Ventura Boulevard
    Encino, CA 90077
21  Telephone: (818) 382-6200; Facsimile: (818) 986-6534

22  Gaston Kroub
    LOCKE LORD BISSELL & LIDDELL, LLP
23  3 World Financial Center
    New York, NY 10281
24  Telephone: (212) 415-8600; Facsimile: (212) 303-2754

25  Robert C. Kain, Jr.
    KAIN & ASSOCIATES
26  900 S.E. Third Avenue, Suite 205
    Fort Lauderdale, FL 33316
27  Telephone: (954) 768-9002; Facsimile: (818) 986-6534

28

Email: melissaw@counselatlaws.com

Counsel for Defendants and
Counterclaimants A.V.E.L.A., INC., and
LEO VALENCIA and for Defendant
CENTRAL MILLS, INC. (FREEZE)

Email: wru@juww.com
Email: lcr@juww.com

Co-Counsel for Plaintiffs and Counter-
Defendants FIFTY-SIX HOPE ROAD
MUSIC LIMITED and ZION
ROOTSWEAR, LLC

Email: tim@gallant-ervin.com

Co Counsel for Plaintiff and Counter-
Defendant ZION ROOTSWEAR, LLC

Email: jalbregts@nevadafirm.com

Counsel for Defendant JEM
SPORTSWEAR

Email: jyates@greenbass.com

Counsel for Defendant JEM
SPORTSWEAR

Email: gkroub@lockelord.com

Counsel for Non-Party Pricepoint
Accessories d/b/a/ Section 8

Email: rkain@complexip.com

Counsel for Non-Party JGR Copa, LLC

1

## PROOF OF SERVICE

2

I, Cristina Ongsing, declare as follows:

3

4
5

I am employed in Los Angeles County, Los Angeles, California. I am over the age of eighteen years and not a party to this action. My business address is Sheppard, Mullin, Richter & Hampton LLP, 1901 Avenue of the Stars, Suite 1600, Los Angeles, CA 90067-6055. On November 21, 2012, I caused the forgoing document:

6

7

**PLAINTIFFS FIFTY-SIX HOPE ROAD MUSIC LIMITED'S AND ZION ROOTSWEAR, LLC'S NOTICE OF CROSS APPEAL AND REPRESENTATION STATEMENT**

8
9

including any and all exhibits, to be electronically filed with the Clerk of Court using the CM/ECF system, which will effectuate service of said document upon the following counsel of record in this action addressed as follows:

10

11

### SEE ATTACHED PROOF OF SERVICE LIST

12
13

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made and that the foregoing is true and correct.

14

Executed on November 21, 2012, at Los Angeles, California.

15

16

/s/Cristina Ongsing
Cristina Ongsing

17

SMRH:407371789.1

18

19

20

21

22

23

24

25

26

27

28

1

SERVICE LIST FOR:

2

Fifty-Six Hope Road Music, Ltd., et al.
vs.

3

A.V.E.L.A., Inc., a Nevada corporation; et al.,
And Related Counterclaim.

4

Case No. 2:08-cv-00105-PMP-GWF

5
Melissa W. Woo-Allen                    Email:  melissaw@counselatlaws.com
2647 Gateway Road, Suite 105-550

6
Carlsbad, CA 92009                       Counsel for Defendants and
Telephone:  (877) 787-4855            Counterclaimants A.V.E.L.A., INC., and

7
LEO VALENCIA and for Defendant
CENTRAL MILLS, INC. (FREEZE)

8
William R. Urga                              Email: wru@juww.com

9
L. Christopher Rose                        Email: lcr@juww.com
JOLLEY, URGA, WIRTH,

10
 WOODBURY & STANDISH               Co-Counsel for Plaintiffs and Counter-
3800 Howard Hughes Pkwy.           Defendants FIFTY-SIX HOPE ROAD

11
Wells Fargo Tower, 16th Floor          MUSIC LIMITED and ZION
Las Vegas, NV 89169                      ROOTSWEAR, LLC

12
Telephone:  (702) 699-7500; Facsimile:  (702) 699-7555

13
Timothy J. Ervin, Esq.                     Email:  tim@gallant-ervin.com
GALLANT & ERVIN, LLC

14
One Olde North Road, Suite 103      Co Counsel for Plaintiff and Counter-
Chelmsford, MA 01824                    Defendant ZION ROOTSWEAR, LLC

15
Telephone:  (978) 256-6041; Facsimile:  (978) 256-7977

16
Jeffrey R Albregts                           Email: jalbregts@nevadafirm.com
SANTORO, DRIGGS, WALCH,

17
KEARNEY, HOLLEY & THOMPSON       Counsel for Defendant JEM
400 South Fourth Street, Third Floor   SPORTSWEAR

18
Las Vegas, NV 89101
Telephone:  (702) 791-0308; Facsimile: (702) 791-1912

19
John R. Yates                                 Email: jyates@greenbass.com

20
GREENBERG & BASS, LLP
16000 Ventura Boulevard               Counsel for Defendant JEM

21
Encino, CA 90077                           SPORTSWEAR
Telephone:  (818) 382-6200; Facsimile:  (818) 986-6534

22
Gaston Kroub                                 Email:  gkroub@lockelord.com

23
LOCKE LORD BISSELL & LIDDELL, LLP
3 World Financial Center                 Counsel for Non-Party Pricepoint

24
New York, NY 10281                        Accessories d/b/a/ Section 8
Telephone:  (212) 415-8600; Facsimile: (212) 303-2754

25
Robert C. Kain, Jr.                          Email:  rkain@complexip.com

26
KAIN & ASSOCIATES
900 S.E. Third Avenue, Suite 205     Counsel for Non-Party JGR Copa, LLC

27
Fort Lauderdale, FL 33316
Telephone:  (954) 768-9002; Facsimile:  (818) 986-6534

28